| | | |
|---|---|---|
| Lance Yarus, D.O. | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No.: 2:14-CV-01656- CDJ |
| vs. | : | |
| | : | |
| Walgreen Company | : | |
| | : | |
| | : | JURY TRIAL DEMANDED |
| & | : | |
| Walgreen Eastern Co., Inc | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGEMENT FILED BY DEFENDANTS' WALGREEN CO. AND WALGREEN EASTERN CO.**

## I.     Procedural History

1.     Denied as stated. This is an action for Defamation and Interference with present and prospective contractual relations.

2.     Admitted.

3.     Denied as stated. Plaintiff's Motion to Amend the Complaint which the Court granted sought to do two things. The first was to add Walgreen Eastern Co. Inc. as a Defendant and the second was to add an allegation with respect to Plaintiff's heart attack and the need for bypass surgery as an item of damages. (***Exhibit 1 Amended Complaint with exhibits thereto***)

## II. **Summary of Argument**

4. Denied.

  Defendants argue that the statements made by their pharmacists to Plaintiff's patients were not defamatory because no damages resulted from these defamatory statements. They argue that the statement in the prescriber profile was not published, and if published the repetition of that statement by the pharmacists was privileged. Finally, they argue that the statute of limitations bars any claims for defamatory statements made on May 1, 2009 and July 23, 2010.

  Defendant's Motion confuses and conflates the issue of the defamatory nature of a statement with the damages caused by that defamatory statement. It is not necessary that a communication actually cause harm to another's reputation or deter third persons from associating or dealing with him, rather, its defamatory character depends on its general tendency to have such an effect.

  A statement by defendant accusing the Plaintiff of a criminal offense or conduct which is incompatible with the proper practice of Plaintiff's business or profession constitutes slander per se. Where the communication constitutes slander per se, a Plaintiff is not required to prove special harm, i.e. pecuniary loss. Rather a defendant who publishes a statement which is slander per se is liable for the proven "actual harm" the publication causes.

  The statement by defendant's pharmacist which repeated and relied upon false information in defendant's prescriber profile constitute slander per se because it accuses Plaintiff of both a crime [unlawful prescribing of a controlled substance] and conduct which is incompatible with the proper practice of his profession.

Defendant misstates the law with respect to the damages recoverable for a defamatory statement. A Plaintiff can recover damages for "actual harm" caused by a defamatory statement. While reputational harm is certainly a component of actual harm, it is not the only type of actual harm damage. ***Even in the absence of reputational harm***, a Plaintiff can recover for embarrassment, humiliation, and emotional distress caused by the defamatory statement.

Defendant ignores the fact that Plaintiff had a heart attack and was required to undergo emergency bypass surgery due at least in part to the emotional distress he was suffering as a result of Defendants defamatory statements.

Plaintiff incurred hospital and medical bills in the sum of $105,581.48, recoverable both as "actual harm" and "special harm" damages, which is pecuniary or economic loss. Defendant further ignores the fact that based upon an evaluation made by Plaintiff's expert; there is also evidence of additional special harm for the loss of patient income in excess of $2.4 million dollars.

Indeed, it was because of the actual harm damages resulting from Plaintiff's heart attack that counsel for defendants, on the same day that he filed his Motion for Summary Judgement also filed a Motion with this court seeking to add James Tinnyo, Esquire and his law firm Thomas, Thomas, and Hafer to the Verdict Slip, or alternatively join them as third-party defendants.

Plaintiff is entitled to recover for the publication which results from repetition by defendants' pharmacists of the defamatory statement about Plaintiff contained in Defendant's prescriber profile, where that repetition is the natural and probable result of the original publication.

It is a question of fact for the jury, as to whether the repetition is the natural and probable result of the original publication. Reasonable jurors can find that Walgreens should have anticipated that the statement in the prescriber profile that Plaintiff was being investigated by the DEA, would be interpreted by the individual pharmacist to mean that the reason he was being investigated was that he was a 'pill-pusher' that 'prescribed narcotics and did very little treating'. Indeed that is precisely how it was interpreted by Karen Gondos, one of the patients to whom the defamatory statement was made by Defendants' pharmacists.

Under Pennsylvania law, substantial circumstantial evidence can establish the publication element in a defamation case. Reasonable jurors can find that this repetition is the natural and probable result of the original publication in the prescriber profile which falsely accuses Plaintiff of being investigated by the DEA.

Reasonable jurors can find that defendants' in house attorneys, Brett Stacey, Esq. and Michael Freeman, Esq. each made admissions against interest, acting within the scope of their authority which established the publication of the defamatory statement in the prescriber profile.

On May 7, 2009, Linda Schick, Esq. sent a letter to the Walgreen Co. legal department stating that she represented Dr. Yarus "regarding his claims for injuries stemming from Walgreens' actions which constitute libel and slander."

She further stated that a defamatory statement was made to one of his patients on May 1, 2009 at a Walgreens pharmacy located at 2014 S. Broad Street. She identified the defamatory statement by stating the patient was informed the "prescriptions written by Dr. Yarus would not be filled as Dr. Yarus is under investigation by the Drug Enforcement Agency [DEA]."

Michel Freeman, Esquire, in house attorney for Walgreen's, acting as its authorized agent, contacted Ms. Schick by phone and advised her that he would investigate the allegations in her letter.

Freeman knew that Ms. Schick was representing an adverse party, when he got back to her three months later on August 17, 2009. For this reason, he knew that his conversation with her about the results of his investigation could not be a casual one but rather one in which he needed to choose his words carefully.

In that conversation, he advised her that the statement had been removed from the computer system and all staff had been counseled and reprimanded. He further stated that the computer system does not hold history so they have no idea how the statement was put into the system.

Reasonable jurors can find that Freeman had the ability to determine what the pharmacist had told Caroline Bailey as well as the ability to determine whether the information in the prescriber profile should not have been put into it.

Reasonable jurors can find this statement by Freeman to be an admission against interest. Those jurors can find that Freeman, after making this investigation; [1] determined the statement referred to in her letter was in fact in the Walgreen computer system; [2] that the Walgreen pharmacist published and repeated the statement to Plaintiff's patient; [3] that Walgreens does not know how the statement was put into the computer system and therefore it had no basis for putting it into the computer system; and [4] by acknowledging that the statement had been removed from the computer system and all staff had been reprimanded and counseled, the remark was false and never should have been placed into the system.

In the letter she sent to Brett Stacey, Esq. a year later, on July 26, 2010, she identified the pharmacy to which another patient had gone, the date on which he had gone as July 23, 2010, and that the statement made to that patient was similar to that made a year earlier. She included a copy of her earlier letter so that he knew that this was not an isolated incident.

In his response to her by email on July 30, 2010, he also stated that the remark had been removed from the computer system. At her request, he followed up with a letter written directly to the Plaintiff on August 13, 2010. That letter stated that the remark had been removed from the computer system and that there was no way of identifying the party who put it in there.

Stacey's email to Schick and his letter to Plaintiff are, just as with the statement by Freeman, admissions against interest. These admissions would allow reasonable jurors to find that the defamatory statements to Caroline Bailey, Fred Bartley, and Jason Robinson had, in fact, been made and published by repetition of the individual pharmacist.

Allowing false and defamatory information to remain in its prescriber profile after defendants' authorized agents stated it had been removed, and after being put on notice of its falsity, would permit reasonable jurors to find that defendants acted with actual malice.

Moreover, defendants in at least three places [***Freeman statement to Schick on August 17, 2009; Brett Stacey's letter to Yarus dated August 13, 2010; and Defendants' Answers to Interrogatories***] have admitted that they have no way of determining the source or identity of the person relied upon in placing the false information into their computer system. They have further admitted in their Answers to Interrogatories that they have no written policy that contained any restriction upon when individual pharmacists could place information into the prescriber profile.

6

These admissions would also allow reasonable jurors to find that defendants acted with reckless disregard for the truth, and therefore acted with actual malice. Defendants' acknowledgement that it had no source to rely upon in placing the false information into the prescriber profile is a classic example of reckless disregard for the truth which constitutes actual malice.

If the jury finds that defendants acted with actual malice, Plaintiff can recover presumed damages [for reputational harm] as well as punitive damages even in the absence of actual harm.

Defendant in arguing that its pharmacists had a privilege to give false and defamatory information about Plaintiff to his patients when refusing to fill prescriptions he had written for them, overlooks the fact that conditional privileges are no longer part of Pennsylvania defamation law, and are considered superfluous in light of first amendment jurisprudence superimposed on the state law of defamation which requires proof of negligence before there can be a recovery for defamation.

For this reason defendant also ignores the fact that Plaintiff, by proving that the defendant acted, at least, negligently in publishing a false and defamatory statement will have defeated any privilege with respect thereto.

In this case, there is substantial evidence that will allow a jury to find not only negligence but actual malice in the form of reckless disregard for the truth in repeating and publishing the false and defamatory statements concerning Plaintiff.

It also ignores the fact that defendant and its pharmacists could easily have determined that the information was false by using a DEA hotline available to pharmacists with respect to physicians who have DEA licenses to prescribe narcotic drugs.

In arguing that the statute of limitations has expired on the defamatory statements made in 2009 and 2010, defendant ignores the fact that these statements are not only relevant to prove the cause of action for defamation, but also are relevant to establish actual malice and permit Plaintiff to recover both presumed and punitive damages for the 2013 defamatory statements.

Defendants do not even bother to discuss the doctrine of fraudulent concealment or the discovery rule as a basis for tolling the statute of limitations in a defamation action. The case upon which they rely, distinguishes between defamatory statements in a closed private internet website and one which is available to the public.

They fail to distinguish between defamation in a mass media publication for which the discovery rule would not apply and a publication which is not put out in a mass media format for which the discovery rule can apply in a proper case.

In the present case, by defendants own admission, their 'Intercom-Plus' computer system and the 'prescriber profile' contained therein is private and not available to the public. Therefore, the defamatory statement in the 'prescriber profile' properly is subject to the doctrine of fraudulent concealment when the elements therefore do exist.

Pennsylvania's fraudulent concealment doctrine tolls the statute of limitations where "through fraud or concealment the defendant causes the plaintiff to relax vigilance or deviate from the right of inquiry."

For application of Pennsylvania's doctrine under which a statute of limitations is tolled due to fraudulent concealment there must be an affinitive and independent act of concealment that would divert or mislead the plaintiff from discovering the injury.

On July 30, 2010, after Linda Schick had received an email from Brett Stacey advising her that the statement in the prescriber profile had been removed, she sent that email to Plaintiff who asked her to get a written statement from him on stationary because he didn't trust them.

Shick then requested a written statement on Walgreens letterhead. That letter was written by Brett Stacey on the Walgreen stationary and in his capacity as a senior attorney for Walgreens stating that the statement in the prescriber profile had been removed.

Reasonable jurors can find that Plaintiff justifiably relied upon the affirmative and false statement made to him by Stacey, which fraudulently concealed the fact that the information remained in the prescriber profile; and that Plaintiff did not become aware thereof until March 2013, when his Patient Damien Zajac advised him of the defamatory statement that had been made to him on March 23, 2013.

The affirmative and false statements by in-house counsel for defendants concealed from plaintiff the fact that the defamatory information in the prescriber profile on plaintiff had not been removed.

### III.    Facts

5.    Denied as stated. Plaintiff is an orthopedic surgeon whose practice currently deals with pain management of patients with chronic, severe, and debilitating injuries or medical conditions.

6.    Denied as stated.

In Plaintiff's Answers to Interrogatories he identified Caroline Bailey as the person to whom defendant's pharmacist made the defamatory statement on May 1, 2009. He identified Fred Bartley and Jason Robinson as the two patients to whom the defamatory statement was made by defendant's pharmacist on July 23, 2010. (***Exhibit 2 Plaintiff's Answers to Defendants Interrogatories at number 3 and 7***)

## Caroline Bailey--May 1, 2009

In May of 2009, Plaintiff contacted Ms. Schick and told her that a patient [Caroline Bailey] informed him that she attempted to fill prescriptions at Walgreen pharmacy in Philadelphia and was declined by the pharmacist who stated that Dr. Yarus was "red-flagged" and "being investigated by the DEA." (***Exhibit 3 Deposition of Linda Schick at 7,8; Exhibit 4 Deposition of Lance Yarus at nt 217-223***)

Ms. Schick who had been using Yarus as an expert witness was initially concerned not only for him but for herself since she "***did not want to hear that one of my experts was under federal investigation.***" (***Exhibit 3 at 7,8***)

## Letter dated May 7, 2009

On May 7, 2009, she wrote to the legal department at Walgreen company informing them that on May 1, 2009 one of Plaintiff's patients who went to a Walgreen pharmacy on 2014 S Broad Street could not get the prescription he had written for her filled because Yarus was "under investigation by the drug enforcement agency" (***Exhibit 3 Deposition of Linda Schick at 12,13; Letter dated May 7, 2009, which is Exhibit 3 to Deposition of Linda Schick***)

After she wrote that letter, she had an initial telephone conversation with Michael Freeman, in-house attorney for Walgreen Co. He stated that he was going to look into the information in her letter and then get back to her. (***Exhibit 3at nt 19***)

## Freeman's Conversation with Schick--August 17, 2009

On August 17, 2009, three months after she wrote her letter, Freeman again contacted Schick by telephone. His conversation with her on that date is summarized on page 2 of a Chronological Log on the Amicus computer system maintained in Ms. Schick's office. (***Exhibit 3 Deposition of Linda Schick at nt 14, 15 ; Chronological log Exhibit 2 to the deposition of Linda Schick***)

Ms. Schick testified that she actually typed what Freeman said to her in that conversation into the computer as he said it. (***Exhibit 3 nt 18,19***)

She testified that she had a clear recollection of the conversation, wholly apart from the information in the log. (***Exhibit 3 at nt 20***)

Freeman told her that he had spoken to a District Manager ***and the remark that Dr. Yarus was under investigation by the DEA had been removed from the Walgreen computer system.*** (***Exhibit 3 nt 21***)

***He further stated that Walgreen had counseled all staff and had reprimanded them. He stated that the computer system does not hold history so they have no idea how the remark was put on. He apologized and said he would even have the DM contact Dr. Yarus and apologize for any inconvenience this caused***. (***Exhibit 3 at nt 21,22***)

## Fred Bartley and Jason Robinson—Letter dated July 26, 2010

A year later, on July 26, 2010, Ms. Schick again wrote to Brett Stacey, Esquire, an in-house attorney for Walgreen Company, advising him that on July 23, 2010, a Walgreen pharmacist at 5627 Germantown Avenue had refused to fill a prescription for Plaintiff's patients [Fred Bartley and Jason Robinson] informing the patient that he was under investigation. She further included as an exhibit to this letter a copy of her first letter of May 7, 2009 *because she wanted him to realize that this was not an isolated incident.* (*Exhibit 3 Deposition of Linda Schick, Esquire at nt 26-28 , Letter dated July 26, 2010, Schick to Stacey, Exhibit 3 to Deposition of Linda Schick, Esquire; Exhibit 4 Deposition of Lance Yarus at nt 231-235*)

Before sending this letter, Ms. Schick was again contacted by Plaintiff who informed her that "*Walgreen was refusing to fill his patient's prescriptions and advising them that he was under federal investigation by the Drug Enforcement Agency*" (*Exhibit 3 at nt 26, 27*)

## Emails--July 30, 2010

On July 30, 2010, Stacey sent an email to Linda Schick stating *"I have confirmed all comments have been removed. I understand you are busy today. I am around Monday and most of next week."* (*Exhibit 3 nt 30 31; Email dated July 30, 2010, Exhibit 4 to the Deposition of Linda Schick*)

This email was forwarded by her to Dr. Yarus on that same date, who stated in an email response, "*Can we get a written statement from him on stationary? I don't trust them.*" (*Chronological Log Exhibit 2 to the Deposition of Linda Schick*)

Ms. Schick then emailed Stacey stating the she wanted a letter on Walgreen letterhead explaining how and why the notation regarding Dr. Yarus was entered into the Walgreen computer system and what was done to remedy that. (***Exhibit 3 nt 32; Exhibit 4 to the Deposition of Linda Schick.***)

## Letter dated August 13, 2010-- Stacey to Yarus

On August 13, 2010, Stacey, in response to this request, wrote directly to Dr. Yarus sending a copy of his letter by fax to Ms. Schick. (***Exhibit 3 nt 36,36; Letter dated August 13, 2010 which is Exhibit 8 to the Deposition of Linda Schick***)

In the letter, Stacey states

> *" …I have been advised that __we do not have the ability to identify historical data pertaining to the prescriber profile (such as the identity of __pharmacy staff that entered comments.__) Two District Pharmacy Supervisors are currently investigating whether they can otherwise identify pharmacy staff that entered the comment into the prescriber profile so as to learn the rationale/basis for the notation.*
>
> *__In the meantime, I can confirm that all comments have since been removed from your prescriber profile.__" (Letter dated August 13, 2010, Exhibit 8 to the Deposition of Linda Schick*

7.     Denied.

Fact discovery is still ongoing. Counsel for defendant has not produced a corporate designee on numerous dates suggested by Counsel for Plaintiff. Counsel for defendant had also canceled the deposition of Kay Hicks, an employee in one of defendant's pharmacies. Judge Sitarski directed the parties to work cooperatively to schedule the depositions of Mr. and Mrs. Grosso"…prior to August 31, 2015. Counsel for defendant filed the Motion for Summary Judgement on July 1, 2015.

13

Counsel for Defendants has now sought to obtain those depositions by August 31, 2015. (***Exhibit 5 Memorandum of Magistrate Judge Sitarski dated July 1, 2015 at page 9; Email dated July 27, 2015.*** )

###### A.  <u>Alleged Defamatory Comments</u>

8.    Denied.

Caroline Bailey, the patient that went to the Walgreen pharmacy on May 1, 2009 and was advised that Plaintiff was under investigation by the DEA, specifically informed Plaintiff Yarus of this fact. (***Exhibit 4 at nt 217-223***)

Michele Casdia has been employed by Plaintiff since June 2004 as a billing and administrative assistant. She testified that it was office policy to document information from patients when they called to advise Plaintiff's office that their prescriptions had been refused by Walgreens. (***Exhibit 6 Deposition of Michele Casdia at nt 8,9, 74-93***)

Caroline Bailey informed Plaintiff of the defamatory statement that was made to her by a Walgreen pharmacist on May 1, 2009. (***Exhibit 4 at nt 217-223***) Fred Bartley and/or Jason Robinson advised members of Plaintiff's office staff about the defamatory statement that was made to them on July 23, 2010, and his office staff then documented this information. (***Exhibit 6 at nt 74-93***; ***Exhibit 7 is documentation of the July 23, 2010 defamatory statement to Bartley and Robinson contained in Plaintiff's records and produced by Plaintiff in response to defendant's interrogatories***)

Admissions by defendants' in house attorneys will allow reasonable jurors to conclude that defendants' pharmacists made the statements described by Linda Schick, Esquire in letters dated May 7, 2009 and July 26, 2010. It is further averred that Damien Zajac and Karen Gondos have given testimony that confirms the defamatory statements were made to each of them.

9.     Denied as stated.

The testimony of those Walgreen pharmacists that Plaintiff has been able to depose is in writing and therefore is the best evidence of what they testified.

### Damien Zajac—March 23, 2013

10.-22. Denied as stated. The Motion takes statements from both Zajac and Gondos out of context.

Damien Zajac testified that on March 22, 2013, he took a prescription written for him by Dr. Yarus to the Walgreen pharmacy in King of Prussia and was advised by Mohammed, the pharmacist on duty, that the prescription could not be filled because Dr. Yarus was out of the area. (***Exhibit 8 Deposition of Damien J. Zajac at nt 42-47***)

Mohammed further advised him that ***he tried to override instructions in the computer system but could not do so***. (***Exhibit 8 at nt 93-96***) The next day, March 23, 2013, he went to the Walgreen in Limerick, Pa at approximately noon. The pharmacist on duty was Aunnee Loi (***Exhibit 8 at nt 49***)

Ms. Loi attended the beginning of the deposition of Mr. Zajac and he positively identified her as the same Aunnee Loi he spoke with when he went to the Walgreens in Limerick on March 23, 2013 (***Exhibit 8 nt 89***)

Zajac testified that she refused to fill the prescription and stated that ***"Dr. Yarus is an irresponsible doctor who just writes 'scripts and probably does very little treating."*** Zajac further stated that this information which was contained in his handwritten note is not a paraphrase but is an exact verbatim account of what she said. (***Exhibit 8 at nt 49, 50 and Handwritten statement of Zajac which is Exhibit 1 to his Deposition***)

Zajac further testified that on his next scheduled appointment with Dr. Yarus following the incident of March 23, 2013, he personally told Dr. Yarus what occurred. He was asked why he told him about what happened.

In testimony which accurately reflects the way in which this information affected him, he stated, "***it was something on my mind, that I was having problems getting his prescriptions filled at Walgreens***." (***Exhibit 8 at nt 83 84***)

### Karen Gondos—December 23, 2013

23.-42. Denied as stated. Karen Gondos testified as follows:

Karen Gondos was deposed on January 29, 2015. Her current status on the date of her deposition was disabled. She testified that in the past, prior to 2007, she had worked in the nursing field and had become a certified nursing assistant. (***Exhibit 9 Deposition of Karen Gondos at nt 10-12***)

She had a torn rotator cuff and Plaintiff provided manipulative range of motion therapy as well as prescriptions for medication. (***Exhibit 9 at nt 15***) A signed statement which she gave on January 8, 2014 was shown to her and marked as Exhibit 1 in her deposition. (***Exhibit 9 page 21 Typed statement of Karen Gondos which is Exhibit 1 to her Deposition***)

The statement on January 8, 2014 was given two and a half weeks after the incident of December 21, 2013; it accurately reflected what occurred and was given at a point in time when the events were perhaps a little clearer in her mind. (***Exhibit 9 at nt 67 68***)

She was asked if she had an independent recollection of what occurred and she gave testimony that was extremely close to that which was in the statement. She testified that when she went to the Walgreen pharmacy, the pharmacist told her that "we don't fill this doctor's prescriptions" and "no one will in the area." The pharmacist suggested that she get another doctor and the DEA wants us to report all prescriptions with him (***Exhibit 9 at nt 24-26***)

She was questioned about the information in the Amended Complaint which summarizes what she was told by the Walgreen pharmacist. Counsel for Walgreen then quoted for her the language which stated:

> ***"I am not going to tell you that the DEA is looking at him. We were told that in order for us to fill a prescription he has to call us an answer a list of questions." (Exhibit 9 at nt 48)***

Counsel for defendant then asked her whether she believed what the pharmacist said when he advised he that the DEA was looking at Dr. Yarus. She answered by stating "I ***didn't know what to believe.***" (***Exhibit 9 at nt 48,49***)

She was asked whether there was anybody else in the store or in the area where she was talking with the pharmacist. She stated that she believed that there were people in earshot and she believed they were aware of what she was being told. (***Exhibit 9 at nt 28***)

She was asked whether she discussed what happened at Walgreens with anyone else and she stated that she did so with her son and with her family. She also stated that she may have told her family physician at Mizzoni Center about it. (***Exhibit 9 at nt 40, 42-43***)

Her concern about what she was told was palpable from the testimony she gave with respect to these concerns after hearing what the pharmacist told her. She stated,

> ***"because I couldn't get the medication filled according to the pharmacist. And I was getting upset that I was still in pain <u>and wasn't sure what the story was with this doctor. I wanted to speak to the lawyer about it</u>." (Exhibit 9 at nt 34)***

When she was asked whether the remarks made her think less of him, she stated "***I didn't know what to think. I never had anybody tell me that about a doctor before.***" (***Exhibit 9 at nt 50***)

She testified that after this event she did computerized research on Dr. Yarus because of concerns that she had. (***Exhibit 9 at 68, 69***) ***She believed that the pharmacist was referring to Dr. Yarus as a 'drug-pusher.'*** (***Exhibit 9 at nt 67***)

When she was asked why she used the words 'drug-addict' or 'pusher' she stated:

> ***Q. Tell me again what you were trying to convey.***
> ***A. And when <u>I decided to continue with Dr. Yarus I wanted to make sure I watched the setting around me, the other patients. I mean, she just had me concerned that it was</u>—there was going to be—like I'm not sure how to even explain it. <u>I never been in that situation where someone frightened me of seeing a doctor.</u>***
> ***Q. Did she frighten you?***
> ***A. Yes.***
> ***Q. When you used the words "drug-addict" or "pusher" did you in your own mind think that she was referring to Dr. Yarus as a pusher?***
> ***A. Yes. (Exhibit 9 at nt 70)***

Counsel for Walgreens went over the allegations of the Amended Complaint with her. She stated that she recalled the pharmacist telling her "***we don't fill this doctor's prescriptions. He is just dispensing narcotics and no Walgreen, CVS, and probably Rite Aid will fill his prescriptions.***" (***Exhibit 9 at nt 47***)

## B. Computerized Prescriber Profile

43. Denied as stated.

Walgreens did not turn over the 'Good Faith Dispensing Policy' to Council for Plaintiff in this lawsuit because Plaintiff's Counsel did not execute a confidentiality agreement. However, a former Walgreen employee who is a whistle blower made the policy public and it is and was available on the internet since before this lawsuit was filed.

The Good Faith Dispensing Policy is concerned with the drug being prescribed and not with the physician prescribing it. There is nothing in this policy which requires an individual pharmacist to give false and defamatory information to a patient concerning the physician who wrote the prescription (***Exhibit 10 is a copy of the National Target Drug Good Faith Dispensing Checklist***)

44. Denied, Denied as stated, and objected to.

Counsel for Walgreen has not yet made a Corporate Designee available for a deposition and has not provided any information about the prescriber profile or its purpose other than producing a copy of that profile.

On September 15, 2014, James L. Moore, Jr., prior Counsel for Walgreen in this litigation, produced to counsel for Plaintiff a copy of the prescriber profile and the document giving the description of the prescriber profile field names. (***Exhibit 11 is the email from Mr. Moore forwarding this information; Exhibit 12 is the Prescriber Profile and Field Name Document***)

45.     Denied and denied as stated.

The only information available to Counsel for Plaintiff about the prescriber profile is the information contained on the face of that document. It makes clear that it falsely stated that Dr. Yarus was being investigated by the DEA. With respect to changes in the computer program in 2014, counsel for Plaintiff received a telephone call from Jodi Pabst, Esquire, in-house counsel for Walgreen who stated to Plaintiff's counsel that his client, Dr. Yarus, should be happy because changes made as of August 2014 to the prescriber profile would prevent entries from being made therein in the way they had been made prior thereto.

46.     Denied as stated.

It is admitted only that the entry that Plaintiff was being investigated by the DEA was placed in the prescriber profile prior to May 1, 2009 and remained in the prescriber profile until 2014, after this lawsuit had been instituted.

47.     Denied as stated.

It is admitted only that Ms. Schick, acting on behalf of Plaintiff, wrote to Defendants in house counsel, Brett Stacey, Esquire complaining yet again about the defamatory information which remained in prescriber profile and was being relied upon by its individual pharmacists when they repeated that defamatory information.

Defendant, in fn7 to its Motion, states as follows:

> ***"Walgreen has evidence that Plaintiff was under DEA investigation in 2010 (and 2012) but Walgreen does not request Summary Judgement based off of that evidence, which is disputed."***

Plaintiff has produced evidence that the statement in defendant's prescriber profile was and is false. On June 19, 2014, counsel for Plaintiff filed a request under the Freedom of Information/Privacy Act to obtain from DEA any documentation as to whether Plaintiff was being investigated by it. (***Exhibit 13 is Letter dated June 19, 2014 from Counsel for Plaintiff to the DEA requesting information on Dr. Yarus as to whether he had "ever been the subject of an investigation by the DEA.")***

The DEA initially refused to provide any information. Plaintiff appealed that denial and on January 29, 2015, The Department of Justice released a report of an inspection which its agents made at the office of Dr. Yarus on November 28, 2012. (***Exhibit 14 is the Letter dated January 29, 2015 from Katherine Myrick responding to Plaintiff's appeal seeking this information. Exhibit 15 is the Report of Investigation attached to that letter.)***

That report makes clear that this was the first inspection; no violations were found; and the matter was closed. Plaintiff's expert, Daniel G. Giaquinto, Esquire has submitted a report to Counsel for Plaintiff dated February 26, 2015 which relies in part upon the report of inspection made by DEA agents. He concludes on the basis of reasonable professional certainty that Dr. Yarus was never under investigation by the DEA. (***Exhibit 16 is the report of Daniel G. Giaquinto, Esquire dated February 26, 2015. Exhibit 17 is the C.V. for Mr. Giaquinto*.)**

Giaquinto's report states in part as follows,

> *"… the report indicates that the activities conducted on November 28, 2012 were conducted by the DEA Diversion Investigators(DI), as opposed to DEA Special Agents (SA). DEA DIs typically conduct administrative or compliance matters, whereas DEA Special Agents have criminal law enforcement authority and conduct criminal investigations."*

In responding to specific questions, he stated,

> *"1.     What is the significance of the fact that the inspection on November 28, 2012 was scheduled; it was arranged for in advance; no violations were found; it was the first Scheduled Inspection; and the matter was closed?*
>
> *It is significant that the action was scheduled. Typically, efforts in an investigation are not scheduled. Law enforcement, and even investigative authorities with administration powers only, prefer to arrive unscheduled and unannounced in order to utilize the element of surprise and gain the upper hand in acquiring information needed in the course of an investigation. The fact that this action was scheduled is another indication that it is an inspection and not an investigation. Moreover, the fact that no violations were found, either criminal or administrative, and the fact that the report clearly states that the matter was closed as of 12/7/12 is indicative of no ongoing matter, regardless of what term DEA may use to describe the scheduled on-site visit."*

> *         \*              \*              \*              \**

> *4.     For the time period May 1, 2009 until the present time, your opinion expressed with a reasonable degree of professional certainty as to whther Walgreens had any babsis for stating in its prescriber profile for Dr. Yarus that he was "under investigation by the DEA."*
>
> *No, there is no basis or justification. I am not aware of how, when or where Walgreen's received the information that Dr. Yarus was under investigation, if indeed they ever did. However,*

*the phrase under "investigation by the DEA" is without basis.*
*Either false information was given to Walgrens and/or*
*Walgreen's personnel misinterpreted they [sic] information*
*received. What is not speculative is that the information "under*
*investigation" is without basis and is false. Dr. Yarus was not*
*under investigation before the on-site visit of November 28, 2012.*
*That visit was an inspection and should not be communicated or*
*interpreted as an investigation in the traditional sense of the*
*word" investigation." The matter of the visit was closed as of the*
*date of the supervisory approval of the report 12/7/12 no adverse*
*action resulted. There simply is no basis for "under investigation*
*by the DEA" to be in Walgreens' prescriber profile at any time."*

Significantly, Giaquinto also points out that because Dr. Yarus is a DATA Waived

physician, who has a license that qualifies him to dispense Schedule III-V Narcotics, Walgreen's

pharmacists had both a website and phone number that they could have used to contact the DEA

if they had any concerns as to whether he was being investigated by the DEA.

48.    Admitted.

49.    Denied.

Counsel for Defendant, without any support for his statement, states that the copy of the

prescriber profile, which was sent by former counsel to Walgreens to counsel for Plaintiff "was

erroneous." This assertion is disputed. The alleged documentation which present defense counsel

recently sent to counsel for plaintiff, is not a business record but a document prepared during the

course of and for the purpose of this litigation.

### IV.    Statement of Undisputed Material Facts

50.    Denied for the reasons set forth above and below.

### Damien Zajac

51.    Denied as constituting a conclusion of law.

It is further averred that harm to Plaintiff's reputation is not the only type of damage to which Plaintiff is entitled because of the defamatory statement made to Zajac.

Plaintiff suffered a heart attack on April 17 2014, and was required to undergo emergency bypass surgery on April 19, 2014. The stress from the ongoing defamatory statements made by defendant's pharmacists to Plaintiff's patients starting on May 1, 2009 and continuing down through December 2013, were a contributing factor to producing that heart attack and the need for bypass surgery.

Plaintiff incurred hospital charges in the total sum of $105,581.49 including a bill from Lancaster General Hospital for $96,511.96 for his hospitalization and surgery and bills from Ephrata Community Hospital in the sum of $9,069.43 for his initial emergency room care and his post-operative rehabilitation. (***Exhibit 18 is the Report of Paul DiKun, CAC, Ed.D, Ph.D dated July 16, 2014 together with his CV. Exhibit 19 is the Report of Nicholas DePace, M.D., FACC dated November 24, 2014 together with his CV; Exhibit 20 is the bill from Lancaster General Hospital; Exhibit 21 are the bills from Ephrata Community Hospital***)

Plaintiff has also suffered a loss of future income as a result of the defamatory statement in the sum of $2,944,101.10 (***Exhibit 22 is the Report and attached exhibits dated May 28, 2015 from statistician, Joan C. Lenahan to John F. Innelli, Esquire.***)

Plaintiff testified to having a heart attack on April 17, and having quadruple heart bypass surgery on April 19, 2014 at Lancaster General Hospital. Initially, he was seen in the emergency room at Ephrata and from there was transferred to Lancaster General Hospital. (***Exhibit 4 Deposition of Lance Yarus, DO at nt 338, 339***)

He testified to the stress that he experienced from the defamatory statements stating as follows,

> *"Q.      When you learned about it, did it cause you any kind of emotional angst or emotional distress?*
> *A.      Sure.*
> *Q.      How would you rate that distress?*
> *A.      I would rate it pretty high. To give it a number I would say it was probably up in the 8,9 range. I'm being accused of something that can be very detrimental to my ability to practice and my own personal reputation. So of course it had that degree.*
> *Q.      So did the distress that you felt when you learned about it, did it abate as time went by?*
> *A.      When I received information that attorney for Walgreens apologized and assured that it would not happen again it certainly lessened my concern. But it certainly didn't take it away a hundred percent.(Exhibit 4 at nt 235)*
>
> *            \*                \*                \*                \**
>
> *Q.      Did the emotional angst or distress that you felt when you learned about it, did I[sic] manifest itself in anyway that you are aware of?*
> *A.      Sure.*
> *Q. How so?*
> *A.      My demeanor and my ability to practice or write prescriptions without having in the back of my mind that somebody was accusing me of something that wasn't true, losing patience, having people think of me as someone who has problems that are being investigated, the quality of my ability to be a physician to people, sure. All that weighed on me even after. (Exhibit 4 at nt 238)*
>
> *            \*                \*                \*                \**
>
> *Q.      When you went through this period of emotional distress after hearing that comment, did you react? Did you yell and curse? Did you fight with anybody? Did you have some physical reaction to it?*
> *A. I'm not a yeller and I'm not a curser. But what I do is internalize. I try to think of what is going to get me to a point*

*where I'm not being accused of these comments that are being made and accusations that are being made by professionals who I rely on to deal with my patients. So it's an internalization and a thought process about how it affects me and my ability to continuing doing what I do. My license is very, very precious to me. My DEA license is even more so it's a federal licensee. And I take it very seriously. So these accusations, my patients knowing about it and hearing about or other people hearing while they are in the vicinity and my name being thrown about , sure, it made me very anxious. It made me very concerned and my future and my practice was of concern (Exhibit 4 at nt 239,240)*

\*   \*   \*   \*

*Q. did you ever seek any form of counseling for emotional distress or anxiety other than or before you went to DiKun in July of 2014?*
*A. No formal, no.*
*Q. Did you ever treat yourself for angst or anxiety or emotional distress?*
*A. In the sense that I had medication which is prescribed for me for that reason, yes.*
*Q. Which medication?*
*A. The Lorezepam.*
*Q. Are you saying again, are you saying you took the Lorazepam specifically because of the comments made to one of your patients?*
*A. I'm not saying specific comments. I mean, the totality of the comments and the consistency with which this was occurring, first in 2009 and then 2013, I thought it was over with. And it wasn't over with. The nightmare came back. The accusation is intense. It's not calling somebody a shithead – excuse my language. But it is saying that somebody professional is less so than they say they are. And that is what caused the anxiety and the stress." (Exhibit 4 at 291,292)*

Michele Casdia testified that ever since the defamatory statements were made about him

by Walgreens's employees and James Tinnyo "*he is not the same man." (Exhibit 6 at nt 112)*

As a follow-up to this question, she was asked if she noticed changes in his demeanor; the way he relates to people; the level of his voice; or whether he gets angry too rapidly. She responded by stating,

> "*I think he just—when he looks at someone, in the back of your mind, you kind of think what are they thinking about me because you never know.*"(*Exhibit 6 at nt 113,114*)

52.    Denied as stated.

Zajac's initial concern and the concern that almost any patient would have when hearing such a defamatory statement about his or her physician is best expressed in his testimony quoted above where he stated,

> "*it was something on my mind, that I was having problems getting his prescriptions filled at Walgreens.*" (*Exhibit 8 at nt 83 84*)

53.    Denied as stated.

Plaintiff is entitled to recover not only for the reputational harm component of "actual harm" but also for embarrassment, humiliation, emotional distress, and the effects of that distress including his heart attack, the need for bypass surgery, and the expenses connected therewith.

He is further entitled to recover "special harm damages" for the economic loss of future patient income.

54.    Denied as stated.

It is admitted only that Zajac told his wife about the defamatory statement made to him by Aunnee Loi. For further response, Plaintiff refers to the report of Joan Lenahan.

## **Karen Gondos**

55.    Denied as constituting a conclusion of law.

For further response Plaintiff refers herein to paragraphs 51 above.

56.    Denied as stated.

Ms. Gondos had significant concerns about Dr. Yarus after hearing the defamatory

statement by the pharmacist as set forth above.

57.    Denied as stated.

Ms. Gondos had significant concerns about Dr. Yarus as set forth above and engaged in

computer research to stratify herself in whether or not the defamatory statement were true.

Plaintiff incorporates herein by reference thereto the portions of her testimony set forth in the

following portions of her testimony. She stated,

> *"because I couldn't get the medication filled according to the pharmacist. And I was getting upset that I was still in pain <u>and wasn't sure what the story was with this doctor. I wanted to speak to the lawyer about it</u>." (Exhibit 9 at nt 34)*
>
> *          *          *          *
>
> "*I didn't know what to think. I never had anybody tell me that about a doctor before.*" (**Exhibit 9 at nt 50**)

She testified that after this event she did computerized research on Dr. Yarus because of

concerns that she had. (**Exhibit 9 at 68, 69**) **She believed that the pharmacist was referring to**

**Dr. Yarus as a 'drug-pusher.'** (**Exhibit 9 at nt 67**)

When she was asked why she used the words 'drug-addict' or 'pusher' she stated:

> *Q. Tell me again what you were trying to convey.*
> *A. And when I  decided to continue with Dr. Yarus I wanted to make sure I watched the setting around me, the other patients. I mean, she just had me concerned that it was—there was going to*

> *be—like I'm not sure how to even explain it. I never been in that situation where someone frightened me of seeing a doctor.*
> *Q. Did she frighten you?*
> *A. Yes.*
> *Q. When you used the words "drug-addict" or "pusher" did you in your own mind think that she was referring to Dr. Yarus as a pusher?*
> *A. Yes. (Exhibit 9 at nt 70)*

58.     It is admitted only that Ms. Gondos disseminated the defamatory statement to her lawyer, family members, and possibly her primary-care physician.

59.     Denied.

## Legal Basis for Summary Judgement

61.-62.  Denied for the reasons set forth below.

## A.  The Published Comments Were Defamatory

63.-65. Defendant continues to confuse the issue of the defamatory character of the statement with the damages caused thereby. Here the defamatory statement was slander per se as set forth above and below.

It is the function of the Court, to determine whether the communication complained of is capable of a defamatory meaning, and if the Court determines that the statement is capable of a defamatory meaning, **it is for the jury to determine whether it was so understood by the recipient.** Corabi v. Curtis Publishing Co. 441 Pa. 432, 273 A.2d 899 at 904 (Pa. 1971); Zartman v. Lehigh County Humane Society 333 Pa. Super. 245, 482 A.2d 266 (Pa. Super. 1984); Agriss v. Roadway Express, Inc. 334 Pa. Super. 295, 483 A.2d 456 (Pa. Super. 1984).

**"[T]o be defamatory, it is not necessary that the communication actually cause harm to another's reputation or deter third persons from associating or dealing with him. Its character depends upon its general tendency to have such an effect."** <u>Corabi</u>, <u>supra</u>. **273 A.2d at 904; <u>Agriss, supra</u>. 483 A.2d at 461.**

A publication is defamatory if it tends to blacken a person's reputation or expose him to public hatred, contempt, or ridicule, or injure him in his business or profession. <u>Agriss, supra.</u> 483 A.2d at 461

A communication is also defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. <u>Agriss, supra</u>. 483 A.2d at 461

The test is the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate. The words must be given by judges and juries the same significance that other people are likely to attribute to them. <u>Agriss, supra</u>. 483 A.2d at 461, 462

The nature of the audience seeing or hearing the remarks is also a critical factor in assessing whether a communication is capable of a defamatory meaning. <u>Agriss, supra</u>. 483 A.2d at 461

Neither the mere susceptibility of an article to an interpretation which would render it innocuous, nor the intention of the author will conclusively defeat the right of action for libel. <u>Agriss, supra</u>. 483 A.2d at 462

Statements by the defendant imputing to the plaintiff a criminal offense or conduct incompatible with the plaintiff's business constitute slander per se. <u>Brinich v Jencka</u>, 757 A. 2d 388 at nt 397 (Pa. Super 2000).

In the present case, the statement in defendants prescriber profile which was interpreted by individual pharmacists to mean that he was a 'pill-pusher', 'an irresponsible doctor', and a doctor 'who just prescribes pills and does very little treating,' is slander per se.

It accuses Plaintiff of a criminal offense [unlawful prescribing of a controlled substance, <u>Commonwealth v. Brown,</u> 52 A.3d 320 (Pa Super 2012)] and further accuses Plaintiff of conduct which is incompatible with the proper practice of his profession as a physician.

### **<u>Damages</u>**

### ***<u>Actual Harm</u>***

When a communication constitutes slander per se, a plaintiff is not required to prove ***special harm i.e. pecuniary loss***; rather a defendant who publishes a statement which can be considered slander per se is liable for the proven***, actual harm*** the publication causes. <u>Brinich</u> <u>supra</u> 757 A. 2d at 397; <u>Joseph v. The Scranton Times, L.P</u>. 89 A.3d 251 at 261 and fn3 (Pa Super 2014).

Actual harm includes evidence of reputational harm, personal humiliation, mental anguish, shame, mortification, and hurt feelings. <u>Joseph</u> <u>supra</u> 89 A.3d at 265,266 Moreover, even if Plaintiff cannot establish reputational harm, he is entitled to an award of actual damages for the other components thereof. In <u>Joseph</u>, the Court stated:

> *"Rather, the trial court ignored it [evidence of embarrassment, humiliation and emotional distress] completely, focusing solely on the question of reputational damages. Returning a verdict in favor of appellees without even considering this evidence of general damages, i.e. emotional distress, mental anguish, and personal humiliation) constrains us to conclude that the trial court erred and a new trial as to damages in warranted"* <u>Joseph supra</u> *89 A.3d at 266*

There is substantial evidence to support an award for both actual and special harm caused by the defamatory statement including Plaintiff's humiliation, embarrassment, emotional distress, and the physical effects that this has contributed to in causing Plaintiff's heart attack and the emergency bypass surgery. This constitutes both actual harm and special harm.

Plaintiff has incurred substantial hospital and medical expenses because of the heart attack, bypass surgery, and psychological counseling he was required to receive. The hospital expenses for Plaintiff's bypass surgery and rehabilitation from his bypass surgery totaled $105,088.40.

There is also evidence that Plaintiff has suffered a loss of patient income in excess of $2.2 million dollars. Defendant ignores this evidence of actual and special harm as set forth above.

### B. <u>Comments Contained in Walgreens Computer System Were Repeated and Published.</u>

#### <u>*Original Defamer's Liability for Repetition of the Defamatory Statement*</u>

66.-71.      The law of Pennsylvania makes clear that an original defamer is liable both for his republication of a defamatory statement as well as the repetition of that defamatory statement by third parties, where the repetition by those third parties can reasonably be anticipated by the original defamer, or is the natural and probable consequence of the initial defamation.

Agriss v. Roadway Express., Inc. 334 Pa.Super. 295, 483 A.2d 456, at 466, 467

Pa.Super.,1984.(***Repetition***) citing Tumbarella v. Kroger Co., 85 Mich.App. 482, 271 N.W.2d

284 (1978), See also Restatement, Second Torts Section 576 (c) (***Repetition***) and Section 578

(***Republication***) ;  Weaver v. Lancaster Newspapers, Inc. 592 Pa. 458, 926 A.2d 899 at 905-907

Pa.,2007 (***Republication***)

It is a question of fact for the jury to determine whether the repetition of the original

defamatory statement is the natural and probable result of the original publication Agriss supra

483 A.2d at 467

It is a factual question as to whether the statement by individual pharmacists to Plaintiff's

patients that Plaintiff was a 'pill-pusher' and an 'irresponsible doctor who just writes 'scripts and

does very little treating' was their repetition of, and the natural and probable result of their

interpretation of the information in the prescriber profile that Plaintiff was under investigation by

the DEA.

Reasonable jurors can find that their interpretation of the defamatory statement in the

prescriber profile was the natural and probable result of allowing that information to remain in

the prescriber profile after defendants attorneys on two separate occasions falsely stated it had

been removed from the prescriber profile.

Moreover, reasonable jurors can find that defendants could anticipate that this was how

the statement would be interpreted by their pharmacists and that it would be used and relied upon

by them if permitted to remain in the system.

## _Rule 801(d)(2)(D)—Admissions to EstablishPublication_

Circumstantial evidence can establish the publication element of a defamation claim including publication by repetition. Agriss supra 483 A.2d 466-467; Porter v. Joy Realty, Inc., 872 A.2d 846, 849 (Pa. Super 2005); Manno v. American General Finance Co., 439 F.Supp. 2d 418 at 432(E.D. Penna 2006)

Zajac and Gondos have each testified directly as to the defamatory statements made to them by the individual pharmacists. Their testimony would allow jurors to determine that the statements to each of them was repetition by the pharmacists of the defamatory statement in the prescriber profile and the natural and probable result of their interpretation of that statement.

Under Federal Rules of Evidence, Rule 801 (d)(2)(D) "a statement is not hearsay if [it is] a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."

No guarantee of trustworthiness is necessary for an admission under this rule. The Advisory Committee to the rules recommends generous treatment of this avenue of admissibility under the rule. Savarese v. Agriss 883 F.2d 1194 at 1200,1201 (3rd Cir 1989); Weaver v. Mobile Diagnostech, Inc 2009 WL 1230297 at *6,7 (WD Penna 2009)

In Collins v. Parexel International 2008 WL 2405029 (E.D. Penna 2008), Plaintiff brought an action against defendant for retaliatory discharge and defamation. He claimed that at least three of defendant's employees defamed him by stating that he had been terminated for mishandling and/or mismanaging money. 2008 WL 2405029 at *1

***Plaintiff was informed of these statements by the other employees.*** For this reason, "***Plaintiff has no first-hand knowledge concerning the content of the publication of the alleged defamatory statements.***"

The court in ruling that these statements were admissible as statements of a party opponent under Rule 801(d)(2)(D) stated,

> "…***we agree with Plaintiff that the statements are non-hearsay as they are admissions of a party-opponent See FED.R.EVID.801(d)(2)(D)(a statement is not hearsay if [it] is offered against a party and is [made] by the party's agent or servant concerning a matter within the scope of the agency or employment …during the existence of the relationship.)***" 2008 WL 2405029 at *4

### Admissions by Party Opponents, Agents, or Servants

The admissions by defendants' in house attorneys would allow jurors to find that the individual pharmacists did in fact publish the defamatory statements to Caroline Bailey, Fred Bartley, and Jason Robinson.

As stated above, Linda Schick, Esquire spoke to Freeman on two occasions after she sent her letter of May 7, 2009 to Walgreens (***Exhibit 3 nt 17-22; See also Letter dated May 7, 2009 which is Exhibit 1 to the Deposition of Linda Schick***)

In the first conversation, he stated after receiving her letter that he was "***going to look into it.***" (***Exhibit 3 at nt 19***)

In his second conversation with Schick on August 17, 2009, three months after 'looking into it', Freeman stated to her:

> "***Q.    All right. Let's go over it. What did Mr. Freeman say to you?***

35

> **A.** **Mr. Freeman told me that he had spoken to a district manager, and the remark – to me the "remark" meant the issue that Dr. Yarus was under investigation by the department – Drug Enforcement Agency had been removed from the Walgreens' computer system and that's why I have the – this is just my shorthand in an e-mail, that they had –"they" being Walgreens—had counseled all staff and reprimanded them."** **(Exhibit 3 at nt 21)**

Freeman knew that Ms. Schick's letter dated May 7, 2009 was threatening a lawsuit for a defamatory statement in defendants computer system which she called "libel and slander/." The letter identified the defamatory statement by Defendants' pharmacist and the location of the pharmacy.

Reasonable jurors can conclude that Freeman had the ability to make an investigation and to get answers to the issues raised by Ms. Schick and her letter. Those jurors can also conclude that, after taking three months to investigate the issues she raised in her letter of May 7, 2009, he would not have told her that the remark had been removed from the computer system and that all staff had been counseled and reprimanded unless, in fact, he had determined from his investigation that the statement had been made, that the statement came from the prescriber profile, and that it was false.

This is particularly so because he was on notice of the fact that Schick as an attorney representing Dr. Yarus was threatening a lawsuit against Walgreen because of what the pharmacists had stated to Bailey. Reasonable jurors can conclude that as an attorney, he would not have casually or lightly made these admissions unless it was the result of his investigation.

Reasonable jurors can further conclude that a year later, the statement made by Brett Stacey in his email to Linda Schick on July 30, 2010 and in his subsequent letter to Plaintiff on August 13, 2010, wherein he advised that the statement in the prescriber profile was an additional admission against interest.

### ***Actual Malice Based on Repetition***

Actual malice exists where the defendant made the statement with knowledge that it was false or with reckless disregard of whether it was false or not. <u>Schiavone Construction  Co v. Time, Inc</u>. 847 F.2d 1069, 1089 (3'd Cir. 1988<u>); Curran v. Philadelphia Newspapers, Inc.</u> 376 Pa Super 508, 546 A2d. 639 at 642 (Pa Super 1988)

In <u>Weaver</u> <u>supra</u>, the Pennsylvania Supreme Court stated that republication by defendant of a defamatory statement after it has been put on notice that the initial publication of that statement was false is evidence that the initial statement as well as the subsequent, republication of that  statement were made with actual  malice.   The Court stated:

> ***To support this conclusion we may look to the Restatement (Second) of Torts § 580A, cmt. d (2006) for guidance. The Restatement instructs that, "Republication of a statement after the defendant has been notified that the plaintiff contends that it is false and defamatory ma y be treated as evidence of reckless disregard." 926 A.2d at 905***

Actual malice can be established by either direct or circumstantial evidence. <u>Schiavone supra</u>  847 F2d at 1089, 1090; Weaver supra 926 at 906 (Pa 2007).

In <u>Schiavone supra</u>, the Court stated:

> ***A plaintiff may "rarely be successful in proving awareness of falsehood from the mouth of the defendant himself." Herbert v.***

*Lando, 441 U.S. 153, 170, 99 S.Ct. 1635.1645, 60 L.Ed.2d 115
(1979). A defendant subject to the actual malice standard
"cannot, however, ... automatically insure a favorable verdict by
testifying that he published with a belief that the statements were
true." St. Amant, 390 U.S. at 732, 88 S.Ct. at 1326. Therefore,
objective circumstantial evidence can suffice to demonstrate
actual malice.
Such circumstantial evidence can override defendants'
protestations of good faith and honest belief that the report was
true. (847 F2d 1069 at 1089-1090)*

In <u>Weaver</u>, the Court discussed how actual malice can be established.

*"The existence of actual malice may be shown in many ways. As
a general rule, any competent evidence, either direct or
circumstantial, can be resorted to, and all the relevant
circumstances surrounding the transaction may be shown,
provided they are not too remote, including threats, prior or
subsequent defamations, subsequent statements of the defendant,
circumstances indicating the existence of rivalry, ill will, or
hostility between the parties, facts tending to show a reckless
disregard of the plaintiff s rights ..." (592 Pa. 458, 926 A2d at
906).*

In the present case, there is substantial evidence to show that the defendants not once, but twice, allowed the defamatory statement to remain in their computer system after being placed on notice that it was false and after having advised Plaintiff's attorney that it had been removed from Plaintiff's prescriber profile.

### *Actual Malice Based on Inability to Identify a Source Relied Upon*

Defendants have in at least three places admitted and acknowledged that they are unable to identify any source which they relied upon when they placed the defamatory statement in their prescriber profile which falsely stated that Dr. Yarus was being investigated by the DEA

This admission was made by Michael Freeman to Linda Schick in the conversation he had with her on August 17, 2009 which she recorded in her computer system as he spoke to her. (*Exhibit 2 at nt 21,22*)

That admission is further contained and reaffirmed in the letter from Brett Stacey to Dr. Yarus on August 13, 2010 when he stated that "*we do not have the ability to identify historical data pertaining to the prescriber profile (such as the identity of pharmacy staff that entered comments).*" (*Exhibit 8 to the deposition of Linda Schick which is Exhibit 2*)

This admission is also contained in Defendant's Answers to Plaintiff's Interrogatories, where it is stated that "the system does not track the name of the employee placing entries in the system. (*Exhibit 22 Answers to Plaintiff's Interrogatories Addressed to the Defendants at question 25. See also Answer to Number 7, 22, 23*)

Actual malice is defined as knowledge that the statement is false or reckless disregard of whether it is false. Where a defendant in a defamation case says it is unable to identify the source of the information which he relied on in making a defamatory statement, it is a classic example of reckless disregard for the truth.

If a defendant is not even able to state what he relied on in making a defamatory statement, how can he then state he did not act negligently in making that statement. That is precisely the situation in this case.

Moreover, the defendant in his Answers to Interrogatories have admitted that they exercise no control over what information their individual pharmacist place into the prescriber profile. This is additional evidence of reckless disregard for the truth and for actual malice.

### *Presumed and Punitive Damages*

If the Plaintiff in a defamation action establishes his or her cause of action, he or she may recover punitive damages even though he is unable to establish an award for compensatory damages. Joseph supra 89 A.3d at 269, 270; See also Laniecki v. Polish Army Verteran Ass'n of Lucyan Chwalkowski 331 Pa. Super 413, 480 A.2d 1101, 1106-1107 (Pa Super 1984)

As stated above, objective circumstantial evidence can be used to determine that a defamatory statement was published with actual malice. Schiavone supra 847 F.2d. at 1089, 1090; Weaver supra 926 A.2d at 906

For the reasons set forth above, there is ample direct and circumstantial evidence which would allow reasonable jurors to determine that the false and defamatory statement in the prescriber profile was entered, and allowed to remain therein with actual malice and was relied upon by defendants' pharmacists when it repeated the defamatory information to Plaintiff's patients.

Where actual malice has been established, a jury is entitled under Pennsylvania law to award both presumed damages and punitive damages. Joseph supra 89 A.3d at 270-273

For these reasons, a jury in this case can award both presumed and punitive damages.

## C. __The Comments Were Priviledged__

72.-77. Denied.

A conditional privilege to communicate a defamatory statement will exist if the communication has been made upon a "proper occasion", from a proper motive, in a proper manner and based upon reasonable and probable cause. American Future Systems, Inc. v. Better

Business Bureau of Eastern Pennsylvania 592 Pa 66, 923 A 2.d 389, 396 (Pa 2007). Pacitti v. Durr 310 Fed. Appx. 526, 528 (3'd Cir. 2009)

A "proper occasion" to communicate a defamatory statement, thereby giving rise to a conditional privilege, occurs " 'if the publisher reasonably believes that the recipient shares a common interest in the subject matter and is entitled to know.'" Howard v. Deklinski 2002 WL 31501850, (3'd Cir 2002); Miketic v. Baron. 675 A.2d 324, 330 (Pa.Super.1996).

The privilege to publish defamatory statements, can be waived by abuse, which occurs when a publication of misinformation (I) is actuated by malice or negligence; (2) is made for a purpose other than that for which the privilege is given; (3) is made to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege; or (4) includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose. Howard supra.

In American Futures Systems supra, the Pennsylvania Supreme Court held that in light of the applicability of first amendment jurisprudence to defamation actions, conditional privileges have become "superfluous" since a private figure plaintiff must prove negligence to prevail on such a claim and by so doing has automatically defeated a conditional privilege. 923 A2d at 397, 398.

The Court stated,

> *"In the wake of New York Times and Gertz this Court concluded that the former Pennsylvania state law conditional privileges (at least those that could be overcome by a showing of negligence) had "lost their significance" because, "[i]f a private-figure plaintiff is to maintain any cause of action at all, he must minimally establish the negligence on the part of the publisher.*

*In doing so, 'he has by that very action proved any possible conditional privilege was abused.' " 923 A2d at 397*

\*　　\*　　\*　　\*

*"Logically, then-and as suggested above in relation to Hepps-this renders the former concept of a conditionally privileged occasion embodying the negligence standard superfluous in the present era." 923 A2d at 398; See also <u>Pacitti supra</u> 310 Fed. Appx. at 528.*

It is a question of law as to whether or not a conditional privilege applies. However, it is a question of fact as to whether or not that privilege has been abused. <u>Medure v. The Vindicator Printing Co</u>. 273 F. Supp.2d. 588 at 617-18 (W.D. Pennsylvania 2002); <u>Simms v. Exeter Architectural Products Inc</u>. 916 F. Supp. 432 at 436 (M.D. Penna 1996).

Plaintiff is a private figure who can prevail on his claim by showing that the defendants acted with negligence in publishing defamatory statements about him. For reasons set forth above, there is ample evidence of defendants' negligence including admissions against interest made by defendants' authorized representative, its in-house attorneys.

## D.  Statute of Limitations

78.-82. Denied.

Plaintiff asserts that the statute of limitations was tolled with respect to the two defamatory statements made on May 1, 2009 and July 23, 2010 by reason of the fraudulent concealment of defendants' actions.

Pennsylvania's fraudulent concealment doctrine tolls the statute of limitations where "through fraud or concealment the defendant causes the plaintiff to relax vigilance or deviate from the right of inquiry." Mest v. Cabot Corporation, 449 F3d 502, 523 (3rd Cir. 2006); Tanzosh v. Inphoto Surveillance, Kroll Inc., 2008 WL 4415693 at *4, 5 (M.d. Penna).

For application of Pennsylvania's doctrine under which a statute of limitations is tolled due to fraudulent concealment there must be an affirmative and independent act of concealment that would divert or mislead the plaintiff from discovering the injury. Mest supra 449 F.3rd at 517.

Defendants sole basis for arguing that the statute of limitations could not be tolled by virtue of fraudulent concealment is in citation to the case of McClanaghan v. Turi, 567 Fed Appx 150 (3rd Cir 2014)

In McClenaghan supra, the 3rd Circuit in considering the discovery rule at it relates to an internet posting on a ***private*** Yahoo site held that the discovery rule was inapplicable not because as a matter of law the discovery rule did not apply to defamatory communications but rather because the Plaintiff was on notice of its injury at an earlier date and that this did not constitute a case of "hard-to-discern injuries against which the discovery rule was designed to protect." 567 Fed Appx at 156.

Significantly it cited the case of Wolk v. Olson, 730 F. Supp 2d 376 378 (E.D. Penna 2010.) The Wolk case makes clear as have many other cases from the Federal District Courts that the discovery rule in a defamation case simply cannot be invoked with respect to a mass media publication.

On the other hand, in defamation cases not involving mass media publications, Pennslyvania Courts have applied the discovery rule to toll the statute of limitations. <u>Smith v. IMG Worldwide, Inc.</u>, 437 F.Supp 2d 297 at 306-307 (E.D. Penna 2006)

In the present case, we are not dealing with a mass media internet or other publication available to the public at large. Instead, we are dealing with a private computer site which contained false and defamatory information.

In this case, on August 17, 2009, Michael Freeman, Esquire, assured Linda Schick, Esquire that the defamatory statements had been removed from the prescriber profile. A year later, Plaintiff determined that this was not true when Fred Bartley and Jason Robinson complained about the same thing happening on July 23, 2010.

On July 30, 2010, Brett Stacey, Esquire, sent an email to Linda Schick telling her that "I have confirmed all comments have been removed." (***Deposition of Linda Schick Exhibit 3 at nt 30, 31***; ***Email string Exhibit 4 to Deposition of Linda Schick***)

Ms. Schick, on that same day, forwarded the email from Stacey to Plaintiff, who wrote back to her stating in part "***Can we get a written statement from him on stationary. I don't trust them.***"(***Chronological Log Exhibit 2 to the Deposition of Linda Schick***)

It is for this reason that Ms. Schick sent an email back to Stacey asking that he put that statement on letterhead (***Email string Exhibit 4 to Deposition of Linda Schick***)

After receiving this request, Stacey wrote the letter to Plaintiff dated August 13, 2010, on Walgreen stationary, and in his capacity as a senior attorney for Walgreen Co., stating that "***I can confirm that all comments have since been removed from your prescriber profile.***" (***Letter dated August 13, 2010, Exhibit 8 to the deposition of Linda Schick***)

44

Plaintiff had every right to rely on this statement by a senior attorney in a letter on the stationary of Walgreens. The statement was an affirmative false statement and a fraudulent concealment. Plaintiff did not become aware of that fact until Zajac advised him of the defamatory statement made to him on March 23, 2013.

This lawsuit was started on November 26, 2013, eight months after Plaintiff first became aware of the fact that the statement by Stacey was false. For this reason the statute of limitations was tolled until Plaintiff became aware of Zajac's statement.

## VI. <u>Conclusion</u>

83.87. Denied. Defendants' Motion for Summary Judgement should be denied for all of the reasons set forth above.

WHEREFORE, Plaintiff Lance Yarus, D.O. respectfully requests that Defendants' Motion for Summary Judgement be denied.

Date: 7/30/15

**FELL & SPALDING**

Stephen R. Bolden, Esquire
Pa. Supreme Court Identification No. 11951
Fell & Spalding
2230 Land Title Building
100 S. Broad Street
Philadelphia, PA 19110
T: 215-563-6161
F: 215-563-8330
E: email@fellandspalding.com
Attorney for Plaintiff
Lance Yarus, D.O.

Date: 7/30/15

John F. Innelli, Esquire
Pa. Supreme Court Identification No. 34466
John F. Innelli, LLC
1818 Market Street, Suite 3740
Philadelphia, PA 19103
T: 267-238-9884
F: 215-561-0012
E: jinnelli@innellilaw.com
Attorney for Plaintiff
Lance Yarus, D.O.