Page 1

1         IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                    -   -   -

4   LANCE YARUS, D.O.              : CIVIL ACTION

                                   :

5             v.                   :

                                   :

6   WALGREEN COMPANY               :

              and                  : NO.

7   WALGREEN EASTERN CO., INC. : 2:14-CV-01656-CDJ

8                    -   -   -

                Monday, April 20, 2015

9                    -   -   -

10        Videotaped deposition of LINDA M.

11   SHICK, taken at Veritext Doylestown, 44 East

12   Court Street, Doylestown, Pennsylvania 18901,

13   commencing at 9:35 a.m., before Denise A. Ryan,

14   a Professional Shorthand Reporter and Notary

15   Public.

16

17                    -   -   -

18

19

20

21

22

23

                VERITEXT LEGAL SOLUTIONS

24                MID-ATLANTIC REGION

              1801 Market Street - Suite 1800

25            Philadelphia, Pennsylvania 19103

Page 2

1 APPEARANCES:
2
3 FELL & SPALDING
   BY: STEPHEN R. BOLDEN, ESQ.
4 2300 Land Title Building
   100 South Broad Street
5 Philadelphia, PA 19110
   Phone: 215.563.6161
6 Email: stephen.bolden@fellandspalding.com
         and
7 JOHN F. INNELLI, LLC
   BY: JOHN F. INNELLI, ESQ.
8 1818 Market Street, Suite 3740
   Philadelphia, PA 19103
9 Phone: 267.238.9884
   Email: jinnelli@innellilaw.com
10 Representing the Plaintiff.
11
12 LITCHFIELD CAVO, LLP
   BY: ROBERT L. SANZO, ESQ.
13 1515 Market Street, Suite 1220
   Philadelphia, PA 19102
14 Phone: 215.999.5774
   Email: sanzo@litchfieldcavo.com
15 Representing the Defendants
16
17 ALSO PRESENT: W. Russell Strain, CLVS,
                Video Technician
18
19
20
21
22
23
24
25

Page 3

1        - - -
         INDEX
2        - - -
3
   Testimony of: LINDA M. SHICK
4
5 By Mr. Bolden .......... 6, 209
6 By Mr Sanzo ........... 40, 215
7
         - - -
8        SHICK EXHIBITS
         - - -
9
   EXHIBIT
10 NUMBER      DESCRIPTION      PAGE
11 Exhibit 1  Letter, 5/7/09, to Walgreens  10
              Co. from Ms. Shick
12
   Exhibit 2  Chronological List for:        14
13            Yarus, Lance vs. Walgreens
              Carol Critelli, Mon Jun 16,
14            2014
15 Exhibit 3  Letter, 7/26/10, to Walgreens  26
              Co. Legal Department from
16            Ms. Shick
17 Exhibit 4  Bates No. Walgreen019          31
18 Exhibit 5  Bates No. Walgreen017          32
19 Exhibit 6  Bates No. Walgreen016          34
20 Exhibit 7  Bates No. Walgreen020          35
21 Exhibit 8  Letter, 8/13/10, to Dr. Yarus  36
              from Mr. Stacey
22
   Exhibit 9  Notes on Sharon Eder and Kurt  92
23            Montgomery
24 Exhibit 10 Copy of Phone Call Message     92
              Slip, 6/12
25

Page 4

1        DEPOSITION SUPPORT INDEX
2
3 Direction to Witness Not to Answer
4 Page Line   Page Line   Page Line
5          -- none --
6
7 Request For Production of Documents
8 Page Line   Page Line   Page Line
9          -- none --
10
11 Stipulations
12 Page Line   Page Line   Page Line
13          -- none --
14
15 Question Marked
16 Page Line   Page Line   Page Line
17          -- none --
18
19
20
21
22
23
24
25

Page 5

1        LINDA M. SHICK
2        VIDEO TECHNICIAN: We are now on
3 the record. My name is Russ Strain
4 representing Veritext Legal Solutions.
5    The date today is April 20,
6 2015. The time is approximately 9:35
7 a.m.
8    This deposition is being taken
9 at Veritext Doylestown office, 44 East
10 Court Street, Philadelphia, PA. The
11 caption of this case is Lance Yarus,
12 D.O. vs. Walgreen Company, et. al.
13 filed in the U. S. District Court for
14 the Eastern District of Pennsylvania,
15 Case No. 2:14-CV-01656-CDJ.
16    The name of the witness is Linda
17 Shick.
18    If counsel at this time will
19 please introduce themselves for the
20 record.
21    MR. BOLDEN: Stephen Bolden,
22 co-counsel for plaintiff, Lance Yarus.
23    MR. INNELLI: John Innelli,
24 co-counsel for plaintiff, Lance Yarus.
25    MR. SANZO: Robert Sanzo for the

2 (Pages 2 - 5)

Page 6

1              LINDA M. SHICK
2       defendant, Walgreen.
3              VIDEO TECHNICIAN: The court
4       reporter is Denise Ryan of Veritext.
5       Will the court reporter please swear in
6       the witness.
7              - - -
8              LINDA M. SHICK, after having
9       been first duly sworn, was examined and
10      testified as follows:
11             - - -
12             VIDEO TECHNICIAN: Testimony can
13      now proceed.
14             - - -
15             EXAMINATION
16             - - -
17 BY MR. BOLDEN:
18      Q.     Good morning, Ms. Shick.
19      A.     Good morning.
20      Q.     Could you just briefly trace
21 your educational background and your
22 professional career?
23      A.     Yes. I graduated in Doylestown
24 from Central Bucks West High School in 1972. I
25 went for a semester to Ursinus College in

Page 7

1              LINDA M. SHICK
2 Collegeville. I left college, got married, had
3 babies, returned to school when my children
4 reached junior high school age, I got my
5 Bachelor of Arts and my JD in the same year.
6 My Juris Doctorate is from Rutgers in Newark,
7 where I commuted while I worked full-time.
8              I became associated with Jeffrey
9 L. Naftulin, P.C. in 1992 as a clerk and have
10 been there ever since and became a partner in
11 2001. Mr. Naftulin has semi-retired and I have
12 purchased the firm.
13      Q.     Very good. Thank you.
14             Ms. Shick, prior to May of 2009
15 had you ever either represented Dr. Lance Yarus
16 or used him as a consultant or expert witness?
17      A.     Yes. My first dealings with
18 Dr. Yarus were prior to that, when he was a
19 defense expert against my clients.
20      Q.     Okay. And as -- after that, did
21 you use him in your own capacity?
22      A.     As I became more familiar with
23 him, I did start to use him in my practice.
24      Q.     Okay. So I want to take your
25 attention to May of 2009. At that time did

Page 8

1              LINDA M. SHICK
2 Dr. Yarus contact you with respect to a problem
3 that he believed he was having with Walgreens?
4      A.     Yes, he did.
5      Q.     Just explain for us what you
6 learned as a result of that conversation.
7      A.     I was told that certain of
8 Dr. Yarus' patients had attempted to fill
9 prescriptions at Walgreens Pharmacy in the
10 Philadelphia area and had been declined and
11 told that Dr. Yarus was red flagged, that he
12 was being investigated by the DEA.
13      Q.     Okay. And when you heard that,
14 what did you -- did you make any suggestion to
15 him about what should be done?
16      A.     Yes. Initially I was concerned
17 for him and I was concerned for myself because
18 as I did not want to hear that one of my
19 experts was under federal investigation, and
20 the first thing I wanted to know was whether or
21 not this was true.
22      Q.     Okay.
23      A.     As truth is a defense.
24      Q.     And what did you -- what did you
25 do in order to satisfy yourself that it wasn't

Page 9

1              LINDA M. SHICK
2 true?
3      A.     I asked Dr. Yarus, "Who would
4 you get in touch with at the DEA to ascertain
5 whether or not you are under investigation?"
6      Q.     Okay. And what did he do as you
7 understand it?
8      A.     I understand that he contacted
9 the DEA to find out whether or not he was under
10 investigation.
11      Q.     And did he get back to you?
12      A.     He did.
13      Q.     And what did he advise you?
14      A.     He told me he was not under
15 investigation, that there were no restrictions
16 in his ability to prescribe narcotics or any
17 other medication.
18      Q.     Okay. Now, as a result of that
19 what did you do next?
20      A.     I contacted -- well, Dr. Yarus
21 and I discussed how to proceed. I believe --
22 at that point, from what he represented to me,
23 I believed that it could be an isolated
24 incident, perhaps a pharmacist that was not
25 pleased with his patient profile, and that it

3 (Pages 6 - 9)

Page 10

1          LINDA M. SHICK
2 was just a local problem. So I wanted to find
3 out what was the extent of the problem, whether
4 it was something that was being -- was
5 happening on a large scale or whether it was
6 just an isolated incident, so I reached out to
7 Walgreens' legal department.
8          MR. BOLDEN: I ask that the
9     court reporter mark this as Shick 1.
10          - - -
11          (Whereupon, Shick Exhibit 1 was
12     marked for identification.)
13          - - -
14          MR. BOLDEN: Off the video
15     record.
16          VIDEO TECHNICIAN: Off the
17     record at 9:41.
18          - - -
19          (The following took place off
20     the video record:
21          MR. BOLDEN: The letter is a
22     two-page letter. On the last page it
23     bears a signature and a cc. What I
24     would like to do is, because the copies
25     that I have only have the first page, I

Page 11

1          LINDA M. SHICK
2     would like to substitute one without
3     the yellow highlighting.
4          MR. SANZO: Can I see it,
5     please?
6          MR. BOLDEN: Yes, sure.
7          MR. SANZO: Do you have a copy?
8          MR. BOLDEN: Yes. Not with the
9     second page.
10          Here.
11          MR. SANZO: Thank you.
12          So I have never seen the second
13     page before, the cc. to Walgreen, to
14     the local Walgreens store, not that it
15     matters a whole lot, but I have never
16     seen that.
17          MR. BOLDEN: Can we have copies
18     made now?)
19          - - -
20          (Whereupon, there was a recess
21     in the proceeding.)
22          - - -
23          (Video record resumed.)
24          - - -
25          VIDEO TECHNICIAN: Back on the

Page 12

1          LINDA M. SHICK
2          record at 9:45.
3 BY MR. BOLDEN:
4          Q.   Ms. Shick, I am going to hand
5 you the document that the court reporter has
6 marked as Exhibit Shick 1. Can you identify
7 that for us?
8          A.   It's a letter that I wrote on
9 May 7, 2009, to Walgreens.
10          Q.   In the top where the date
11 appears there is a "2008." Can you just
12 explain whether that's a typographical error or
13 why, what happened with that?
14          A.   It is a typographical error, and
15 I cannot tell you when it was corrected. It
16 would have gone -- I believe it would have gone
17 out with the error. I wouldn't have allowed it
18 to be corrected like that and sent out.
19          Q.   Okay. And I see that you wrote
20 to the legal department at Walgreen Company.
21 How did you get that address, as to who the
22 letter should be sent to?
23          A.   I looked on the Internet to find
24 out where Walgreens' home office was and called
25 them and asked them for an address for their

Page 13

1          LINDA M. SHICK
2 legal department.
3          Q.   Okay. Now, you say that "On May
4 1, 2009, a patient of Dr. Yarus was advised by
5 the Walgreens pharmacy located at 2014 S. Broad
6 Street in Philadelphia, that prescriptions
7 written by Dr. Yarus would not be filled as
8 Dr. Yarus is under investigation by the Drug
9 Enforcement Agency (DEA)."
10          Is that the information that
11 Dr. Yarus had conveyed to you?
12          A.   Yes.
13          Q.   Okay. You also -- you also
14 state in the beginning of the letter that the
15 actions of Walgreen constitute libel and
16 slander. Prior to sending this letter out, had
17 you yourself had any significant matters
18 involving defamation?
19          A.   I did.
20          Q.   And what was that?
21          A.   In the matter of Malta vs.
22 Schulmerich I had a $2 million verdict in
23 federal court in front of Judge Weiner for
24 Internet slander.
25          Q.   Okay. So when you were dealing

4 (Pages 10 - 13)

Page 14

LINDA M. SHICK

2 with Dr. Yarus and writing the letter, were you
3 using the benefit of your experience in your
4 assessment of what happened?
5    A.    Yes, the agony of my experience.
6    Q.    Okay. Thank you.
7          Now, after you wrote this
8 letter, what is the next thing that happened as
9 it relates to Dr. Yarus and your letter to
10 Walgreen?
11    A.    Either I communicated with
12 Walgreens and was -- found Michael Freeman or
13 Michael Freeman called me. I can't tell you
14 with any certainty or without further
15 documentation which -- how that happened.
16          MR. BOLDEN:  Mark this as
17 Exhibit Shick 2.
18          - - -
19          (Whereupon, Shick Exhibit 2 was
20 marked for identification.)
21          - - -
22 BY MR. BOLDEN:
23    Q.    Ms. Shick, I am having the court
24 reporter hand to you what has been marked as
25 Shick 2. Can you identify that for us?

Page 15

LINDA M. SHICK

2    A.    This is a chronological log that
3 is part of a software program that my office
4 maintains. It is a printout from my paralegal
5 that was made on June 16, 2014.
6    Q.    Was that made for our -- at our
7 request?
8    A.    Yes, it was.
9    Q.    Okay. And how did -- can you
10 explain to us how the system works?
11    A.    Yes.
12    Q.    Just briefly.
13    A.    The system is called Amicus.
14 It's a Canadian company. You may be familiar
15 with Needles or Time Matters or one of those
16 programs, but this is a program that's used by
17 a lot of personal injury firms because it's not
18 so heavy on keeping time as it is on
19 communications.
20          So everything -- theoretically,
21 everything that happens on a file, each file
22 has a space within the software and
23 theoretically anything and everything that
24 happens on the file should be kept in the
25 chronology.

Page 16

LINDA M. SHICK

2    Q.    Okay.
3    A.    Any phone call, now it's
4 advanced to the point that any letter written
5 would be documented in the -- within the log.
6    Q.    I see. Okay.
7    A.    At the time that this -- at the
8 time of Dr. Yarus' first incident in 2009, we
9 were only using the components that would
10 document telephone calls or e-mails.
11    Q.    Okay. So let me direct your
12 attention -- your letter is dated May 7, 2009.
13 Let me direct your attention to the second page
14 of this log, and I want to direct your
15 attention to an entry on Wednesday, May 27,
16 2009. Do you recognize that?
17    A.    Yes.
18    Q.    Okay. And it says that "Michael
19 Freeman returned my call." When it says
20 "returned my call," was that you, Linda Shick,
21 or your paralegal, Ms. Critelli?
22    A.    I believe that it was -- that
23 Carol Critelli, my paralegal, had been trying
24 to reach Mr. Freeman on my behalf, and she is
25 making a notation that -- because it's only a

Page 17

LINDA M. SHICK

2 four-second phone call, she made -- he
3 called -- he returned her call and it says: "I
4 told him you wanted to speak to him." That
5 would be her telling me that she told him that
6 I need to speak to him, and then she further
7 notes that: "He has pharmacy services looking
8 into the issue. I'll put the message on your
9 desk too."
10    Q.    So this information was conveyed
11 to you in this format from Ms. Critelli,
12 correct?
13    A.    Yes.
14    Q.    Okay. What is the next thing
15 that happened with respect to this situation?
16    A.    Well, internally there are --
17 there is a diary set to follow-up with Mr.
18 Freeman in a week. It's noted that on June 5th
19 it was done, which means that another phone
20 call was placed to Mr. Freeman, and I am
21 assuming that would be by Carol Critelli, and I
22 there is an effort to try -- we are trying to
23 reach him.
24    Q.    Now, after that, let me direct
25 your attention to the entry right above that

5 (Pages 14 - 17)

Page 18

LINDA M. SHICK

2 and to the first page at the bottom, which
3 gives a date of August 17, 2009, is that a
4 phone call that was taken by you?
5      A.    That is a phone call that --
6 it's a synopsis of a phone call conversation
7 that I had with Michael Freeman.
8      Q.    Ms. Shick, at the time that you
9 had this conversation did you actually type
10 into a computer what was being said to you by
11 Mr. Freeman?
12     A.    Yes.
13          And let me go back in explaining
14 Amicus. My staff uses Amicus. If I type into
15 Amicus, that does not get the information to
16 the staff, so I create an e-mail to the staff
17 to tell them what I did. They then -- on the
18 platform we have now they can attach the
19 e-mail. Back then they would have cut and
20 pasted from the e-mail into an Amicus entry so
21 that the log would be complete, but the
22 information would be conveyed to them by
23 e-mail.
24          It's my recollection that as I
25 talked to Mr. Freeman, I created an e-mail to

Page 19

LINDA M. SHICK

2 Carol Critelli that she then put into the
3 Amicus log, and this is a synopsis of the
4 communication that I had with him. And I also
5 do not believe that this is the first time that
6 I spoke to him.
7      Q.    You may have had an earlier
8 conversation?
9      A.    I know that I had an earlier
10 conversation.
11     Q.    What do you recall about that?
12     A.    I know that I chatted with him
13 for a minute, because he has the same name as
14 someone I went to high school with who I had
15 heard was in -- had become an attorney also,
16 and I had asked him if he had grown up in the
17 Central Bucks area. He did not. But we had
18 just spoken kind of chatty for a minute or two
19 and discussed the -- what was involved, what
20 Dr. Yarus' concerns were, he was going to look
21 into it, and then we spent the time trying to
22 follow-up with him. And then this is a
23 subsequent telephone conversation that I had
24 with him.
25     Q.    Because -- and for the purpose

Page 20

LINDA M. SHICK

2 of this deposition, have you again looked at
3 the information that's in this log that you are
4 looking at right now?
5      A.    Yes.
6      Q.    Aside from having looked at
7 that, do you have a clear recollection of the
8 conversation that you had with Mr. Freeman?
9      A.    Yes, I do.
10     Q.    Okay. Does the information
11 that's in the system with respect to that phone
12 conversation accurately state what the
13 substance of the conversation was?
14     A.    It's -- it's a brief synopsis of
15 a greater detailed conversation.
16     Q.    Okay. Incidentally, it says:
17 "Spoke, duration 00:02:14." What does the
18 2 minutes and 14 seconds relate to?
19     A.    Well, since I didn't -- since I
20 don't use Amicus directly, the 2 minutes and
21 14 seconds would have been the time that Carol
22 used to enter my e-mail into the log.
23 2 minutes and 14 seconds seems long to me, but
24 I don't know that she wasn't interrupted by a
25 telephone call or something. The clock just

Page 21

LINDA M. SHICK

2 runs as long as you have the file open.
3      Q.    Was your conversation with
4 Mr. -- to your recollection, was your
5 conversation with Mr. Freeman shorter or longer
6 than 2 minutes and 14 seconds?
7      A.    It was longer than 2 minutes and
8 14 seconds.
9      Q.    All right. Let's go over it.
10 What did Mr. Freeman say to you?
11     A.    Mr. Freeman told me that he had
12 spoken to a district manager, and the remark --
13 to me the "remark" meant the issue that
14 Dr. Yarus was under investigation by the
15 department -- Drug Enforcement Agency had been
16 removed from the Walgreens' computer system and
17 that's why I have the -- this is just my
18 shorthand in an e-mail, that they had -- "they"
19 being Walgreens -- had counseled all staff and
20 reprimanded them.
21          "He said the computer system
22 does not hold history so they had no idea how
23 the remark was put on. The patient is still
24 filling scripts from Dr. Yarus at Walgreens.
25 He apologized and said he would even have the

6 (Pages 18 - 21)

LINDA M. SHICK

2 DM contact Dr. Yarus and apologize for any
3 inconvenience this caused."
4    Q.    Do you remember anything -- do
5 you remember anything else about the
6 conversation or your pressing Mr. Freeman for
7 other information that's not recorded here?
8    A.    Yes. I told him that that
9 didn't make any sense to me.
10    Q.    And what did you mean by that,
11 when you said it didn't make any sense?
12    A.    That it makes no sense that a
13 computer system doesn't hold history so that
14 you wouldn't know who made the entry, when the
15 entry was made, how long ago the entry was
16 made, why the entry was made, that -- the fact
17 that there could be an entry -- a stand-alone
18 entry in a computer system without any
19 indication of how or why or when it was
20 entered. But he told me that it had been
21 removed.
22    Q.    Now, after he told you it had
23 been removed, did you get this -- did you
24 convey that information to Dr. Yarus?
25    A.    I did. I told him that it

LINDA M. SHICK

2 was -- that Walgreens had represented to me
3 that his patients should have no problems
4 filling prescriptions, that they were being
5 filled, and that he should have no further
6 problems with the issue.
7    Q.    Let me take you back to the
8 first page of Shick 2, there is an entry for
9 8/19, it says: "Notes: per LMS on 8/19."
10 What does that mean?
11    A.    I am responding to one of my
12 staff, which I assume at that time would have
13 been Carol.
14    Q.    Okay.
15    A.    That what are we doing --
16 because I had impressed upon them that there is
17 a one-year statute of limitations and that we
18 had to watch this closely, that -- she asked me
19 what are we doing at this point, and I said,
20 no, he is happy for now, just keep the general
21 file with all e-mails, we are going to hold in
22 the event it happens again.
23    Q.    Now, when Mr. Freeman advised
24 you that the remark had been removed from the
25 computer system, did you rely on what he told

LINDA M. SHICK

2 you?
3    A.    I absolutely relied on what he
4 told me.
5    Q.    And based on your conversation
6 with Dr. Yarus conveying to him what Mr.
7 Freeman told you, did he also rely on that?
8    A.    He -- he did, and I recall
9 speaking to Dr. Yarus further, asking him, "Are
10 any of your patients telling you that they are
11 still having issues? Do you have any reason to
12 believe that this has not been resolved?" And
13 we both thought that everything had been taken
14 care of.
15    Q.    So let me --
16    MR. BOLDEN: Let's --
17    - - -
18    (Whereupon, there was an
19    off-the-record discussion.)
20    - - -
21 BY MR. BOLDEN:
22    Q.    Yes, there is another entry on
23 August 18th, the day earlier, of 2009. Can you
24 tell us what that is? It says: "Done - call
25 Mr. Freeman - what is going on?"

LINDA M. SHICK

2    A.    Yeah, it says: "He is in a
3 meeting all day today." Then that -- there is
4 a voicemail left for him. It looks like we are
5 trying to reach him on the 12th, the 13th, the
6 17th, the 18th, and I am conveying to my staff
7 that we are not yet filing suit but Dr. Yarus
8 will want to know what they found and what they
9 are doing to resolve.
10    Q.    And that's on the 12th, correct?
11    A.    Well, it's repeatedly. We tried
12 to reach him -- there is "VM," voicemail,
13 "8/12 - he is in a meeting all day today,"
14 voicemail 8/13, voicemail 8/17, and then I
15 finally get him -- he finally returns my call
16 on 8/17.
17    Q.    Okay. Got you. Thank you.
18    Now, let me move you ahead
19 approximately a little over a year, to July
20 2010. Were you again recontacted by Dr. Yarus
21 with respect to the problems involving
22 Walgreen?
23    A.    Yes.
24    MR. BOLDEN: And let me have the
25    court reporter mark as Exhibit Shick 3

LINDA M. SHICK

this document.

\- - -

(Whereupon, Shick Exhibit 3 was marked for identification.)

\- - -

MR. BOLDEN: Let's go off the video record for a second.

VIDEO TECHNICIAN: Off the record at 10:02.

\- - -

(Whereupon, there was an off-the-record discussion.)

\- - -

VIDEO TECHNICIAN: Back on the record, 10:02.

BY MR. BOLDEN:

Q. Ms. Shick, can you just formally identify for the record the letter that has been marked as Shick 3?

A. It's a letter that I sent to Brett Stacey, an attorney at Walgreens Legal Department, on -- during July of 2010.

Q. And before sending that letter what is it that Dr. Yarus told you that caused

LINDA M. SHICK

you to write that letter?

A. Dr. Yarus told me that his patients were being denied -- that the Walgreens was refusing to fill their prescriptions, advising them that he was under federal investigation, and that -- by the Drug Enforcement Agency, and that this was a different location than the prior year.

Q. In the third paragraph you refer to an event on July 23, 2010. Is that the one that Dr. Yarus told you about?

A. Yes.

Q. And the location of the pharmacy in that event was 5627 Germantown Avenue in Philadelphia, correct?

A. Right.

Q. Okay. So that's the information that was included in the letter?

A. Yes.

Q. Okay. Now, you, according to this letter -- incidentally, how did you get Mr. Stacey's name?

A. I called the number I had for Michael Freeman and I don't have a specific

LINDA M. SHICK

recollection of whether I spoke to Michael Freeman or if I was told he is no longer in that department or exactly what transpired, but I was directed to Brett Stacey.

Q. And that's why you directed the letter to him?

A. Yes.

Q. Okay. And it says in your letter to Mr. Stacey on July 26, 2010, that you were including a copy of the first letter dated May 7, 2009. Why did you include that first letter?

A. I wanted him to know that this was not an isolated incident, that now we are dealing with at least two separate stores over a period of time.

Q. After receiving the assurances that you had received from Mr. Freeman that the remark had been removed from the computer system, were you surprised to find out that it was still in the system?

A. Yes. I didn't know if it had been reentered or if it had been there the entire time.

LINDA M. SHICK

Q. Now, in the fourth paragraph you make this statement: "Dr. Yarus is not being investigated by any agency. The Walgreens pharmacy personnel admitted that the Walgreens' computer system warned them that Dr. Yarus is under investigation and precluded filling any prescriptions written by him." Where did you get that information from?

A. That was information that I got from Dr. Yarus.

Q. All right. You go on in that letter on the second page to say that they must immediately correct their system to properly reflect Dr. Yarus' status and good standing.

After sending this letter, did you have contact with Brett Stacey?

A. I did.

Q. And what -- tell us what you recall about that.

A. My independent recollection is that Brett Stacey and I had a number of conversations pertaining to Dr. Yarus and his status at Walgreens, and he eventually assured me that there were no notations in the computer

Page 30

LINDA M. SHICK

2 system, Dr. Yarus was -- they had no reason to
3 believe he was under investigation, and that
4 they were apologizing, and I asked him for
5 something in writing verifying that -- their
6 apology and that Dr. Yarus wasn't being flagged
7 for any reason.
8    Q.    Yes, let me take you back to
9 Exhibit Shick 2, if I can, and let me direct
10 your attention to the last page of that
11 exhibit, there is a reference -- there is a
12 reference to an e-mail from Brett Stacey; is
13 that correct?
14    A.    The last page that -- the last
15 page that I have is the e-mail from Brett
16 Stacey.
17    Q.    Yes, I should have said "is the
18 e-mail," right, okay.
19          And is that the e-mail that you
20 are talking about?
21    A.    That's one of the e-mails that
22 we exchanged.
23    Q.    And that's on July 30, 2010?
24    A.    Yes.
25    Q.    And he says: "I have

Page 31

LINDA M. SHICK

2 confirmed" -- "Linda: I have confirmed all
3 comments have been removed. I understand you
4 are busy today. I am around Monday and most of
5 next week. Thanks."
6    Q.    Did you have follow-up e-mails
7 with him because of concerns you had as a
8 result of the fact that this was the second
9 time?
10    A.    Yes.
11    Q.    Okay. Let me show you what I
12 would like to be marked as Exhibit Freeman 4 --
13 excuse me; Shick 4.
14          - - -
15          (Whereupon, Shick Exhibit 4 was
16          marked for identification.)
17          - - -
18 BY MR. BOLDEN:
19    Q.    Can you identify that for us?
20    A.    Well, this is -- this is not --
21 this -- it's an e-mail between Brett Stacey and
22 me, but it's not printed from my system. It's
23 printed from his system.
24    Q.    Right. And it bears a Walgreens
25 Bates stamp, correct, at the bottom?

Page 32

LINDA M. SHICK

2    A.    Yes, it does.
3    Q.    And that's Walgreen019?
4    A.    Yes.
5    Q.    Okay. Now, in that e-mail what
6 did you ask from Brett Stacey?
7    A.    I asked him for a letter on
8 Walgreens' letterhead explaining how and why
9 the notations regarding Dr. Yarus being under
10 investigation was entered into Walgreens'
11 computer system and what was done to remedy
12 that.
13    Q.    Okay. And that e-mail is on
14 8/3/2010 at 11:25 a.m., correct?
15    A.    Correct.
16          MR. BOLDEN: Okay. Mark this as
17    Exhibit 5.
18          - - -
19          (Whereupon, Shick Exhibit 5 was
20          marked for identification.)
21          - - -
22 BY MR. BOLDEN:
23    Q.    Is that an e-mail to you that
24 was printed on the Walgreens system?
25    A.    Yes --

Page 33

LINDA M. SHICK

2          MR. SANZO: Before you go on,
3    can I have a copy of that, please?
4          MR. BOLDEN: Oh, I'm sorry.
5    Let's go off the record for a
6    second.
7          VIDEO TECHNICIAN: Off the
8    record at 10:10.
9          - - -
10          (Whereupon, there was a recess
11          in the proceeding.)
12          - - -
13          VIDEO TECHNICIAN: Back on the
14    record, 10:11.
15 BY MR. BOLDEN:
16    Q.    Can you identify Exhibit Shick
17    5?
18    A.    That is Brett Stacey's response
19 to my request for something in writing on
20 Walgreens' letterhead.
21    Q.    And what did he advise you?
22    A.    He says: "I'll see what I can
23 put together. Please give me until early next
24 week as I am traveling and have a number of
25 meetings scheduled. As mentioned in my prior

9 (Pages 30 - 33)

Page 34

1        LINDA M. SHICK
2 e-mails, the comments have been removed. While
3 I don't anticipate any problems, if any of his
4 patients have a similar issue, please advise."
5        MR. BOLDEN: Let me mark this as
6   Exhibit Walgreens 6.
7        MR. INNELLI: Shick 6.
8        MR. BOLDEN: Shick 6. I'm
9   sorry.
10             - - -
11        (Whereupon, Shick Exhibit 6 was
12   marked for identification.)
13             - - -
14 BY MR. BOLDEN:
15    Q.   Can you identify that, Ms.
16 Shick?
17    A.   That's a follow-up from me to
18 Brett Stacey, basically asking him where is the
19 letter, it's now August 11th, Dr. Yarus is
20 still waiting for a letter from a person in
21 authority explaining how the notations about
22 him were entered into the Walgreens' computer
23 system, why were they entered, why were his
24 patients told he was under investigation, and
25 assurance that it has been removed from the

Page 35

1        LINDA M. SHICK
2 system.
3    Q.   And what is -- as a result of
4 that, what is the next thing that happened with
5 respect to this matter?
6    A.   I don't know if there were
7 anymore e-mails but I do know that Brett Stacey
8 wrote a letter directed to Dr. Yarus.
9        MR. BOLDEN: Okay. Let me have
10   this marked as Exhibit 7.
11             - - -
12        (Whereupon, Shick Exhibit 7 was
13   marked for identification.)
14             - - -
15 BY MR. BOLDEN:
16    Q.   Ms. Shick, can you identify
17 Exhibit Shick 7?
18    A.   Well, I can -- the bottom part
19 of it is very light and I am having difficulty
20 reading what Brett said to me on August 11th.
21        "We continue to look" -- I
22 don't -- it's my fault. It's really small.
23 And he is asking me if I have time to discuss
24 it on Friday. So I really don't -- I can't
25 tell you verbatim. This is ridiculous but --

Page 36

1        LINDA M. SHICK
2        Oh, "We continue to look into
3 the origin of the notation." As confirmed last
4 week, the notations have been removed.
5    Q.   And did you write back to him
6 after receiving --
7    A.   I did.
8    Q.   And what did you tell him?
9    A.   Of course -- I said: "Of
10 course, I am willing to discuss it, but because
11 this is the second time Walgreens has told
12 Dr. Yarus' patients that he is under
13 investigation in a short time period, Dr. Yarus
14 wants a writing. Walgreens has hurt his
15 reputation with his patients."
16    Q.   As a result of that, did you --
17 did Mr. Stacey write to Dr. Yarus?
18    A.   He did.
19        MR. BOLDEN: Okay. Mark this as
20   Exhibit 8.
21             - - -
22        (Whereupon, Shick Exhibit 8 was
23   marked for identification.)
24             - - -
25        MR. SANZO: Do you have a copy?

Page 37

1        LINDA M. SHICK
2        MR. BOLDEN: Yes, just one
3 second.
4        MR. SANZO: Okay.
5        Thank you.
6        MR. INNELLI: You are welcome.
7 BY MR. BOLDEN:
8    Q.   Ms. Shick, did you receive a
9 copy of Exhibit 8?
10    A.   I did. It was faxed to me.
11    Q.   And is that a letter from
12 Mr. Stacey directly to Dr. Yarus?
13    A.   Yes.
14    Q.   Okay. And what did you
15 understand it -- what did Mr. Stacey tell your
16 client, Dr. Yarus?
17    A.   He is telling him that -- he is
18 trying to explain that the pharmacy system
19 tracks pharmacy personnel involved in the
20 filling and dispensing of prescriptions but
21 that Walgreens does not have the ability to
22 identify historical data pertaining to the
23 prescriber profile, such as the identity of
24 pharmacy staff that enter comments. Two
25 District Pharmacy Supervisors are currently

10 (Pages 34 - 37)

Page 38

LINDA M. SHICK

2 investigating whether they can otherwise
3 identify pharmacy staff that entered the
4 comment into the prescriber profile so as to
5 learn the rationale/basis for the notation.
6        He is confirming that the
7 comments have been removed from the prescriber
8 profile and he is going to have a District
9 Pharmacy Supervisor monitor his profile each
10 week for comments.
11    Q.   The term "prescriber profile"
12 that Mr. Stacey used in the letter to
13 Dr. Yarus, is that the first time that
14 terminology was used or was it also used, if
15 you can recall, in your conversations with Mr.
16 Freeman?
17    A.   I believe it was -- it had been
18 used all along, that there was something -- it
19 wasn't about the individual patients that were
20 coming in to get prescriptions, there was some
21 part of the computer that had book on Dr.
22 Yarus.
23    Q.   And that was what you understood
24 to be the prescriber profile?
25    A.   Yes.

Page 39

LINDA M. SHICK

2    Q.   Now, let me take you back to
3 Exhibit 2, which is Shick 2, before Mr. Stacey
4 sent that letter and after you had gotten the
5 e-mail from Mr. Stacey on July 30th in which he
6 said the remarks have been removed from the
7 computer system, once again, did you convey
8 that information to Dr. Yarus?
9    A.   I did.
10    Q.   And let me direct your attention
11 to the next-to-the-last page of Exhibit 2, and
12 I see an entry on July 30th at 12:01 from your
13 Verizon Wireless BlackBerry. Is that a
14 communication from you to Dr. Yarus?
15    A.   Yes.
16    Q.   Okay. And in that communication
17 did you advise him of the e-mail -- or did you
18 send him a copy of the e-mail from Brett Stacey
19 on July 30th?
20    A.   I believe I forwarded him
21 without -- it doesn't look like I had said
22 anything other than forwarding him that e-mail.
23    Q.   Okay. And can you tell us what
24 he got back and said to you?
25    A.   He said: "Thanx so i hope this

Page 40

LINDA M. SHICK

2 means it is over and certainly not true. Can
3 we get a written statement from him on
4 stationery. I dont trust them."
5    Q.   So when you got this written
6 statement from Brett Stacey on the Walgreen
7 letterhead and in his capacity as the Senior
8 Attorney saying the remarks have been removed,
9 did you rely on that?
10    A.   I did.
11    Q.   Okay. And to your knowledge
12 based on your conversations with Dr. Yarus, did
13 he rely on it?
14    A.   Yes, he did.
15        MR. BOLDEN: Cross-examine.
16 BY MR. SANZO:
17    Q.   Ms. Shick, how you doing?
18    A.   Good.
19    Q.   We are going to be a little
20 while. Do you want to take a break or do you
21 just want to keep on going?
22    A.   No; go ahead.
23    Q.   Okay. Now let me ask you some
24 stray questions first, then I will try to get
25 more organized. You were using a magnifying

Page 41

LINDA M. SHICK

2 glass a few minutes ago reading Shick 7 --
3    A.   Yes.
4    Q.   -- and I noticed that you didn't
5 quote exactly -- I just want to correct that
6 for the record. Do you have that handy,
7 please?
8    A.   Sure. I don't know that that's
9 going to help me see it. It's more that it was
10 so faint than it was so small.
11    Q.   I understand.
12        You were looking at the August
13 11, 2010, e-mail from Brett Stacey to you. Are
14 you with me there?
15    A.   Yep.
16    Q.   Read along as best you can, tell
17 me if you can't read this: "We continue" --
18 this is the e-mail from Brett to you: "We
19 continue to look into the origin of the
20 notation. As confirmed last week, the comment
21 has been removed."
22        Does that seem to be correct to
23 you as far as you can tell?
24    A.   Yes.
25    Q.   Okay. Now, if you would look --

11 (Pages 38 - 41)

Page 42

LINDA M. SHICK

turn your attention to Shick 2, those are -- if I understand correctly, these are the Amicus notes and apparently some e-mails also were copied into this pile of stapled documents. Is that accurate?

A. Yes.

Q. In the Amicus notes, if I understand correctly, it's a software program that your office uses and they did use it back in 2009 and 2010; is that correct?

A. Yes.

Q. And you personally do not enter anything into the Amicus system but your staff does; is that right?

A. It's not that I don't ever. If it's -- if it's for my information only, if it's not something -- if I am working on something with Carol or a paralegal, then I will convey that information to them by e-mail and they then will put it into Amicus. If it's something that I am working on, then I may enter it myself into the system.

Q. Okay. In dealing with the Yarus and Walgreen situation, did you enter any of

Page 43

LINDA M. SHICK

the Amicus comments yourself ever?

A. I may have.

Q. Can you tell me which ones that you entered yourself?

A. I would not be able to tell you which ones.

Q. Okay. So of all these notations on Exhibit Shick 2, you don't know which ones, if any, you entered yourself and which ones were entered by Carol Critelli or other staff?

A. I would -- I would believe that during the 2009 incident it would have been all through Carol Critelli, and during the 2010 incident it would have been through a different paralegal.

Q. Okay. But not yourself though?

A. Not directly into the Amicus system by me.

Q. Okay. So just to clarify that then, you did not enter any of the notes into the system yourself pertaining to Dr. Yarus, it would have been somebody on your staff?

A. In -- yes.

Q. Okay. Now, the purpose -- I

Page 44

LINDA M. SHICK

think you already said this, the purpose of this Amicus system is to document conversations regarding an event or incident or a case that you are working on, correct?

A. It's -- it's file maintenance, so that a diary is created and statutes are notated.

Q. Okay. And in maintaining the file the point would be to have all significant or key conversations logged; is that fair to say?

A. Ideally, yes.

Q. Okay. Obviously nobody is perfect, but that's the point, that's the idea behind it, correct?

A. Right. And Amicus is not an independent system. I have other computer -- there is other computer software where every single document or every single note that I make is scanned and put into a -- into the client file.

Q. Okay. Other than the documents on the table that we have marked as exhibits today, is there any other documentation at all

Page 45

LINDA M. SHICK

that exists regarding Walgreen -- this situation, the Yarus-Walgreen situation?

A. No, there is not.

Q. Okay. And is Exhibit 2, the Amicus chronology, is it redacted anywhere?

A. No.

Q. So this is exactly the way it would be in the system if you printed it out right now?

A. Not right now, it would not be. Because we changed platforms earlier this year, old closed files may or may not come over in this exact format.

Q. So this Shick 2 exhibit is seven pages. I just counted them off.

A. Yes.

Q. Is it your testimony that there are no redactions whatsoever on any of these seven pages of Shick 2?

A. No, nothing has been redacted.

Q. Okay. Thanks.

Before you testified today, did you speak with counsel for Mr. -- for Dr. Yarus?

12 (Pages 42 - 45)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 46

```
1              LINDA M. SHICK
2     A.    Yes, I did.
3     Q.    Now, tell me about that
4  conversation.
5     A.    I -- I have spoken with them
6  pertaining to this incident and what my office
7  did on behalf of Dr. Yarus.
8     Q.    Okay. Did you speak with them
9  today?
10    A.    I did.
11    Q.    What did they tell you today?
12    A.    That we were going to video the
13 conversation and asked me whether or not there
14 were any other notations that I had pertaining
15 to conversations with Walgreens.
16    Q.    And the answer would be no
17 apparently.
18    A.    No; apparently the answer would
19 be that my paralegal found a notation of a
20 phone message from 6/12 that somebody took
21 where Michael Freeman called me.
22    Q.    What year is that?
23    A.    You know, I don't -- I don't
24 know. Well, if it was Michael Freeman, it
25 would have been '09.
```

Page 47

```
1              LINDA M. SHICK
2     Q.    Is that documented in Shick 2
3  anywhere?
4     A.    No; it's just a telephone -- I
5  believe it's just a telephone message from June
6  12th. I didn't look to see if it's on -- if
7  it's on Shick 2. I can do that.
8     Q.    Okay. You think it was June 12,
9  2009?
10    A.    Yes, because it says "Michael
11 Freeman." That would be him -- that would
12 be -- I didn't communicate with him during
13 2010.
14          I don't see it. It probably was
15 a phone message that was left on my desk.
16    Q.    So you are saying that you found
17 a hard copy of a handwritten phone message?
18    A.    No; I found the carbon -- I
19 found the carbon of a phone message.
20    Q.    May I see it, please?
21    A.    Sure.
22    Q.    Thank you.
23          So the document you just handed
24 me has three messages on it, and the bottom one
25 is the one you were talking about?
```

Page 48

```
1              LINDA M. SHICK
2     A.    Yeah, the first -- they didn't
3  use the first one.
4     Q.    Right. It's crossed off, right.
5  It would have four but it only has three that
6  were actually written on.
7     A.    Right.
8     Q.    Okay. So it says -- you don't
9  have a copy with you, do you?
10    A.    Of that?
11    Q.    Yes.
12    A.    No. I was just looking at Shick
13 2.
14    Q.    I am going to read -- and I will
15 hand it back to you -- it has Michael Freeman's
16 name, it has "Walgreens," it has a phone
17 number, it has -- the re: is "Yarus," and then
18 it says: "Looking for" -- it looks like it
19 says: "Looking for patient names," and it has
20 "Telephoned" is checked and "Please Call." Did
21 I read that correctly?
22    A.    Yes, you did.
23    Q.    Okay. And did you talk to Mr.
24 Freeman about -- is that your note or someone
25 else's note?
```

Page 49

```
1              LINDA M. SHICK
2     A.    That's someone else's note.
3     Q.    Okay. Are there any other -- is
4  there any other documentation, notes, anything
5  at all pertaining to anybody from Walgreen or
6  this whole entire event that we haven't now
7  discussed today?
8     A.    Not that I have documentation
9  for.
10    Q.    Okay. What is your current
11 relationship with Dr. Yarus, if anything?
12    A.    Dr. Yarus is a consulting expert
13 for me.
14    Q.    Okay. And you do plaintiff's
15 personal injury work?
16    A.    I do.
17    Q.    Do you do any defense?
18    A.    I do not.
19    Q.    And do you have cases pending
20 right now where Dr. Yarus is your expert or
21 your consultant?
22    A.    I don't know that there is
23 any -- no, I correct that, I believe that he is
24 an expert in one case that is scheduled for
25 mediation but he will not be testifying.
```

13 (Pages 46 - 49)

Page 50

LINDA M. SHICK

2    Q.    Okay. When did you first meet
3  Dr. Yarus?
4    A.    The first time I met Dr. Yarus
5  was probably about eight years ago.
6    Q.    So about 2007, give or take?
7    A.    I -- I think that that's true.
8    Q.    And the first time you met him,
9  was that when he was an opposing expert?
10   A.    No. When he was an opposing
11 expert, I only saw him on paper.
12   Q.    Okay. How did you meet him or
13 what was the nature of the first meeting with
14 Dr. Yarus in 2007?
15   A.    That probably was at some kind
16 of social event.
17   Q.    Okay. When did you first use
18 Dr. Yarus as a consultant or testifying expert?
19   A.    Dr. Yarus actually has never
20 testified on behalf of any of my clients. I
21 have been present at one of his depositions,
22 video testimony, on a case where I was
23 co-counsel, and that was maybe three years ago.
24 Other than that, he has -- he has written
25 reports for me.

Page 51

LINDA M. SHICK

2    Q.    Okay. Are you strictly in the
3  third party liability context as opposed to
4  workers' compensation?
5    A.    I do -- yes, I do not do
6  workers' comp.
7    Q.    Okay. So if I understand
8  correctly, you use Dr. Yarus as a testifying
9  expert to prepare reports but he doesn't
10 typically testify for you?
11   A.    No. Fortunately, those cases
12 have either been resolved or have gone to an
13 alternative dispute resolution where I haven't
14 had to produce him.
15   Q.    Just so we are clear, when he
16 prepares a report, you are referring to an
17 expert report?
18   A.    Yes.
19   Q.    Under Pennsylvania law or
20 federal law?
21   A.    Yes.
22   Q.    Okay. Approximately how many
23 reports has he prepared for you over the years?
24   A.    If -- if I have -- if I started
25 with him eight years ago, it could be as many

Page 52

LINDA M. SHICK

2  as 25.
3    Q.    Okay. And you currently are
4  using him as a consultant you said right now?
5    A.    There are times that I call him
6  about a medical question.
7    Q.    As --
8    A.    Not --
9    Q.    I'm sorry.
10   A.    Not as a hired consultant on a
11 case, but if there is a statement in a
12 defense -- even on a case that he is not
13 utilizing or I am not utilizing him on the
14 case, if there is a statement in the defense
15 medical, I might call him for clarification.
16   Q.    Okay. So you basically call him
17 just to consult with him or for advice
18 informally I guess?
19   A.    Yes.
20   Q.    All right. Do you currently
21 have any cases you are handling where Dr. Yarus
22 is involved in any way, shape or form in the
23 case as a consultant or as a potential expert?
24   A.    Yes.
25   Q.    How many?

Page 53

LINDA M. SHICK

2    A.    I believe I have -- I believe
3  that there are two clients scheduled, scheduled
4  to see him within the next couple months,
5  within the next month or so, and I believe that
6  I have one case that is going to a binding
7  high/low arbitration where he is -- he has seen
8  the client.
9    Q.    Okay. And do you plan to
10 continue using Dr. Yarus into the future as an
11 expert or as a consultant?
12   A.    I don't know. Since he is
13 closing the Allentown office, he is -- he is
14 out of the area where my client -- would be
15 convenient for my clients.
16   Q.    Okay. So if you don't use him
17 in the future, it will be because of the
18 geographical issue?
19   A.    For the most -- for the most
20 part.
21   Q.    Okay. Do you ever see Dr. Yarus
22 socially?
23   A.    There have been occasions we
24 have been at the same place at social
25 occasions.

14 (Pages 50 - 53)

Page 54

```
1          LINDA M. SHICK
2    Q.   Do you ever intentionally
3  schedule a social event with Dr. Yarus, go out
4  to dinner, see a movie, go to a show, anything
5  like that at all?
6    A.   We have had lunch.
7    Q.   Okay. Do you consider him to be
8  a friend of yours?
9    A.   A friend? He -- he is -- I
10 would say we are friendly.
11   Q.   Okay. Is that different than
12 saying he is a friend?
13   A.   Yeah. If I -- if my husband and
14 I are going to go on a vacation, he is not
15 somebody that we are going to go with.
16   Q.   So he would be a level of
17 friend, is that what you are saying, but not a
18 close friend? I don't follow what you are
19 saying.
20   A.   We don't --
21       MR. BOLDEN: Well, I will object
22 too.
23 BY MR. SANZO:
24   Q.   I'm sorry; I don't want to beat
25 a dead horse, but the question was, is he a
```

Page 55

```
1          LINDA M. SHICK
2  friend of yours or not really? That's the
3  basic question.
4    A.   Yeah, I would say that he -- I
5  would say that he -- that he is. I mean, I
6  don't send him a birthday card.
7    Q.   Okay.
8    A.   He doesn't send me one.
9    Q.   Okay. Let me just -- I'm going
10 to bounce around a little bit here, let me go
11 back to Shick 2, just a technical question or
12 two about the way the Amicus system works, at
13 least the way it worked in this particular
14 case, do you know, what's the time frame --
15 like there is one entry you were talking about,
16 let me just find it here, okay, when you were
17 talking about the August 17, 2009, entry,
18 begins on the bottom of the first page and the
19 substance is on the second page.
20   A.   Yes.
21   Q.   Okay. And you testified -- and
22 if you tell me I'm wrong of course, just tell me,
23 but my recollection is you testified that this
24 was a conversation you recall having with Mr.
25 Freeman and you e-mailed Carol Critelli and she
```

Page 56

```
1          LINDA M. SHICK
2  made the entry into the Amicus system; is that
3  correct?
4    A.   Yes.
5    Q.   Okay. What is the sequence, the
6  time sequence? You had the conversation to
7  your recollection with Mr. Freeman and then
8  when did you prepare the e-mail to
9  Ms. Critelli?
10   A.   I usually -- because -- I left
11 out of my background and history that I spent a
12 long time as a secretary and a paralegal
13 between the time that I went to law school and
14 the time that I had quit college. I can type
15 faster than I can write or talk. So I would --
16 I typically type the e-mail contemporaneously
17 with the conversation. I then immediately send
18 it to whoever it's directed to.
19       Normally, my relationship with
20 Carol, that lag time would be within the half
21 hour or the hour, depending on what else she is
22 working on. The very next time she would go to
23 her e-mail she would clear everything and
24 attach it so that it clears out her e-mail.
25 It's just a system that we have developed over
```

Page 57

```
1          LINDA M. SHICK
2  the years. She has been with me since 2000 --
3  I think 2002.
4    Q.   And she is with you today still?
5    A.   She is.
6    Q.   Okay. So this particular e-mail
7  then, the one that was typed on August 17,
8  2009, so you are saying that you typed this at
9  the same time you were speaking with Mr.
10 Freeman?
11   A.   Yes.
12   Q.   And then you sent it off to
13 Carol Critelli and then she would have
14 eventually entered the substance of the e-mail
15 into the Amicus system; is that correct?
16   A.   Yes.
17   Q.   Now, would she have cut and
18 pasted your e-mail and put it into the system
19 directly as you sent it to her?
20   A.   Back then she would have done it
21 that way.
22   Q.   Okay. So the note we are
23 looking at here on Page 2 of Shick 2 is a copy
24 of your e-mail verbatim then?
25   A.   Yes.
```

15 (Pages 54 - 57)

Page 58

LINDA M. SHICK

2  Q.  All right. And when you were
3  typing what Mr. Freeman said to you, did you
4  type all -- whatever you felt was significant
5  you would type down?
6  A.  It was -- yes, it was my
7  condensation of his -- of what he was telling
8  me.
9  Q.  In other words, you weren't
10 typing as if you were a court reporter, you
11 were just typing the pertinent portions, the
12 pertinent statements?
13 A.  Correct.
14 Q.  Okay.
15 A.  Because there is nothing --
16 there is nothing here that says what I said.
17 Q.  Okay. And I think you testified
18 before that the 2 minute and 14 seconds, you
19 were sort of assuming that that was the time
20 that it took Ms. Critelli to enter it. Is that
21 what you said before?
22 A.  Yes, because there is no clock
23 running on my e-mail, but there is a clock
24 running on Amicus.
25 Q.  Okay.

Page 59

LINDA M. SHICK

2  A.  As soon as you open up the
3  client file, the clock starts to run.
4  Q.  I see. Is there anything else
5  about the conversation -- actually, let me back
6  up a second, do you have an actual recollection
7  about this conversation you had in 2009 with
8  Michael Freeman without looking at the note?
9  A.  Yes, I do.
10 Q.  Do you typically recall
11 conversations many years later from people in
12 general? Do you have that kind of a memory?
13 A.  About certain things I do.
14 Q.  Okay. What is it about this
15 particular conversation that makes you still
16 recall it all these years later?
17 A.  Because I thought he was lying
18 to me.
19 Q.  Thought who was lying?
20 A.  I thought Michael Freeman was
21 lying to me.
22 Q.  And why do you say that?
23 A.  I thought that -- or he was not
24 being completely candid in that -- telling me
25 that he was unable to tell how there was the --

Page 60

LINDA M. SHICK

2  what was the origin of the comments and how is
3  it that they -- how is it -- why was it that
4  Dr. Yarus had been flagged. I did not think he
5  was being -- I think -- I think that he knew
6  the answer to that and was not sharing it with
7  me.
8  Q.  After you -- strike that.
9      When did you last have any
10 involvement in this entire affair with
11 Walgreen? Was it 2010? Was it July or August
12 of 2010?
13 A.  Other than to hear that
14 Dr. Yarus had decided to proceed, yes.
15 Q.  So it was probably about August
16 2010, that's when the letter came from Brett
17 Stacey to Dr. Yarus?
18 A.  Yes.
19 Q.  After August of 2010 when do you
20 next have any involvement whatsoever or even
21 hear about the Walgreen/Yarus situation?
22 A.  I think -- I believe that it was
23 in 2013.
24 Q.  What happened in 2013?
25 A.  I -- my recollection is that

Page 61

LINDA M. SHICK

2  Dr. Yarus and I had a conversation that there
3  was intertwined ongoing litigation between a
4  law firm and a comment that was made about
5  Dr. Yarus and the resurfacing of issues with
6  Walgreen.
7  Q.  And how did that or where did
8  that conversation arise?
9  A.  It probably was -- no; I am
10 certain it was on the telephone. I am -- I
11 don't recall that being in person. And I
12 believe he was asking me if I would cooperate
13 with his attorneys.
14 Q.  Okay. Can you recall what month
15 in 2013 that conversation took place?
16 A.  I don't. And if I had to
17 rethink it, the fact that Carol sent the log,
18 recreated the log in June of '14, it may have
19 been, it may have been late 2013 and then some
20 time may have gone by before I heard from
21 counsel.
22 Q.  Did he ask you to represent him?
23 A.  No.
24 Q.  And when he asked you if you
25 would cooperate, I imagine you said yes?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 62

LINDA M. SHICK

2    A.    Yes.
3    Q.    Okay.  Now, before that 2013
4 conversation with Dr. Yarus, did you -- I'm
5 sorry; strike that, please.
6         After that conversation did you
7 go back and review your notes of what happened
8 in 2009 and 2010?
9    A.    Not then, I did not.
10   Q.    When was the first time that you
11 can recall reviewing your notes, and
12 specifically the Amicus notations, after August
13 of 2010?
14   A.    When Carol wrote them out or
15 printed out from the computer -- I don't know
16 how to print out from the computer like this.
17 So when she printed it out, before it was sent
18 anywhere, I reviewed it.
19   Q.    It looks -- there is a date on
20 Shick 2 of June 16, 2014?
21   A.    Right.
22   Q.    Is that the date when this was
23 printed out?
24   A.    Yes.
25   Q.    Okay.  So is it your testimony

Page 63

LINDA M. SHICK

2 that -- well, I'm sorry, let me ask a different
3 question, did you review the notes then, in
4 2014, in June 2014?
5    A.    Yes.
6    Q.    Okay.  Before they were sent
7 over to plaintiff's counsel?
8    A.    Yes.
9    Q.    All right.  Before reviewing
10 those notes in June 2014, did you recall the
11 conversation we are talking about with Mr.
12 Freeman that took place in August of 2009?
13   A.    Yes.
14   Q.    Okay.  That never left your
15 memory, you always recalled that?
16   A.    It did not -- it did not leave
17 my memory that -- when it resurfaced, I know
18 that I -- I was surprised that it had
19 resurfaced again but it had always stuck with
20 me that I had never had a full recollection --
21 a full revelation from Walgreens as to why and
22 how Dr. Yarus was flagged --
23   Q.    Okay.
24   A.    -- and relied on their
25 representation that it had been resolved.

Page 64

LINDA M. SHICK

2    Q.    And you testified that you had
3 had a prior phone conversation with Mr. Freeman
4 about the situation with Walgreen and Lance
5 Yarus.  Do you recall testifying to that a few
6 minutes ago, a half an hour ago?
7    A.    That when -- which conversation?
8    Q.    Well, I am going to get to that
9 in more detail.
10        You testified, if I recall
11 correctly, that other than the conversation you
12 had on August 17, 2009, you had had another
13 conversation with Mr. Freeman?
14   A.    At least one.
15   Q.    Okay.  Now, when would that
16 conversation have taken place, before or after
17 August 17, 2009?
18   A.    Before.
19   Q.    And describe the nature of that
20 conversation?  What did he say to you?  What
21 did you say to him?
22   A.    Well, the initial conversation
23 that I had with him was the chatty, you know,
24 do I know you, are you from the area, and then
25 telling him what had happened at Walgreens and

Page 65

LINDA M. SHICK

2 Dr. Yarus' concern over it and could he please
3 look into it and resolve it immediately.
4    Q.    Okay.  And what did he say?
5    A.    He said that he would look into
6 it.
7    Q.    Okay.
8    A.    He said, no, he wasn't from the
9 area and that he would look into it, and he
10 couldn't explain without further investigation
11 on his side as to how and why it had happened.
12   Q.    Was that your first contact with
13 Michael Freeman?
14   A.    I believe that to be my first
15 contact with Michael Freeman.
16   Q.    Can you give me an approximate
17 date?
18   A.    If I initially wrote to him in
19 May -- I believe it's during -- I believe that
20 it's during May -- it looks -- from the notes
21 it looks like that we're periodically either
22 missing each other or having short
23 conversations from the time that I wrote the
24 letter in May until -- until August 17th.
25   Q.    Where is the conversation you

17 (Pages 62 - 65)

Page 66

LINDA M. SHICK

2 just described with Mr. Freeman documented in
3 your Shick 2?
4    A.    It's not, but there is
5 somehow -- I know that -- I know that I spoke
6 to people at Walgreen, I know that I was
7 referred to Mr. Freeman. This is not inclusive
8 of all communication.
9    Q.    So how many total conversations
10 do you think you had with Michael Freeman? You
11 have talked about two now.
12    A.    Well, I know that there was the
13 conversation -- there would have been an
14 initial conversation and then there was a
15 conversation where the issue was resolved and I
16 believe in between there was another --
17 there was a conversation in between those two.
18    Q.    So when you say "the issue was
19 resolved," which conversation are you referring
20 to?
21    A.    That would have been the August
22 17th conversation.
23    Q.    Okay. So you think the August
24 17, 2009, conversation that is documented was
25 your last conversation you ever had with

Page 67

LINDA M. SHICK

2 Michael Freeman?
3    A.    I believe that was the last time
4 I ever spoke to him.
5         I can see that there is a lot of
6 voice messages being left during August.
7    Q.    By you or by someone on your
8 staff?
9    A.    I can't answer that.
10    Q.    And which one are you looking
11 at, which notation?
12    A.    If you look at the August
13 18th --
14    Q.    What page? Oh, I see it, yes,
15 okay.
16    A.    And I can't explain to you why
17 Amicus generate -- it could be that it's a
18 different category of message, according to
19 Amicus, so that you can see a series of voice
20 messages left in a note section. It says:
21 "Notes: Voice message 8/12 - He is in a
22 meeting all day today," voice message 8/13,
23 voice message 8/17, "We aren't filing suit but
24 Lance will want to know what they found out."
25         The fact that it says "but Lance

Page 68

LINDA M. SHICK

2 will want to know," that tells me that I did
3 it, because my staff would not refer to him as
4 "Lance."
5    Q.    So you are talking about the
6 August 18, 2009, notation on Shick 2?
7    A.    Yes.
8    Q.    And you think that you typed
9 that?
10    A.    The fact that it says "Lance"
11 leads me to believe that I typed that.
12    Q.    So you typed that directly into
13 Amicus?
14    A.    Yes.
15    Q.    On August 18, 2009?
16    A.    Yes.
17    Q.    Okay. Now, you mentioned
18 another conversation, I am not sure I followed.
19 We have two we just talked about now.
20    A.    Right.
21    Q.    There is a third conversation
22 with Michael Freeman?
23    A.    There has got to be a -- there
24 is -- at some point in time while this is going
25 on there is a conversation that would have

Page 69

LINDA M. SHICK

2 basically been what is happening and at that
3 point he didn't have anything to report to me,
4 and I -- and I think at that -- other than to
5 assure me that Dr. Yarus shouldn't be
6 experiencing any problems.
7    Q.    Okay. All of your conversations
8 with Michael Freeman were after your May 7,
9 2009, letter, correct?
10    A.    Yes.
11    Q.    And they were all in your role
12 as Yarus' attorney, correct?
13    A.    Yes.
14    Q.    And the one conversation you
15 mentioned where it began with, "Did you grow up
16 in the area" --
17    A.    Yes.
18    Q.    -- and then you asked him -- I
19 am just going to paraphrase, basically you
20 asked him what's happening with Walgreens, will
21 you look into this, and he agreed to do that,
22 correct?
23    A.    Yes.
24    Q.    Why isn't that documented?
25    A.    Why isn't that conversation

18 (Pages 66 - 69)

Page 70

1       LINDA M. SHICK
2 documented?
3    Q.   Right.
4    A.   Because I am not married to
5 Amicus to the extent that my staff is. It may
6 have been documented on a yellow sheet within
7 my file.
8    Q.   Okay.
9    A.   That has since been purged. I
10 don't have the same methods as support staff.
11   Q.   The yellow sheet that you
12 produced a few minutes ago, the notes with --
13   A.   On the telephone message book?
14   Q.   Right.
15   A.   Yeah, I'm talking about a
16 yellow -- a yellow sheet like you're writing
17 on.
18   Q.   Okay. Before I forgot, I would
19 like to request a copy of that, please.
20   A.   Of the phone message?
21   Q.   Yes, please, the one note from
22 Dr. Yarus.
23   A.   Sure.
24   Q.   After we are done.
25       MR. INNELLI: From Dr. Yarus or

Page 71

1       LINDA M. SHICK
2 from Mr. Freeman?
3       MR. SANZO: It's -- whatever the
4    note is regarding a conversation, the
5    bottom of that page you are looking at.
6       MR. INNELLI: It's from Mr.
7    Freeman.
8       MR. SANZO: Okay.
9 BY MR. SANZO:
10   Q.   In that spiral notebook that is
11 in front of you there, whose writing is that?
12 Is that Critelli's writing?
13   A.   No, that's not Carol Critelli's
14 writing, and I do not -- I do not know whose
15 writing that is or whose book this is.
16   Q.   And that was my next question,
17 you don't know whose book it is?
18   A.   I don't recognize -- back in
19 '09, I don't recognize whose book that is, and
20 they are not putting initials on the note.
21   Q.   Where did you find the book
22 physically?
23   A.   Carol has all of -- every yellow
24 book that I have ever used, she has in a
25 drawer -- that my practice has ever used, she

Page 72

1       LINDA M. SHICK
2 has in a drawer.
3       MR. INNELLI: This is a
4    telephone message book, correct?
5       THE WITNESS: Yes.
6 BY MR. SANZO:
7    Q.   Who was involved in the Walgreen
8 situation besides you and Carol Critelli,
9 anybody?
10   A.   In 2009, no. In 2010, Carol was
11 not. Another paralegal, Ryan Relyea, was.
12   Q.   Okay. Anybody else besides
13 Ryan, Carol and yourself at any time?
14   A.   No.
15   Q.   Is Ryan still employed with you?
16   A.   No.
17   Q.   Why did he leave?
18   A.   Ryan's mother had mesothelioma
19 and he left to take care of her.
20   Q.   Okay.
21   A.   Following that he got married
22 and his wife had a job in South America, so he
23 went with her.
24   Q.   Okay. Have you been through --
25 I see you are going through it now. Are there

Page 73

1       LINDA M. SHICK
2 any other notations at all regarding this
3 entire situation with Dr. Yarus and Walgreen?
4    A.   No. I am just trying to figure
5 out why whoever it was that kept this book
6 didn't ever put their initials on any phone
7 call, and I don't know whose telephone --
8 whose -- there is more than one person used
9 this book and I don't recognize any of the
10 handwriting.
11   Q.   But of all the notations in that
12 book, it's just the one that pertains to this
13 case, the Yarus/Walgreen situation?
14   A.   Yes.
15   Q.   And you have nothing else of any
16 kind, any documentation regarding Walgreen or
17 this situation back in your office?
18   A.   Not back in my office, no.
19   Q.   Anywhere else?
20   A.   There is duplicates of what you
21 saw in my exhibits that are in what is left of
22 a hard file.
23   Q.   But that's the same thing that's
24 on the table here that we have marked as
25 exhibits?

19 (Pages 70 - 73)

Page 74

LINDA M. SHICK

1        LINDA M. SHICK
2    A.    Yes.
3    Q.    Okay. Other than the 2009 and
4  2010 representation of Dr. Yarus, have you
5  represented him at any other time in your life?
6    A.    I have not formally represented
7  him. I have discussed some issues with him and
8  referred him to other people that I thought
9  were -- if it's not personal injury, it's not
10  my thing. He has had other issues that I have
11  referred him to other counsel for.
12    Q.    So he has called you with an
13  issue and you referred him off to some other
14  counsel?
15    A.    Yes.
16    Q.    Okay. So other than the
17  Walgreen situation, that's the only time you
18  ever represented him formally?
19    A.    Yes.
20    Q.    I don't know if that's even
21  formal or not, there was no suit filed, but he
22  was your client though?
23    A.    Yes.
24    Q.    Okay. When is the last time you
25  spoke with Lance Yarus about this case in

Page 75

1        LINDA M. SHICK
2  general, anything to do with this case?
3    A.    Specifically about this case was
4  I spoke to him when there became discussion of
5  my giving a deposition, I spoke with him to get
6  a waiver of confidentiality.
7    Q.    Okay.
8    A.    We did not discuss what was
9  going on in the case.
10          Prior to that, I probably spoke
11  to him after I heard that he had had his
12  cardiac event, I spoke to him a little bit
13  about stress, and when he was out of the office
14  for the period of time affected me personally
15  in that, where is my expert.
16    Q.    When you spoke to him to get the
17  waiver of the privilege, approximately when was
18  that?
19    A.    I received it shortly
20  thereafter, so I think that that was -- that
21  was back in mid April.
22    Q.    Of 2014?
23    A.    2015.
24    Q.    So it was just a few days ago?
25    A.    The actual writing of -- that I

Page 76

1        LINDA M. SHICK
2  have a waiver was a few days ago.
3    Q.    Okay.
4    A.    Prior to that, I had asked him
5  verbally or he had directed me verbally to
6  cooperate with his counsel.
7    Q.    And was that in 2015?
8    A.    That he directed me verbally?
9    Q.    Yes.
10    A.    No; it would have been whenever
11  his current counsel began investigating his
12  claims.
13    Q.    Okay. And the letter that you
14  have, was that a letter from Dr. Yarus waiving
15  the attorney-client privilege?
16    A.    As to this suit -- as to this
17  case only.
18    Q.    Is that all it says?
19    A.    It specifically says: "Dear
20  Attorney Shick, I am hereby waiving the
21  attorney-client privilege with regards to the
22  Walgreen matter. This waiver does not apply to
23  any other matters. Thank you for your kind
24  consideration."
25    Q.    Okay. Thanks.

Page 77

1        LINDA M. SHICK
2          What do you know about the
3  current lawsuit that Dr. Yarus has against
4  Walgreen?
5    A.    What do I know factually or what
6  have I heard?
7    Q.    Obviously, yeah, obviously it's
8  defamation, you know that, but --
9    A.    I know it's defamation.
10    Q.    -- what do you know -- yes, it's
11  the same question to me, what do you know
12  factually, what have you heard, to me. Is that
13  different to you?
14    A.    It could be.
15    Q.    Okay. Take them one --
16    A.    I know that the case stems from
17  Walgreens advising his patients and whoever
18  else, their pharmacists, their staff, to
19  whomever they publish their disparagement, I
20  know that it involves their representation that
21  he is a pill-pushing scriptwriter who doesn't
22  treat and that he was under -- that he was and
23  is under investigation by federal authorities.
24    Q.    And how do you know that?
25    A.    I know that from having read the

20 (Pages 74 - 77)

Page 78

LINDA M. SHICK

2 lawsuit and I know that from conversation with
3 Dr. Yarus when he decided to go forward with
4 the case.
5      Q.   Okay. So when you said a moment
6 ago, you know, factually and from what I have
7 heard, have you covered both of those now?
8      A.   No -- no. I have also -- I have
9 also heard about another suit wherein he was
10 disparaged that may be intertwined with this
11 suit.
12     Q.   And what is the nature of that
13 suit or who is the defendant in that suit, if
14 you know?
15     A.   That case has been resolved.
16 The defendant is -- was Thomas, Thomas & Hafer.
17 I don't know the specific attorney who made the
18 remark that Dr. Yarus is a -- either a
19 crackhead or crack user.
20     Q.   And you believe that case has
21 been resolved?
22     A.   I believe that case has been
23 resolved.
24     Q.   And who told you that?
25     A.   I believe that his current

Page 79

LINDA M. SHICK

2 counsel has told me that that case has been
3 resolved, when I inquired as to whether that
4 case was still ongoing.
5      Q.   You mean one of the lawyers
6 sitting at the table today?
7      A.   Correct.
8      Q.   Okay. What have you looked
9 at in preparation for today's deposition? You
10 just mentioned a lawsuit. Would that be the
11 federal complaint?
12     A.   I looked at the federal
13 complaint. I had previously Googled and found
14 the remark on the Internet about the -- the
15 crackhead remark was on the Internet. That's
16 not this suit.
17        I looked at -- I looked at my
18 documents and I looked at the Complaint in this
19 case.
20     Q.   Your documents that we have been
21 talking about today?
22     A.   Yes.
23     Q.   The crackhead comment, is that
24 referring to the other suit?
25     A.   Yes.

Page 80

LINDA M. SHICK

2      Q.   Where is that on the Internet?
3      A.   There is -- it's in a number of
4 places about their being a federal case because
5 a Thomas, Thomas & Hafer attorney called
6 Dr. Yarus a crackhead.
7      Q.   So the crackhead term is in the
8 context of the lawsuit? You don't see it out
9 there independently? Somebody else isn't
10 calling Dr. Yarus a crackhead?
11     A.   I didn't do a detailed -- I only
12 read what came up in a credible legal site.
13     Q.   Okay. Do you have any personal
14 knowledge yourself about anything that was ever
15 in the Walgreen computer system regarding
16 Dr. Yarus?
17     A.   I'm sorry; could you state that
18 again?
19     Q.   Yes. Do you have any direct or
20 personal knowledge about anything, any comment,
21 any notation, anything in the Walgreen computer
22 system regarding Dr. Yarus?
23     A.   Only from what Brett Stacey or
24 Michael Freeman told me.
25     Q.   Okay. And what did Brett Stacey

Page 81

LINDA M. SHICK

2 tell you?
3      A.   That there were comments in the
4 Walgreen provider profile.
5      Q.   Okay. And what did Freeman tell
6 you?
7      A.   The same thing, that there were
8 comments in the provider profile.
9      Q.   Did either Mr. Stacey or Mr.
10 Freeman tell you what those comments were?
11     A.   Quote what the comments were,
12 no. They -- the impression was that they were
13 negative comments in the provider profile.
14     Q.   What did Lance Yarus tell you
15 the comments were, if he told you?
16     A.   He -- his information was what
17 his patients had told him, and also his staff
18 called -- when the -- when the patients
19 returned or called his office and said, "I had
20 difficulty filling the prescription" and told
21 them why, then staff or Dr. Yarus called to
22 find out why aren't my prescriptions being
23 filled and was told that he was red flagged or
24 there is notations that his narcotic
25 prescriptions could not be filled.

21 (Pages 78 - 81)

Page 82

LINDA M. SHICK

2  Q.  Other than that, do you know of
3  any other comment that was allegedly in the
4  Walgreen computer system about Dr. Yarus?
5  A.  I don't know specifically what
6  it said, only that they were negative.
7  Q.  Okay.  In even -- I don't want
8  to put too fine a point on this, but I
9  understand what you said you don't know
10  specifically, but do you even know generally,
11  just paraphrasing, what was in that system, the
12  computer system about Dr. Yarus, if you know?
13  A.  Well, from what I -- from what I
14  know, that the -- and that's like third-hand
15  information, so I don't know if it's a
16  pharmacist -- I don't know if it's a
17  pharmacist's interpretation of what they read
18  in the computer, but what was conveyed to the
19  patient was that you need to find another
20  doctor, your doctor does not treat, he only
21  writes scripts and he is a pill pusher.  Those
22  are the -- now I -- my intellect tells me that
23  Walgreens wouldn't be so stupid as to write
24  those things in their computer, but that is
25  what their staff who is reading the profile

Page 83

LINDA M. SHICK

2  conveyed to the patients that had come in to
3  get prescriptions filled.
4  Q.  And that's your understanding
5  from speaking with Dr. Yarus who spoke with
6  someone else; is that correct?
7  A.  Yes.
8  Q.  Okay.  And that's also what is
9  written in the Amended Complaint, the federal
10  Amended Complaint against Walgreen, isn't it?
11  A.  Yes.
12  Q.  Okay.  Did anybody from Walgreen
13  ever tell you that there were comments such as
14  you just mentioned in the computer about Dr.
15  Yarus, that he is a pill pusher, that he just
16  writes scripts, that he is not a good doctor;
17  anything like that?
18  A.  No.  My -- my conclusion from
19  what they told me would be that what was
20  written in the computer is that that -- I don't
21  know -- I don't know Walgreens' system, so I
22  don't know if a little red flag pops up, I
23  don't know if there's a notation that actually
24  says "DEA investigation," I don't know what
25  within Walgreen, what message is given that is

Page 84

LINDA M. SHICK

2  then interpreted by their personnel.
3  Q.  Other than -- you talked about
4  already today asking Dr. Yarus whether he was
5  under investigation or not.  Did you ever
6  investigate yourself to find out if he,
7  Dr. Yarus, was under investigation by the DEA?
8  A.  Other than to ask him how it
9  would be done, how would you ascertain whether
10  you are under investigation, I did not have
11  personal knowledge of how to ascertain that
12  information.
13  Q.  Did anybody from Walgreen -- did
14  you ever discuss with anybody from Walgreen --
15  I'm sorry; let me just ask a different
16  question, you spoke with two people from
17  Walgreen that I understood, Brett Stacey and
18  Mike Freeman; is that correct?
19  A.  There may have been someone on
20  the phone for me to get hooked up with them,
21  that I told them why I was -- you know, why I
22  was trying to reach -- who was the person that
23  I need to speak to.  I can't identify that
24  person or persons to you.
25  Q.  But substantively you spoke with

Page 85

LINDA M. SHICK

2  those two people, Freeman and Stacey, and no
3  one else?
4  A.  As the problem solvers, yes.
5  Q.  Okay.  Did either Mr. Freeman or
6  Mr. Stacey ever explain to you or ever discuss
7  with you why that comment of the DEA
8  investigation was supposedly in the Walgreen
9  computer?
10  A.  No.
11  Q.  Do you know if Walgreen had a
12  basis for it or not?
13  A.  It's my conclusion that they did
14  not.
15  Q.  And what is your basis for that
16  conclusion?
17  A.  Based on the representations
18  from Michael Freeman and Brett Stacey.
19  Q.  Okay.  What did they say?
20  A.  That -- that it had been
21  removed, that he was not under investigation,
22  and that they apologized.
23  Q.  Okay.  Did Brett Stacey ever say
24  to you in effect, there was never any basis for
25  it in the first place or that it was incorrect

22 (Pages 82 - 85)

Page 86

```
1            LINDA M. SHICK
2  notation?
3      A.    I don't have a specific
4  recollection of how he stated that, but my
5  impression was that it was in error.
6      Q.    So Brett Stacey agreed to remove
7  the comment and he apologized for it being in
8  there, and from that you are concluding that it
9  was unfounded; is that correct?
10     A.    Correct.
11     Q.    Okay. Do you have any other
12 basis for concluding that the comment was
13 unfounded?
14     A.    Dr. Yarus advising me that he
15 was not under federal investigation and
16 explaining to me how it works when you have the
17 right -- all doctors can't prescribe narcotics,
18 and when he explained -- when he explained the
19 inner workings of the licensing and the
20 licensing process and how it is that you can
21 prescribe narcotics and the safeguards that
22 have to be on a physician that can prescribe
23 narcotics, I had a -- I had a sense that it
24 couldn't be true or he wouldn't still be able
25 to write those scripts.
```

Page 87

```
1            LINDA M. SHICK
2      Q.    Any other basis other than that
3  we just talked about now and the conversation
4  you had with Brett Stacey?
5      A.    Other than my background
6  knowledge, no.
7      Q.    Okay. The same kind of
8  questions with Michael Freeman, what is your --
9  would it be the same answers if I asked you
10 what is the basis for your conclusion that
11 Freeman was telling you that it was unfounded;
12 it would be the same answer?
13     Do you understand what I am --
14     A.    Yes.
15     Q.    Okay.
16     A.    I am trying to discern whether
17 he said -- I am trying to recall whether he
18 said anything differently.
19     It would be the -- it would be
20 basically the same response.
21     Q.    Okay. If either Mr. Freeman or
22 Mr. Stacey had said to you, in effect, the
23 comment is not founded, we have no basis for
24 having it in the system, that would have been
25 documented, correct? You would have documented
```

Page 88

```
1            LINDA M. SHICK
2  it I mean, correct?
3      A.    Yes.
4      Q.    Okay. And is it documented
5  anywhere?
6      A.    Not that I -- no, not
7  specifically, no.
8      Q.    Okay.
9      A.    More so my conclusion.
10     Q.    Understood.
11     Do you have -- and you may have
12 answered this. I don't want to beat a dead
13 horse again, but do you have any personal or
14 direct knowledge about anything any Walgreen
15 employee ever stated allegedly about Lance
16 Yarus?
17     A.    I'm sorry; say that again?
18     Q.    Right. You talked about
19 comments that were allegedly made to patients
20 or a patient. Do you have any direct knowledge
21 of any comment, anything ever said by a
22 Walgreen employee to any patient of Dr. Yarus?
23     A.    Do you mean did I hear it with
24 my own ears?
25     Q.    Yes.
```

Page 89

```
1            LINDA M. SHICK
2      A.    I did not hear it with my own
3  ears.
4      Q.    Okay. What do you know about
5  anything that was ever said in a derogatory
6  nature about Dr. Yarus by any Walgreen
7  employee?
8      A.    I -- I know what was related to
9  me by Dr. Yarus and Dr. Yarus' staff and -- I'm
10 trying to -- I'm trying to think of -- that's
11 where my information came from.
12     Q.    So all of your entire basis for
13 knowledge or belief about comments allegedly
14 uttered by Walgreen employees comes from Lance
15 Yarus and his staff; is that correct?
16     A.    And Brett Stacey and Michael
17 Freeman.
18     Q.    As we have talked about?
19     A.    Yes.
20     Q.    Okay. Is that correct?
21     A.    Yes.
22     Q.    All right. Just to broaden it
23 up a little bit, do you have any knowledge of
24 any kind about anything ever said by a Walgreen
25 employee to anybody in the world other than
```

23 (Pages 86 - 89)

Page 90

1           LINDA M. SHICK
2  patients?
3           You talked about patients now.
4  Do you have any knowledge of anything ever said
5  by Walgreen to anybody else, like just as an
6  example, to other pharmacists, published in
7  newspapers, anything, anybody at all, as broad
8  as can be?
9      A.   Other than Walgreen employees?
10 You mean like did Walgreens call CVS and say,
11 "We have him flagged, you should have him
12 flagged"?
13     Q.   Right.
14     A.   I have no knowledge of that.
15     Q.   And not just CVS but anybody,
16 any pharmacist, people on the street, not that
17 you would know this of course, but I just want
18 to make sure my question is very broad, do you
19 have any knowledge about anything ever said by
20 Walgreen employees about Lance Yarus that you
21 haven't already talked about?
22     A.   No.
23     Q.   Okay. Can you identify
24 anybody -- I guess we are talking about
25 patients really.

Page 91

1           LINDA M. SHICK
2           Can we narrow this deposition,
3  the comments that were made by Walgreen
4  according to Dr. Yarus were all made to
5  patients; is that your understanding?
6      A.   Yes.
7      Q.   All right. So can you identify
8  any patient who was ever the recipient of an
9  allegedly derogatory or defamatory comment by a
10 Walgreen employee?
11     A.   I -- I have a note of two
12 people's names, and I don't know where they
13 fall into the timeline.
14     Q.   Okay. Can I see the note,
15 please?
16     A.   Yes.
17     Q.   Is it on the table here?
18     A.   No.
19         MR. BOLDEN: Let me see it.
20         THE WITNESS: I don't know where
21     it is.
22         Well, I have -- could we go off
23     for a second --
24         MR. SANZO: Sure.
25         THE WITNESS: -- just so it

Page 92

1           LINDA M. SHICK
2  doesn't look like I am fumbling through
3  my --
4         VIDEO TECHNICIAN: Off the
5  record at 11:09.
6          - - -
7         (Whereupon, there was an
8  off-the-record discussion.)
9          - - -
10        (Whereupon, Shick Exhibits 9 and
11     10 were marked for identification.)
12         - - -
13        VIDEO TECHNICIAN: The time now,
14     11:21. Back on the record. Beginning
15     of Tape No. 2.
16 BY MR. SANZO:
17     Q.   Ms. Shick, before we talk about
18 the documents that we just produced here, that
19 you just pulled out for you, are you here
20 pursuant to a subpoena today or not?
21     A.   No; I think I am just noticed.
22     Q.   Okay. Were you requested to
23 produce any documentation at today's
24 deposition?
25     A.   Not other than what had already

Page 93

1           LINDA M. SHICK
2  been produced.
3      Q.   Did you receive a letter from
4  plaintiff's counsel, from Dr. Yarus' counsel
5  asking to produce any documentation?
6      A.   No.
7      Q.   Okay. What documents did you
8  review -- did I ask you that? -- in preparation
9  for today's deposition?
10         You mentioned the Amended
11 Complaint, the Amended Federal Complaint. What
12 else did you review?
13     A.   I reviewed the phone log --
14 today what I reviewed?
15     Q.   Well, for today's deposition,
16 whether it was today or some time in the past.
17     A.   Since the time -- since the time
18 that I knew that my deposition was going to be
19 taken, I thumbed through my file of the
20 materials that I had from when I represented
21 Dr. Yarus, I saw the federal complaint and its
22 attachments. That's it. I haven't seen
23 anybody else's deposition. I haven't seen any
24 memos. I haven't seen anything else.
25     Q.   Okay. So you have seen nothing

24 (Pages 90 - 93)

Page 94

LINDA M. SHICK

2 but what you have just mentioned now?

3    A.    As far as I can recall, yes.

4    Q.    Okay.  Have you seen any

5 documentation from the other related case

6 involving the law firm you mentioned a few

7 minutes ago, the Thomas, Thomas & Hafer law

8 firm?

9    A.    No doc -- no legal documents.  I

10 told you that I had seen things on the

11 Internet.

12    Q.    Right.  Okay.  So if you would

13 look, please, at what we have marked as Shick

14 9.

15    A.    Yes.

16    Q.    Please explain this document, if

17 you would?

18    A.    When -- I can't tell you exactly

19 when, maybe, maybe last week, maybe further

20 back than that, when I had the file pulled --

21 the physical -- the remains of the physical

22 file pulled from storage, this document was in

23 the -- was in the physical file in the format

24 that I have given it to you.

25    Q.    Okay.  And it's obviously a

Page 95

LINDA M. SHICK

2 typewritten document, correct?

3    A.    Yes.

4    Q.    Who typed this document, Shick

5 9?

6    A.    I do not -- I do not know other

7 than it did not come from my office.

8    Q.    Did it come from Lance Yarus?

9    A.    I would make that -- I would

10 have to make that assumption.

11    Q.    Is there anybody else that it

12 could have come from that you are aware of

13 besides Lance Yarus?

14    A.    No.  The only other way that it

15 could have been created is if someone from

16 Dr. Yarus' office told someone at my office and

17 they typed what was said, but I don't have any

18 firsthand knowledge to know that that happened.

19    Q.    On the original document, Shick

20 9, there is a sticker, a purple sticker, it

21 says "11-11."  Do you see that?

22    A.    Yes.

23    Q.    What does that mean, do you

24 know?

25    A.    I do not know.  It was -- it was

Page 96

LINDA M. SHICK

2 attached -- it was attached to the paper when I

3 pulled the paper out of the file and I -- it

4 was not even in the location that it's in now.

5 I moved it and put it where it is.  But it was

6 attached to the document.

7    Q.    Do you know if it stands for the

8 11th day of the 11th month?

9    A.    It could, or it -- it could, but

10 I -- I don't know.

11    Q.    Okay.  And do you have any

12 personal knowledge of any of the comments or

13 allegations made in Shick 9, statements, any of

14 the statements made in Shick 9?

15    A.    No.

16    Q.    Do you know who Sharon Eder is,

17 E-D-E-R?

18    A.    I do not.

19    Q.    How about Kurt Montgomery?

20    A.    I do not.

21    Q.    Did you ever speak with either

22 of those individuals?

23    A.    I did not.

24    Q.    Do you know of anything that

25 substantiates anything that's stated in Shick

Page 97

LINDA M. SHICK

2 9, any evidence, any substantiation of any

3 kind?

4    A.    No.

5    Q.    Okay.  Now, did you destroy

6 portions of the Lance Yarus file from 2009,

7 2010?  I don't mean you personally.  Was a

8 portion of it destroyed I should say?

9    A.    There may be parts of the -- in

10 looking at the physical file, there are file

11 sections -- file folders that I would expect to

12 see that I do not see.

13    Q.    Such as?

14    A.    Such as a -- I usually make a

15 subfile that's called "Yellow Sheets," and any

16 note that I make gets thrown into "Yellow

17 Sheets."

18    Q.    Your involvement with Lance

19 Yarus where this claim against Walgreen ended

20 in August of 2010, correct?

21    A.    Correct.

22    Q.    What is your usual document

23 retention policy for cases, case material?

24    A.    Well, it has changed.  Today

25 everything that comes into my office or any

25 (Pages 94 - 97)

Page 98

LINDA M. SHICK

2 yellow sheet that I create is scanned and moved
3 into the patient -- or the client's file on my
4 server, so that at the termination of a case,
5 medical documents, insurance policies,
6 photographs, anything that the client has given
7 me is returned to the client with their
8 settlement check.
9    Q.    The hard copies are?
10    A.    The hard copies.
11          And a letter telling them that I
12 am not retaining copies, even though I am on my
13 system.
14          On my server everything is
15 scanned. The rest of the physical file is
16 shredded.
17    Q.    What was your policy back in
18 2010?
19    A.    Back in 2010 the file would be
20 trimmed to things that could be an issue within
21 the statute of limitations.
22          When we went to scanning, those
23 old files, what was still in them were scanned
24 into an old file document.
25    Q.    When did you go to scanning?

Page 99

LINDA M. SHICK

2    A.    We went gradually into scanning.
3 Our prior copier had scanning capability but we
4 weren't -- it had not occurred to me that I
5 could get rid of a storage unit if we developed
6 a new system where -- first we went where
7 everyone was scanned and it went onto a disk,
8 so every client wound up with a CD when their
9 file was closed and then we had notebook after
10 notebook of disks.
11    Q.    What I am looking for is what
12 year did you go into preserving the
13 documentation electronically like you just
14 mentioned, scanning it onto disks or scanning
15 it onto a hard drive or whatever the case might
16 be?
17    A.    It was a gradual system. We are
18 now into 2015. I would say that my first -- my
19 first total scanning of files probably was in
20 2012.
21    Q.    So in this case, when it closed
22 out in August of 2010, the case involving Lance
23 Yarus and Walgreen, what was your policy to
24 retain that file?
25    A.    The files would be kept in a --

Page 100

LINDA M. SHICK

2 kept in -- kept in boxes until the statute of
3 limitations would have run, then the file would
4 be trimmed, and then we would keep it further
5 than that. If we wound up with too many of
6 them, I had a storage unit that they would get
7 moved into.
8    Q.    So you would keep the trimmed
9 version of the file indefinitely into the
10 future?
11    A.    Yeah.
12    Q.    Okay. So you have some that are
13 many, many, 10 years old or older?
14    A.    I did. Not anymore, but I did.
15    Q.    And when you say "trimmed," what
16 are you trimming from the file?
17    A.    Maybe phone messages. For the
18 most part my cases are personal injury cases,
19 so my concern is am I going to hear from this
20 client -- and I am pretty much not, because
21 they have signed a release, so I am pretty much
22 not going to hear from the client in the future
23 as against me. I may hear from the -- I may
24 hear from someone in the future where they have
25 had another accident and not returned to me or

Page 101

LINDA M. SHICK

2 maybe they have had another accident and
3 returned to me, so I am going to want to find
4 the prior medicals or I am going to want to
5 find the prior litigation and see what was --
6 see whether or not we are talking about the
7 same body parts. But I am going to trim
8 anything that wouldn't be involved in future
9 litigation or that couldn't easily be
10 duplicated.
11          I am going to get rid of
12 pleadings. I am going to get rid of -- I am
13 not going to get rid of -- yes, I am going to
14 get rid of depositions if they are done at
15 Veritext because I am a VIP and I can retrieve
16 online any deposition that I have ever taken.
17    Q.    Okay.
18    A.    So it's a case-by-case issue as
19 to whether or not there are things to trim from
20 the file.
21    Q.    Okay. So in Lance Yarus' claim
22 in 2009 and 2010, that's a one-year statute of
23 limitations of course, correct?
24    A.    Yes.
25    Q.    So would you have only preserved

26 (Pages 98 - 101)

Page 102

1           LINDA M. SHICK
2 the entire file for about a year, so
3 approximately August of 2011?
4      A.    The entire -- the entirety of
5 it, I would say probably.  When my -- when --
6 it isn't something that I would do.  I probably
7 said, "Don't destroy all of that file," because
8 it was Dr. Yarus.
9      Q.    And why do you say that?
10     A.    Because I knew that there were
11 other issues with Thomas, Thomas & Hafer, there
12 were different things happening that -- that I
13 couldn't rule out may not come -- may not cause
14 my materials to come into play.
15     Q.    In August or September 2011,
16 which is approximately one year after you last
17 had contact with Dr. Yarus, what did you know
18 then that might lead you to believe there would
19 be additional involvement in the future
20 involving Dr. Yarus and Walgreen?
21     A.    I don't know chronologically
22 when the event happened with Thomas, Thomas &
23 Hafer.  I don't know the date of that event.  I
24 don't know the date of when I learned of it.
25         I am trying to recall whether or

Page 103

1           LINDA M. SHICK
2 not there were other events that would have
3 caused me -- or it could just be that it was a
4 small file and it was -- that once I said
5 tag -- you know, leave it, that it -- it was
6 not using up an extraordinary amount of space
7 in our storage capacity.
8      Q.    So you treated this file -- just
9 using my own words -- differently in that you
10 didn't destroy all the phone messages, just
11 because either you thought there might be
12 something going on in the future or because it
13 was just a small physical file?
14     A.    I did destroy the phone
15 messages.  The book that you got is the -- is
16 the carbon set that's maintained.  The physical
17 phone messages usually don't go into a file,
18 they go into my trashcan after I return the
19 phone call.
20     Q.    Okay.  So did you preserve this
21 file any differently than you would have any
22 other file in 2010?
23     A.    Yes.
24     Q.    How so?
25     A.    Well, with personal injury cases

Page 104

1           LINDA M. SHICK
2 the files are set up completely different than
3 this.  With a plaintiff's personal injury where
4 we are talking about a physical injury, where
5 contents of the file are completely different.
6         I don't have any photographs of
7 property damage in here.  I don't have pictures
8 of people in the hospital.  I don't have any --
9 it's a totally different kind of file than the
10 normal case that I handle.
11     Q.    My question is, is how did you
12 treat this file in terms of preservation
13 differently than any other of your personal
14 injury files, if you did treat it differently?
15     A.    It wasn't stripped down as far
16 as a personal injury file would be stripped
17 down.
18     Q.    And why is that?
19     A.    Why wasn't it?
20     Q.    Why was it not stripped down as
21 much as you would if it was a personal injury
22 file?
23     A.    Well, there is no medical
24 records to give back to the client.  There is
25 no -- which is -- that's usually the voluminous

Page 105

1           LINDA M. SHICK
2 part of a file, and if I can get rid of them by
3 giving them back to the client, that's --
4 that's making storage space for me.
5      Q.    Okay.
6      A.    And I am meeting my ethical
7 obligations to preserve it by returning it to
8 the client.
9      Q.    Can you tell us now on the
10 record that there is absolutely no other
11 documentation that exists pertaining to your
12 handling of the Yarus/Walgreen matter?
13         MR. BOLDEN:  Objection.
14         MR. INNELLI:  Off the video,
15 please.
16         MR. SANZO:  Stay on the
17 transcript, please.
18         VIDEO TECHNICIAN:  Off the
19 record at 11:35.
20             - - -
21     (The following took place off
22 the video record:
23         MR. BOLDEN:  Read that question
24 back to me.
25             - - -

27 (Pages 102 - 105)

Page 106

1          LINDA M. SHICK
2          (Whereupon, the pertinent
3      portion of the record was read.)
4              - - -
5          MR. BOLDEN: I object to the
6      question because you are asking her a
7      question that goes beyond what she
8      knows or beyond what she has in the way
9      of her file. You are just saying is
10     there -- read me the first part of the
11     question again.
12             - - -
13         (Whereupon, the pertinent
14     portion of the record was read.)
15             - - -
16         MR. BOLDEN: That's too broad.
17     If you just narrow it down a little
18     bit, than she can answer it.
19         MR. SANZO: Are you telling her
20     not to answer the question?
21         MR. BOLDEN: I am not telling
22     her not to answer the question. I am
23     objecting to your question because it
24     was too broad.
25         MR. SANZO: Okay. Let's go back

Page 107

1          LINDA M. SHICK
2      on the record, please.)
3              - - -
4          (Video record resumed.)
5              - - -
6          VIDEO TECHNICIAN: Back on the
7      record, 11:36.
8  BY MR. SANZO:
9      Q.    Do you understand my question?
10     A.    I do.
11     Q.    Please.
12     A.    I cannot assure you that there
13 aren't any other phone books that might have
14 yellow carbon of an incoming phone message. I
15 can't give you an assurance that there are
16 absolutely none. To my knowledge, I am not
17 aware of any. I could -- we could sit and go
18 through probably another 20 phone books and
19 look to see if there is any other phone calls,
20 phone messages.
21         I also can't tell you with any
22 certainty that -- well, yes, I can tell you
23 with any certainty that to the best of my
24 knowledge there are no other documents
25 pertaining to my representation of Dr. Yarus

Page 108

1          LINDA M. SHICK
2  during 2009 and 2010, pertaining to the
3  Walgreens matter.
4      Q.    Are you saying except for the
5  possibility of phone slips?
6      A.    Or mis -- or if something were
7  to be misfiled.
8      Q.    Okay. So let me see if I
9  understand this, you are saying that there is
10 definitely no documentation existing regarding
11 Yarus/Walgreen except for if there was a
12 mistake in a misfiling of course which you may
13 not know about or there might be phone slips;
14 is that what you are saying?
15     A.    That's to the best of my
16 knowledge.
17     Q.    If there were a phone slip
18 pertaining to the Walgreen/Yarus claim in 2009
19 and 2010, wouldn't that have been placed in the
20 file?
21     A.    No.
22     Q.    Where would that be stored?
23     A.    Well, I -- you have seen the
24 physical phone book with the carbon set. Those
25 are maintained. If someone takes a phone

Page 109

1          LINDA M. SHICK
2  message for me and leaves it on my desk, once I
3  have returned the phone call, in all likelihood
4  that phone message is going to go in the trash.
5      Q.    Okay. In this case one was
6  preserved apparently, because we have this --
7      A.    That's the yellow phone book.
8      Q.    -- Shick 10, right.
9      A.    That's the carbon set.
10     Q.    Okay. All right. So the phone
11 book that Shick 10 came from, that spiral bound
12 book, whose -- we don't know who the author of
13 that book is, correct?
14     A.    That's correct.
15     Q.    Where did you find that in the
16 office? Where was that physically located?
17     A.    Carol has a drawer of phone
18 message books.
19     Q.    Okay. And how is it that you
20 came up with this Shick 9, a message pertaining
21 to this case for today's deposition? Was there
22 a search done?
23     A.    No; Carol did. You can ask
24 Carol. Carol came in my office this morning
25 and said, "I don't know what made me think of

28 (Pages 106 - 109)