LINDA M. SHICK

1
2 this, but I went and pulled the phone book and
3 here is a message from Mr. Freeman."
4 Q. And I will ask her, Carol, if
5 it's more appropriate, but are there any other
6 phone books like the one that you have in your
7 folder there, where Shick 10 came from that
8 exists now?
9 A. I -- I would think so.
10 Q. Okay. So who is the best person
11 that could tell us whether or not any other
12 notations or comments or notes exist in those
13 phone books pertaining to Yarus and Walgreen?
14 Would it be Carol Critelli?
15 A. Carol may know. She could
16 explain to you -- every person that's working
17 for me is going to be maintaining an ongoing
18 phone book.
19 Q. Okay.
20 A. So there isn't just one in the
21 office. So if Carol runs -- Carol is
22 maintaining a phone book and hers runs out, she
23 throws the old one in the drawer and gets a new
24 one.
25 Q. Okay.

LINDA M. SHICK

1
2 A. If Ryan was -- when Ryan was
3 with us, when Ryan's phone book would run out,
4 Ryan would throw it in the drawer and go get a
5 new one.
6 Q. Okay. So these phone books that
7 you are talking about, are they all similar to
8 the one you have on the table here that we
9 talked about this morning?
10 A. Yes.
11 Q. That one there?
12 A. I usually order the four to a
13 slip. Sometimes they are -- it's going to be
14 the same idea. It's going to be something that
15 tears off and maintains a carbon set.
16 Q. Okay. What happens to the
17 original?
18 A. Sometimes they wind up in my
19 trash, sometimes they get taped to a piece of
20 yellow paper and I write more underneath of it
21 and it gets sent back to whoever is handling
22 the file and it gets scanned and hooked up to
23 the client's digital file and the hard copy
24 will go into the physical file and then get
25 stripped out when the file is closed.

LINDA M. SHICK

1
2 Q. So everybody, you and your staff
3 all use those similar spiral notebooks?
4 A. I do not.
5 Q. Oh, your staff does?
6 A. Yes.
7 Q. Okay. And are they kept
8 indefinitely?
9 A. I -- I believe that we probably
10 have them going back to 2001 when I bought the
11 firm.
12 Q. Is there a formal policy or is
13 that just the way it's done, is that just the
14 practice?
15 A. It's just happened over time.
16 Q. Okay. So you think you have all
17 of these notebooks back to 2001, that were ever
18 prepared by --
19 A. Unless Carol were to tell me
20 that in -- that I started throwing them out.
21 Each year I was -- at some point in time I was
22 getting rid of a year.
23 Q. Okay. I will ask Carol about
24 that.
25 A. Okay.

LINDA M. SHICK

1
2 Q. Just one more question about
3 that, I think this is obvious, so those
4 notebooks contain notations regarding all
5 cases, not any one particular case?
6 A. Correct.
7 Q. They are not dedicated to a
8 particular case?
9 A. Correct.
10 Q. All right. So other than -- now
11 you have produced this document that we have
12 marked as Shick 9 that references two patients
13 that you believe came from Dr. Yarus. Other
14 than those two patients, can you name any other
15 patient that was ever the recipient of an
16 alleged defamatory or derogatory or negative
17 comment from a Walgreen employee?
18 A. Only by consulting further
19 documents.
20 Q. And what documents would that
21 be?
22 A. Those would be documents that
23 are in the possession of Dr. Yarus' current
24 counsel.
25 Q. Okay. And they are documents --

29 (Pages 110 - 113)

LINDA M. SHICK

2 are they on the table here today? Did we talk
3 about them yet today?
4    A.    I believe they are attached to
5 the Complaint.
6    Q.    Okay. And do you have them in
7 your folder?
8    A.    I -- I would have them -- if
9 they were attached to the Complaint, they would
10 be attached to my copy.
11    Q.    Let me make it easier for you,
12 without going through all that, are you
13 referring to documents that are attached as
14 exhibits to the Amended Complaint in this
15 particular case?
16    A.    I am.
17    Q.    Okay. Anything besides that?
18    A.    No.
19    Q.    Okay. So you know about the
20 names of patients from Shick 9, which is this,
21 and from the exhibits attached to Dr. Yarus'
22 Amended Complaint against Walgreen, correct?
23    A.    Yes.
24    Q.    Do you know -- do you have any
25 other source of knowledge about the names of

LINDA M. SHICK

2 patients allegedly involved or allegedly
3 hearing defamatory or derogatory comments from
4 Walgreen?
5    A.    No.
6    MR. INNELLI: You testified
7    earlier as to those individuals who --
8    being turned away in '09 and '10.
9    THE WITNESS: Well, I don't know
10    their names.
11    MR. INNELLI: Okay.
12    THE WITNESS: I know that they
13    were supposedly black men but I -- I
14    don't know their names.
15 BY MR. SANZO:
16    Q.    Why do you say they were
17 supposedly black men? Where did you hear that?
18    A.    That -- initially when -- when
19 Dr. Yarus and I discussed what happened, part
20 of the initial impression was that Walgreens --
21 that perhaps it wasn't Dr. Yarus that was being
22 targeted, that it was a profiling of certain
23 client types, that -- that would involve Dr.
24 Yarus too, that they either had come into
25 possession of his prescription pad or he was

LINDA M. SHICK

2 feeding OxyContin or other narcotics onto the
3 street because these guys were black guys
4 paying cash.
5    Q.    You are saying that was a theory
6 that you and Dr. Yarus discussed?
7    A.    It is something we discussed.
8    He knew that they did not have
9 his prescription pad, but the question was
10 whether did Walgreens think that they had his
11 prescription pad.
12    Q.    So you and Dr. Yarus discussed
13 the possibility that Walgreens was under the
14 impression that some of Lance Yarus' patients
15 had his prescription pad and were using it for
16 illegal means?
17    A.    That they may believe that.
18    Q.    Okay. Was there -- is that the
19 case that you are aware of?
20    A.    What, that black guys had his
21 prescription pad and were putting Oxy onto the
22 street?
23    Q.    Not so much black guys, but are
24 you aware that Dr. Yarus' prescription was ever
25 used by a patient -- was ever in the possession

LINDA M. SHICK

2 of a patient and used in that manner?
3    A.    To my knowledge, that has never
4 happened.
5    Q.    Okay. Has Dr. Yarus ever
6 mentioned to you that his prescription pad had
7 been lost or stolen?
8    A.    No.
9    Q.    Are you aware of any patients or
10 any people ever writing fraudulent
11 prescriptions on Dr. Yarus' prescription pad?
12    A.    No. I have discussed that with
13 Dr. Yarus.
14    Q.    Okay. What did he say?
15    A.    He takes his licensing very
16 seriously, and part of -- part of his licensing
17 to enable him to write narcotics puts him at a
18 higher standard in guarding against such
19 things.
20    Q.    You mean guarding against -- or
21 guarding his pads, his prescription pads?
22    A.    Guarding the misuse of his pads,
23 guarding the maintenance of any narcotics in
24 his facility.
25    Q.    Just to sidestep for a second

30 (Pages 114 - 117)

LINDA M. SHICK

1    LINDA M. SHICK
2  here, when you are using Dr. Yarus, as you
3  testified to earlier today, as an expert or as
4  a consultant, in what capacity is he an expert?
5  What field is he testifying in or writing
6  reports in?
7       A.    Dr. Yarus is an orthopedic
8  surgeon and Dr. Yarus is a pain specialist. So
9  on cases where I have someone with an
10  orthopedic injury, he has served as an expert
11  and on -- some of my patients have chronic
12  pain, he has served as an expert in their --
13  in -- a narrative report regarding their
14  chronic pain, and sometimes it's a combination
15  of both.
16       Q.    Do you know other lawyers that
17  currently use Dr. Yarus as a consultant or as
18  an expert?
19       A.    Do I -- do I? I know that I
20  have received phone calls asking me for my
21  opinion of Dr. Yarus and whether or not he
22  would be suitable in a certain case, just like
23  I have called other attorneys and asked them if
24  they have an expert in a certain matter, if
25  it's something that I don't run into every day,

1    LINDA M. SHICK
2  and whether or not they have gone further and
3  actually used him or not I don't know.
4       I know Ralph Bellafatto used
5  Dr. Yarus in a case that we co-counseled.
6       Q.    Was that recently?
7       A.    That case has been over for two
8  or three years. I don't know if Ralph has used
9  him beyond that.
10       Q.    Okay. And these phone calls
11  that you sometimes get from other counsel about
12  Dr. Yarus, what is the time frame? Is that
13  ongoing? Has that happened in 2015?
14       A.    I don't recall receiving any
15  this year.
16       Q.    Okay. How about last year?
17       A.    Last year I probably discussed
18  Dr. Yarus with at least one other attorney.
19       Q.    And when you are asked questions
20  about Dr. Yarus, what do you typically say?
21       A.    I -- I discuss what field I
22  think that he would be useful in, if it
23  involves -- if it involves something that I
24  don't think he would be useful in, then I would
25  say I don't think that that's in his

1    LINDA M. SHICK
2  wheelhouse.
3       Q.    Okay. Have you ever recommended
4  against using Dr. Yarus because of his
5  integrity or honesty?
6       A.    No.
7       Q.    Because of his ability as a
8  doctor?
9       A.    No.
10       Q.    Because of his reputation?
11       A.    No.
12       Q.    Do you know anybody that has
13  ever refused to use Dr. Yarus as an expert
14  because of his reputation?
15       A.    I can't tell you their name.
16       Q.    Okay. But you do know somebody?
17       A.    I know of someone.
18       Q.    What do you know?
19       A.    I know that the person that was
20  privy to Dr. Yarus being called a crackhead
21  never used him.
22       Q.    That's what -- you are referring
23  to the Thomas, Thomas & Hafer issue?
24       A.    Yes.
25       Q.    Other than that person, do you

1    LINDA M. SHICK
2  know of any other lawyers that refused to use
3  Dr. Yarus because of reputation?
4       A.    No, but understand that personal
5  injury attorneys keep their experts close to
6  their chest.
7       Q.    Do you --
8       A.    You don't want them -- you don't
9  want them used too often.
10       Q.    Okay. Can you identify any
11  patients that have left Dr. Yarus' practice
12  because of anything ever allegedly said by a
13  Walgreen employee?
14       A.    No.
15       Q.    Has Dr. Yarus ever told you that
16  he claims that certain patients have left his
17  practice because of Walgreen comments?
18       A.    Do I know that directly from
19  Dr. Yarus or do I know it from something that I
20  read?
21       Q.    I will ask you both questions.
22  Starting first with Dr. Yarus, did he ever tell
23  you that?
24       A.    No, Dr. Yarus did not --
25  Dr. Yarus and I have not discussed the

LINDA M. SHICK

1           LINDA M. SHICK
2 intricacies of this lawsuit.
3     Q.    Okay. Do you know if it's
4 something that you read that he makes that
5 claim?
6     A.    I believe in the Complaint that
7 that's one of -- that that's part of the
8 allegations in this case.
9     Q.    Okay. You are talking about the
10 complaint against Walgreen?
11    A.    Yes.
12    Q.    Okay. Do you know, do you have
13 any knowledge whether or not any patient that
14 allegedly received a derogatory comment about
15 Dr. Yarus from Walgreen ever disseminated that
16 comment to anybody else, any other patient, any
17 other person?
18    A.    Yes.
19    Q.    Okay. Who, please?
20    A.    I know that the patients that
21 were involved when I represented Dr. Yarus
22 returned to Dr. Yarus -- returned to Dr. Yarus'
23 staff, either personally or by telephone, and
24 related what they -- what they had been told.
25    Q.    Told by Walgreen employees?

1           LINDA M. SHICK
2    A.    Correct.
3    Q.    And can you name those patients?
4    A.    I cannot name those patients.
5    Q.    Do you have any documentation
6 that you could look at to refresh your
7 recollection or to tell you who those patients
8 were?
9    A.    No.
10    Q.    Okay. So those patients, they
11 relayed what they claim that Walgreens told
12 them to Dr. Yarus' staff, correct?
13    A.    Yes.
14    Q.    Do you have any knowledge or any
15 basis to believe that any patients of Dr. Yarus
16 that was the alleged recipient of a defamatory
17 or derogatory comment from Walgreen ever
18 disseminated that alleged comment to anybody in
19 their world other than Dr. Yarus or his staff?
20    A.    I don't have personal knowledge
21 of that.
22    Q.    Okay. Do you have any
23 knowledge, even if it's hearsay or indirect
24 knowledge?
25    A.    My common sense tells me that

1           LINDA M. SHICK
2 they did.
3    Q.    Other than that though. Can you
4 point to any evidence, whether it's admissible
5 in court or not, can you point to any evidence
6 at all?
7    A.    It's not going to be admissible,
8 but my common sense when I was looking into
9 this case would be that if someone is declined
10 a prescription, that they are going to -- that
11 they are going to say to somebody, be it their
12 mother or their friend or their spouse, "I went
13 in the pharmacy and couldn't get my
14 prescription and they told me my doctor is
15 flagged, they told me my doctor is -- doesn't
16 treat people, he only writes prescriptions."
17    Q.    You are repeating what you heard
18 from Dr. Yarus' staff or from Dr. Yarus,
19 correct?
20    A.    Correct.
21    Q.    And I appreciate your common
22 sense, and I am not going to argue with you,
23 but can you point to anything, any evidence,
24 did anybody ever tell it to you, did you ever
25 see a document, do you have anything you can

1           LINDA M. SHICK
2 point to at all besides common sense?
3    A.    Besides common sense and learned
4 experience, no.
5    Q.    Okay. And you were also talking
6 about how a patient might tend to tell his or
7 her family, that's fine. Do you have any
8 reason to believe that any patient that was the
9 alleged recipient of a defamatory comment by
10 Walgreen ever passed on that alleged comment to
11 any other patient?
12    A.    I don't -- I don't have any
13 firsthand knowledge of that.
14    Q.    How about indirect knowledge or
15 any other kind of knowledge, hearsay?
16    A.    It would just be -- it would
17 just be a -- something that I surmised when I
18 was looking into whether or not something
19 should be done further than what I did.
20    Q.    What would be the basis for your
21 assumption?
22    A.    Common sense. Anything that
23 somebody has to say something bad about
24 somebody, it gets spread like wildfire.
25    Q.    Are you aware -- this is kind of

LINDA M. SHICK

1
2 a -- are you aware of any patients of Dr. Yarus
3 that know other patients of Dr. Yarus? Do you
4 follow my question?
5    A.    I -- do I know patients of
6 Dr. Yarus.
7    Q.    Who know other patients.
8    A.    I have had -- I have had clients
9 where a husband and wife have treated with
10 Dr. Yarus or a family member has treated with
11 Dr. Yarus.
12    Q.    Okay.
13    A.    I mean, it's typical that
14 members of a family would go to the same
15 doctor, the same kind of doctor if they had the
16 same need.
17    Q.    But do you have any evidence or
18 any actual direct knowledge of that being the
19 case? You are assuming it of course.
20    A.    Yes, I have had clients whose
21 spouse has then seen Dr. Yarus.
22    Q.    Okay. Would you please look at
23 your May 7, 2008 or 2009 letter? It's Exhibit
24 1.
25    A.    (Witness complies with request.)

LINDA M. SHICK

1
2    Q.    Do you have that in front of
3 you?
4    A.    I do.
5    Q.    First of all, if you can see in
6 the year, somebody crossed out "8" and put "9."
7 Did you do that?
8    A.    I am going to say that, yes, I
9 did, because it looks like my "9." I can't
10 tell you when I did it, except to tell you that
11 I know that it was after the letter went out.
12    Q.    My recollection was --
13    A.    Because I wouldn't have sent it
14 out like that.
15    Q.    I could be mistaken; I thought I
16 saw Dr. Yarus' counsel doing that at a recent
17 deposition. I may be mistaken. I may be wrong
18 about that.
19         MR. INNELLI:  You are wrong.
20         MR. SANZO:  I apologize. I
21    thought I saw you --
22         MR. INNELLI:  So you shouldn't
23    even raise it on the record.
24         MR. SANZO:  -- doing that.
25         MR. INNELLI:  You know better

LINDA M. SHICK

1
2    than that.
3         MR. SANZO:  No; I --
4 BY MR. SANZO:
5    Q.    So you think you may have
6 scratched that out yourself after the letter
7 went out?
8    A.    Yes.
9         MR. BOLDEN:  Can we go off the
10    record for a second?
11         MR. SANZO:  Yes.
12         VIDEO TECHNICIAN:  Off the
13    record at 11:55.
14              - - -
15         (The following took place off
16    the video record:
17         MR. BOLDEN:  This is my
18    recollection, I'm just trying to take
19    what I think is a small point and get
20    beyond it.
21         MR. SANZO:  It's a very small
22    point.
23         MR. BOLDEN:  I think when we
24    talked in June and you had this stuff
25    sent to us, I think at that point you

LINDA M. SHICK

1
2    may have stricken it out, because I
3    brought to your attention that there
4    was a typographical mistake and then I
5    think you may have stricken it out and
6    sent it to us that way or sent a copy
7    of it to us that way.
8         MR. INNELLI:  That's consistent
9    with my recollection.
10         MR. SANZO:  Okay. Ready to go
11    back on.)
12              - - -
13         (Video record resumed.)
14              - - -
15         VIDEO TECHNICIAN:  Back on the
16    record, 11:56.
17 BY MR. SANZO:
18    Q.    So Exhibit 1 -- excuse me one
19 second -- okay. Exhibit 1 was mailed in 2009,
20 not 2008, correct?
21    A.    Correct.
22    Q.    Okay. And you are the author of
23 that letter, correct?
24    A.    I think I typed it myself.
25    Q.    Okay. And is that the first

33 (Pages 126 - 129)

LINDA M. SHICK

2 letter you ever sent to Walgreen?
3    A.    Yes.
4    Q.    All right. And had you spoken
5 with or e-mailed or communicated with Walgreen
6 prior to sending that letter?
7    A.    Yes.
8    Q.    And what was that all about?
9 Was it e-mail? Was it telephone conversation?
10    A.    It would have been a telephone
11 conversation.
12    Q.    Okay. So when did Dr. Yarus
13 come to you about the situation? Was it May of
14 2009?
15    A.    Yes.
16    Q.    And he told you what?
17    A.    Well, from the letter he didn't
18 find out that this had happened until May 5th.
19    Q.    Do you recall him telling you
20 that or are you going by your own letter?
21    A.    I am going by my letter.
22    Q.    What do you recall about your
23 conversation with Dr. Yarus when he first came
24 to you about this Walgreen incident?
25    A.    I recall that he called me and

LINDA M. SHICK

2 that he told me that -- it's my recollection
3 that he told me that -- I don't know if it was
4 one or two patients, I know that it was two
5 black men, had gone into Walgreens and had been
6 refused -- that their prescription had been
7 refused, and that they had been told that he
8 was under investigation by the Drug Enforcement
9 Agency, and I asked -- then I -- we discussed
10 whether or not he was the target or they were
11 the target or were they both targets.
12    Q.    Is it documented anywhere in
13 your files that these two patients were black?
14    A.    Not in the present contents of
15 my file.
16    Q.    Was it ever documented?
17    A.    It's probably part of my -- the
18 original scribble that I made while I was
19 talking to him.
20    Q.    Which you probably threw away?
21    A.    I probably did.
22    Q.    So after Dr. Yarus came to
23 you -- well, first of all, was that a phone
24 call to you?
25    A.    Yes.

LINDA M. SHICK

2    Q.    Okay. Did he ever come into
3 your office to discuss it in more detail?
4    A.    No.
5    Q.    After that phone call from
6 Dr. Yarus, that would have been May of 2009 we
7 established I believe.
8    A.    Yes.
9    Q.    All right. What did you do?
10    A.    Well, I spoke to him further and
11 said, "We have to find out whether you are
12 under investigation."
13    Q.    Okay.
14    A.    "I can't send a letter. If you
15 are under investigation, it would be a good
16 thing to know."
17    Q.    So Dr. Yarus, according to your
18 letter, didn't learn about this alleged
19 defamatory comment until May 5th; is that
20 correct?
21    A.    Yes.
22    Q.    In your letter to Walgreen you
23 stated May 7th, correct?
24    A.    Yes.
25    Q.    All right. So what did you do

LINDA M. SHICK

2 between May 5th and May 7th to look into
3 whether or not Dr. Yarus was under
4 investigation with the DEA?
5    A.    I don't know if I heard from
6 Dr. Yarus on May 5th. After I heard from
7 Dr. Yarus and I said to him, "We need to know
8 if you are under federal investigation," he
9 said, "I would know if I was."
10    And I told him that that wasn't
11 good enough for me, he was going to have to
12 make a phone call, who are you going to -- who
13 can you call? You have to look further. And
14 then I got -- and then he called me back.
15    Q.    So it looks like, according to
16 your letter, the earliest Dr. Yarus could have
17 called you was May 5th, it may have been later
18 than May 5th but it couldn't have been earlier;
19 do you agree with that?
20    A.    Correct.
21    Q.    And you wrote the letter to
22 Walgreen on May 7th, correct?
23    A.    Correct.
24    Q.    So you spoke with Dr. Yarus on
25 May 5th, 6th or 7th, is that fair to say, for

34 (Pages 130 - 133)

LINDA M. SHICK

2 the first time?
3    A.    Yes.
4    Q.    Okay. And I know that we talked
5 about the identities of patients generally
6 speaking, but I want to ask you now about your
7 letter specifically, can you identify the name
8 of the patient referenced in your May 7, 2009,
9 letter?
10    A.    No.
11    Q.    And the location, as you can see
12 in the second paragraph of your May 7, 2009,
13 letter is 2014 South Broad Street. Do you know
14 for a fact that was the pharmacy in question or
15 is that just something you got from Dr. Yarus?
16    A.    That's information I was told by
17 Dr. Yarus.
18    Q.    And according to your letter, it
19 just says that Dr. Yarus' patient was advised
20 by the Walgreen pharmacy that prescriptions
21 written by Dr. Yarus would not be filled, as he
22 is under investigation. Do you have any
23 personal knowledge of that actually coming from
24 Walgreen or is that something that you heard
25 from Dr. Yarus?

LINDA M. SHICK

2    A.    Well, all of the information I
3 got from Dr. Yarus.
4    Q.    Okay. So everything in this
5 letter, this May 7, 2009, letter, you got from
6 Dr. Yarus?
7    A.    Right. And I had him -- and I
8 can't tell you whether it was before I spoke to
9 him or after I spoke to him but before I wrote
10 the letter that I wanted to know that the
11 pharmacy had been called too.
12    Q.    I didn't follow that. I'm
13 sorry.
14    A.    I wanted to know -- I wanted him
15 or someone from his staff to call the pharmacy
16 to find out why his prescriptions aren't being
17 filled.
18    Q.    Okay. Did somebody call?
19    A.    Yes.
20    Q.    From your staff or from
21 Dr. Yarus' staff?
22    A.    From Dr. Yarus' staff.
23    Q.    Okay. Who called from Dr.
24 Yarus' staff?
25    A.    I would be guessing, but I would

LINDA M. SHICK

2 say Michelle Hackenberry.
3    Q.    Is she still with Dr. Yarus?
4    A.    No.
5    Q.    And why do you say Michelle
6 Hackenberry?
7    A.    Because I know that that was his
8 office manager person at the time.
9    Q.    So why do you believe that
10 Michelle Hackenberry or somebody else from
11 Dr. Yarus' staff would have called Walgreen
12 before May 9 -- I'm sorry; before May 7, 2009?
13    A.    Because I say: "The Walgreens'
14 pharmacy admitted that the Walgreens' computer
15 system warned Dr. Yarus is under investigation
16 and precluded filling any prescriptions written
17 by him."
18    Q.    Okay. Therefore, you believe
19 that somebody must have gotten that information
20 and it wasn't anybody from your staff and it
21 wasn't you?
22    A.    I wouldn't have had a -- I
23 wouldn't have authority without having
24 someone's HIPAA to discuss their medical
25 information with a pharmacy, so I knew I wasn't

LINDA M. SHICK

2 going to get anywhere.
3    Q.    Okay. So then for that third
4 paragraph in your May 7, 2009, letter, where it
5 says: "The Walgreens' pharmacy admitted," you
6 believe that that -- you learned that from
7 Dr. Yarus who learned that from somebody on his
8 staff?
9    A.    My conversations were with
10 Dr. Yarus.
11    Q.    Okay. So is that what Dr. Yarus
12 told you, that somebody from Walgreen admitted
13 that the Walgreen computer system warned that
14 Dr. Yarus was under investigation?
15    A.    He was really upset. I was
16 pretty sure that he looked into -- he
17 personally looked into this.
18    Q.    Okay. But -- I understand -- I
19 appreciate that, but my point is or my question
20 is, where did that come from? What's the
21 source of that information?
22    A.    Dr. Yarus.
23    Q.    Okay. And so you testified
24 earlier that you wanted to find out if it was
25 true if he was under investigation and him

35 (Pages 134 - 137)

LINDA M. SHICK

1              LINDA M. SHICK
2 saying to you, Dr. Yarus saying to you that "I
3 would know it," that wasn't good enough, you
4 wanted him to do more?
5    A.    I did want him to do more.
6    Q.    Okay. What did he do as far you
7 know?
8    A.    I can't tell you where he
9 called, what number -- who he would speak to
10 about his license or at the investigation
11 level, but he -- he contacted whoever it was
12 that you would ascertain whether or not you are
13 under investigation.
14    Q.    Is that what he told you?
15    A.    Yes.
16    Q.    Did he tell you anymore than
17 just that?
18    A.    Well, we had already
19 discussed -- when he said, "I would know," I
20 wanted to know how you know, and that's
21 when he explained to me about his license and
22 the parameters of his license.
23    Q.    Okay. Do you know if he called
24 the DEA or some other organization?
25    A.    I am -- I am assuming that it's

LINDA M. SHICK

1              LINDA M. SHICK
2 the DEA.
3    Q.    Did he tell you that?
4    A.    That's my best recollection.
5    Q.    And if a person was under
6 investigation, do you know if the DEA would
7 admit to that or not over the phone?
8    A.    I don't -- I don't know that,
9 but what he told me about his being able to
10 prescribe narcotics, it made sense to me that
11 that is something that if he was under
12 investigation, that they would preclude him
13 from being able to write the narcotics.
14    Q.    As a lawyer you understand that
15 if you are or if a client is a target of an
16 investigation by a governmental agency and that
17 client, that target calls the government, they
18 may not be candid; is that fair to say?
19    A.    That the government could lie?
20    Q.    Yeah.
21    A.    Yeah, that's probably fair.
22    Q.    Okay. Or they might just not
23 disclose, they might lie, they might just say,
24 "We are not going to talk to you;" that could
25 happen also, correct?

LINDA M. SHICK

1              LINDA M. SHICK
2    A.    Correct.
3    Q.    Okay.
4    A.    But I felt I had enough
5 information to at least write the letter.
6    Q.    Did you ever do any other
7 investigation to whether or not Dr. Yarus was
8 under investigation by the DEA other than
9 asking Dr. Yarus to confirm or deny?
10    A.    No.
11    Q.    Do you have any documentation --
12 did you ever have any documentation to confirm
13 he was not under investigation?
14    A.    No, but as I sit here today I
15 still believe he has never been under
16 investigation.
17    Q.    Why do you say that?
18    A.    Because of continue -- because
19 of the continued -- the fact that Walgreens
20 told me that it was an error, the fact that
21 if -- from 2009 until 2015 they haven't pulled
22 his license, I'm not reading about him like I'm
23 reading about some other individuals who have
24 been -- had their licenses pulled and have been
25 arrested. I would not believe that an

LINDA M. SHICK

1              LINDA M. SHICK
2 investigation would go on for six years.
3    Q.    And just to clarify, no one from
4 Walgreen actually told you it was an error, you
5 assumed that from your prior testimony,
6 correct?
7    A.    And from the letters that I --
8 from the letters and conversation that I had
9 with Michael Freeman and Brett Stacey.
10    Q.    As we talked about today, in
11 other words, the apology, the agreement to
12 remove the comment; that kind of thing,
13 correct?
14    A.    Correct.
15    Q.    Okay. Are you aware of an
16 investigation done against Dr. Yarus at the end
17 of 2012?
18    A.    I don't believe that there was.
19    Q.    Okay. So the answer is you are
20 not aware of one; is that fair to say?
21    A.    I am not.
22    Q.    All right. Do you have any
23 knowledge from any source the identity of the
24 person from Walgreen that allegedly said that
25 the Walgreens' computer system contains the

LINDA M. SHICK

1
2  information about Dr. Yarus being under
3  investigation?
4      A.   None other than it was the
5  pharmacist or a pharmacy assistant at that
6  location.
7      Q.   Okay. And that comes from
8  Dr. Yarus' mouth, correct?
9      A.   Yes.
10     Q.   And that alleged admission was
11  made to someone from Dr. -- to Dr. Yarus or his
12  staff according to your understanding; is that
13  correct?
14     A.   I'm sorry.
15     Q.   Yes, in your letter, the May 7,
16  2009, letter, where you say the pharmacy
17  admitted that the Walgreen computer system
18  warned that Dr. Yarus was under investigation,
19  that was allegedly stated to someone -- either
20  Dr. Yarus or somebody on his staff?
21     A.   Correct.
22     Q.   Not to anybody else, just
23  somebody, either Yarus or his staff?
24     A.   I don't know who else it was
25  said to. I learned it from one of them.

LINDA M. SHICK

1
2      Q.   Do you know of anyone else that
3  it was said to? That really kind of was my
4  question, poorly phrased as it was.
5      A.   I don't -- I can't name a name
6  for you.
7      Q.   Okay. Do you know if anybody
8  else was ever given that information besides
9  Dr. Yarus or his staff?
10     A.   Not at that particular event.
11     Q.   Do you have any documentation
12  regarding that alleged admission, a note,
13  anything at all, computer printout, e-mail,
14  Amicus note?
15     A.   Other than to what I have
16  already testified from Brett --
17     Q.   Right.
18     A.   -- Stacey and Michael Freeman?
19     Q.   Right.
20     A.   No.
21     Q.   Okay. So your statement in your
22  third paragraph, on May 7, 2009, about the
23  pharmacy, Walgreen refusing to fill
24  prescriptions, that also came from Dr. Yarus
25  and you have no personal knowledge, correct?

LINDA M. SHICK

1
2      MR. BOLDEN: Objection.
3  Can we go off the record?
4      VIDEO TECHNICIAN: Off the
5  record at 12:10.
6      - - -
7      (The following took place off
8  the video record:
9      MR. BOLDEN: You know, Mr.
10  Sanzo, there is such a thing as trying
11  to beat a witness down. You have asked
12  her these questions again and again and
13  again, phrased them in exactly the same
14  language, phrased them in slightly
15  different language, but I object to the
16  repetition at this point. Up until now
17  I haven't said a word about it, but I
18  think at this point you are trying to
19  wear the witness down by asking her the
20  same questions over and over again.
21      MR. SANZO: Let me just say
22  that's the first time I've asked that
23  question. I think I do know the answer
24  from the witness' prior testimony, I am
25  going to try to streamline it, but I

LINDA M. SHICK

1
2  have not asked that question in any
3  way, shape or form until this moment.
4      MR. INNELLI: No, that's not
5  true.
6      MR. SANZO: I have not asked a
7  question about --
8      MR. INNELLI: By my count this
9  is the sixth time that you have
10  asked --
11      MR. SANZO: I have not yet asked
12  a question about whether or not or how
13  she knows that there is an allegation
14  of nonprescription filling. That's a
15  little different.
16      Are we ready to go back on?
17      MR. BOLDEN: Yes, I am ready to
18  go back on.)
19      - - -
20      (Video record resumed.)
21      - - -
22      VIDEO TECHNICIAN: Back on the
23  record, 12:11.
24  BY MR. SANZO:
25     Q.   Ms. Shick, I don't want to beat

37 (Pages 142 - 145)

LINDA M. SHICK

2 a dead horse. I do want to try to get through
3 this.
4    A.    I don't want to be a dead horse.
5    Q.    Pardon me?
6    A.    I don't want to be a dead horse.
7    Q.    So all of -- well, let me ask a
8 general question, and I do think that I have
9 asked this, I wanted to ask you specifically
10 about the alleged failure to fill
11 prescriptions, but all the information in your
12 letter of May 7, 2009, comes from Dr. Yarus or
13 his staff; is that fair to say?
14    A.    It is.
15    Q.    Okay.
16    A.    And let me respond to your
17 deeper question as to how I would get firsthand
18 knowledge, I can't call them and ask, because I
19 don't have a HIPAA, I can't go in as a ringer,
20 have Dr. Yarus write me a prescription and see
21 if they are going to fill it, because that's
22 insurance fraud and it's fraud on a lot of
23 different levels. So my only source of
24 information and the only reasonable way for me
25 to get information is from someone who

LINDA M. SHICK

2 experienced it and the doctor.
3    Q.    Thank you. I appreciate that.
4    A.    I don't want this jury to think
5 that I am negligent in my investigation.
6    Q.    Let me ask you some more
7 questions, and we can probably go through them
8 quickly because I think I know what you are
9 going to say based on your past testimony, but
10 I have to hit them though, you state in
11 Paragraph 4 of your May 7, 2009, letter that
12 "Walgreens actions have caused Dr. Yarus
13 significant emotionally" -- I guess that should
14 be "emotional distress." Is that something
15 Dr. Yarus told you?
16    A.    I could hear it. I could hear
17 how upset he was.
18    Q.    Okay. How so?
19    A.    He would -- Dr. Yarus is very --
20 Dr. Yarus worked very hard to get his medical
21 degree and to get his practice as successful as
22 he has become, that he is chosen by the court
23 to be an expert in pedicle screw litigation, I
24 know that he values his license and any -- just
25 as if somebody made a comment about my legal

LINDA M. SHICK

2 standing, I could tell that he was as upset
3 about anybody besmirching his reputation as a
4 doctor, and to be called a -- asserting that
5 you are under investigation because you are
6 writing narcotic prescriptions is going to
7 ultimately cost you your license.
8    Q.    So in the phone conversation you
9 had with Dr. Yarus you could tell he was upset;
10 is that what you are saying?
11    A.    I could tell that he was upset.
12    Q.    Was he cursing?
13    A.    No.
14    Q.    Was he crying?
15    A.    No. But I could tell by his
16 voice that he was -- that he was really, really
17 under stress.
18    Q.    Okay.
19    A.    And he did, he said to me, "This
20 is very upsetting to me."
21    Q.    Are you aware whether or not
22 Dr. Yarus was ever -- whether or not his
23 reports, his expert reports were ever precluded
24 by the court in the pedicle screw litigation?
25    A.    I do not know every detail of

LINDA M. SHICK

2 the pedicle screw litigation.
3    Q.    Okay.
4    A.    I don't.
5    Q.    Other than the conversation
6 where you sensed or you heard the emotional
7 upset in Dr. Yarus' voice, do you have any
8 other -- can you point to anything else that
9 led you to believe he was under emotional
10 distress?
11    A.    That he told me and that I could
12 tell from the way that he was speaking, the
13 urgency that he had about this has to be
14 resolved.
15    Q.    Okay.
16    A.    My own concern, my own concern
17 about I am using him as an expert and I
18 certainly don't want my expert under federal
19 investigation.
20    Q.    So did you research further on
21 your own whether or not he was under
22 investigation because you do use him as an
23 expert?
24    A.    I did -- I did not have the
25 means to ascertain that without really

1         LINDA M. SHICK
2 committing a fraud.
3     Q.    I am not limiting it to that
4 May 5th to May 7, 2009, time frame. After
5 that, at any point in time did you -- because
6 you were using him as your expert and your
7 consultant still, did you undertake an
8 investigation of any kind, a FOIA request to
9 DEA or any other form of investigation to
10 figure out whether or not he was under
11 investigation by the DEA?
12     A.    No -- other than my
13 conversations with Michael Freeman and Brett
14 Stacey, no.
15     Q.    Did you ask Michael Freeman and
16 Brett Stacey about that?
17     A.    I did.
18     Q.    What did they say?
19     A.    They said, "He is not."
20     Q.    Do you know if they knew that?
21     A.    I would have -- I made the
22 assumption --
23         MR. BOLDEN:  Objection.
24         Objection.
25         MR. INNELLI:  Off the record.

1         LINDA M. SHICK
2 Off the video.
3         VIDEO TECHNICIAN:  Off the
4     record at 12:16.
5         - - -
6     (The following took place off
7     the video record:
8         MR. BOLDEN:  Please repeat the
9     question.
10         - - -
11     (Whereupon, the pertinent
12     portion of the record was read.)
13         MR. BOLDEN:  You are asking her
14     to get inside their mind.  She told you
15     what they said.  You can't ask her to
16     get inside their mind.
17         MR. SANZO:  I know.  You have
18     done it yourself a few times today, but
19     I will withdraw the question.
20         MR. BOLDEN:  Okay.
21         MR. SANZO:  Can we take a
22     five-minute break?)
23         - - -
24     (Whereupon, there was a recess

1         LINDA M. SHICK
2     in the proceeding.)
3         - - -
4     (Video record resumed.)
5         - - -
6         VIDEO TECHNICIAN:  Back on the
7     record at 12:23.
8 BY MR. SANZO:
9     Q.    Ms. Shick, other than the
10 distress that you heard in Dr. Yarus' voice
11 over the telephone, can you point to anything
12 else that suggested to you that he was under
13 emotional distress?
14     A.    The words that he spoke to me.
15     Q.    In that conversation?
16     A.    Yes.
17     Q.    Anything besides that?
18     A.    No.
19     Q.    And the words were that he wants
20 it taken care of quickly; that kind of thing?
21     A.    That "This is really upsetting
22 to me. I want this taken care of."
23     Q.    Sure. Did he ever seek
24 treatment for emotional distress?
25     A.    I don't know.

1         LINDA M. SHICK
2     Q.    Did you ever recommend that he
3 seek treatment?
4     A.    No, I didn't.
5     Q.    And in your letter you state to
6 Walgreen, this is the May 7, 2009, letter
7 still, Shick 1, you state to Walgreens that
8 Walgreens has interfered with the
9 doctor/patient relationships of Dr. Yarus.
10 That's in your fourth paragraph. Do you see
11 that?
12     A.    Yes.
13     Q.    Do you have any evidence for
14 that?
15     A.    Yes.
16     Q.    What is your evidence for that?
17     A.    The fact that client -- that his
18 patients had to contact his office because they
19 were unable to get their medications.
20     Q.    And how many patients was that?
21     A.    It was my initial impression
22 that there were two.
23     Q.    Okay. Did you learn of any
24 others?
25     A.    At the time that I wrote the May

LINDA M. SHICK

2 9 -- May 7, 2009, letter, no.

3    Q.    Okay. And those two patients
4 that you referenced, do you know their names?
5    A.    I do not.
6    Q.    Are they the ones -- strike
7 that. I'm sorry.
8          Okay. Do you know if those two
9 patients, did they continue to treat with
10 Dr. Yarus?
11    A.    I do not know if they did or
12 didn't.
13    Q.    So other than I guess we can
14 categorize it as an annoyance or an
15 inconvenience having to tell Dr. Yarus their
16 prescription wasn't filled, how did it affect
17 the relationship between doctor and patient?
18          MR. BOLDEN: Objection.
19          MR. INNELLI: Objection.
20 BY MR. SANZO:
21    Q.    You can answer the question.
22          MR. BOLDEN: Go off the record,
23 please.
24          VIDEO TECHNICIAN: Off the
25 record at 12:25.

LINDA M. SHICK

2          - - -
3          (The following took place off
4     the video record:
5          MR. BOLDEN: Can you read the
6     question back to me?
7          - - -
8          (Whereupon, the pertinent
9     portion of the record was read.)
10          - - -
11          MR. BOLDEN: It's a compound
12     question. You are taking your
13     characterization of it as an annoyance
14     and then weaving it with a question so
15     that whatever answer she gives is
16     wrong. I just -- it's a compound
17     question. Break it down step by step.
18          MR. SANZO: Go back on the
19     record.)
20          - - -
21          (Video record resumed.)
22          - - -
23          VIDEO TECHNICIAN: Back on the
24     record at 12:27.
25 BY MR. SANZO:

LINDA M. SHICK

2    Q.    Do you understand my question?
3    A.    I do.
4    Q.    Please answer.
5    A.    I would say that it's something
6 more than an annoyance or a distraction. If
7 you are a chronic pain patient, having an
8 interruption in your medication can be -- can
9 be detrimental both to your health and to your
10 emotional state, and I don't want to
11 personalize this but my husband is in chronic,
12 chronic physical pain because of MS. If his
13 medication -- if I try to get his medication
14 and I am told that the pharmacist is flagged
15 and under investigation, I am going to be more
16 than annoyed or disturbed.
17    Q.    I appreciate that, but that
18 wasn't what I meant to ask you. My question
19 may have come out wrong.
20          My question was, other than the
21 problem that the refusal to fill a
22 prescription, the alleged refusal would have
23 with the patient itself, how did that affect
24 the relationship between Dr. Yarus and the
25 patient? That's really a different question.

LINDA M. SHICK

2 Do you follow?
3    A.    I don't know if they continued
4 to have Dr. Yarus as their doctor. I don't
5 know firsthand.
6          I know personally that if that
7 happened to me, that would no longer be my
8 doctor.
9    Q.    But in this case you don't know
10 either way, correct?
11    A.    I don't know.
12    Q.    Okay. And also just to
13 sidestep, you are a very experienced attorney,
14 a trial attorney, you obviously know not to
15 answer a question that I ask you that is not
16 clear to you, correct?
17          MR. INNELLI: Is this closing
18     argument or argument on the record?
19 BY MR. SANZO:
20    Q.    Do you understand, ma'am?
21          MR. SANZO: This is what we call
22     an instruction I would give to a
23     layperson.
24 BY MR. SANZO:
25    Q.    Nobody gave you that instruction

40 (Pages 154 - 157)

LINDA M. SHICK

2 because you are an experienced lawyer.
3    A.    I am.
4    Q.    But because of some of the
5 objections raised, I want to make sure we are
6 on the same page here, so if I ask you a
7 question that's not clear or you don't like it
8 for any reason, you can tell me that of course.
9 You understand that, right?
10    A.    I do.
11    Q.    Okay. Another instruction you
12 weren't given that you know very well from
13 being a lawyer is that you are free to stop
14 anytime you want and take a break. You just
15 let us know, we will stop. Okay?
16    A.    Yes.
17    Q.    Thank you.
18          Can you identify a single
19 patient whose relationship with Dr. Yarus was
20 damaged or harmed due to Walgreen?
21    A.    I cannot by name, no.
22    Q.    And you also state in your May
23 7, 2009, letter that Walgreens' actions have
24 injured Dr. Yarus' reputation and jeopardized
25 his professional standing.

LINDA M. SHICK

2          Is that something that Dr. Yarus
3 told you or can you point to any evidence of
4 that?
5    A.    That -- that statement follows
6 the event. That's my conclusion from the
7 event.
8    Q.    And you are acting as an
9 advocate in your letter, I understand that; is
10 that fair to say?
11    A.    Yes.
12    Q.    Okay. Other than acting as an
13 advocate, I am not criticizing you for saying
14 it either, but can you point to any evidence to
15 back it up?
16    A.    At the time that the letter was
17 written, no.
18    Q.    Okay. How about currently?
19    A.    Currently I -- currently I am
20 not his attorney, so I am not privy to all --
21 the names of the patients or whether they have
22 returned or not returned, so I am -- I have not
23 been inside of that evidence to know.
24          I would -- I would conclude that
25 fact that we are here today that there is some

LINDA M. SHICK

2 evidence of that.
3    Q.    Okay. Other than your
4 assumptions, you can't point to any evidence;
5 is that fair to say?
6    A.    That it -- at the time that I
7 wrote the letter, the only individuals I would
8 have known about that had been affected by
9 Walgreens were the people that we have talked
10 about.
11    Q.    The ones that you can't name
12 though?
13    A.    I cannot name.
14    Q.    Okay. Have you learned of any
15 patients ever that have stopped treating with
16 Dr. Yarus because of anything Walgreens said or
17 did?
18    A.    Only the -- only the exhibits
19 that are attached to the pleadings that we
20 discussed before.
21    Q.    You are talking about the
22 pleadings attached to -- I'm sorry; the
23 exhibits attached to Dr. Yarus' Complaint
24 against Walgreen?
25    A.    Yes.

LINDA M. SHICK

2    Q.    Okay. I will use the term
3 "investigation." I don't know; if that's
4 inaccurate, you tell me.
5          The investigation you conducted
6 into the alleged defamation by Walgreen would
7 consist of what you've already talked about
8 today, the phone conversations with the folks
9 from Walgreen; is that fair to say?
10    A.    My communications with Dr. Yarus
11 and my communications with Walgreens.
12    Q.    Is there any other aspect or
13 element to that investigation besides those two
14 items, the conversations with Dr. Yarus and the
15 conversations with the Walgreen people?
16    A.    No.
17    Q.    Okay. Have you ever seen -- let
18 me back up a second, the computer system we
19 have been talking about from time to time
20 today, do you know what it's called?
21    A.    I do not.
22    Q.    Have you ever seen -- have you
23 ever had access to or seen the computer system,
24 in other words, looking at the monitor and
25 seeing anything about Dr. Yarus on the Walgreen

41 (Pages 158 - 161)

1          LINDA M. SHICK
2 computer system?
3     A.    No.
4     Q.    Do you know anybody that ever
5 has?
6     A.    Do I know anyone that ever has?
7     Q.    In other words, just so I am
8 clear, do you know of anybody that's ever seen
9 into Walgreens' computer system looking at a
10 monitor to see what it says or said at any
11 point in time about Dr. Yarus?
12    A.    Not other than Mike Freeman and
13 Brett Stacey, no.
14    Q.    And you assume they did because
15 they are Walgreen employees?
16    A.    I assume that they do because --
17 they did because they represented to me that
18 the notations had been removed.
19    Q.    Okay. After your May 7, 2009,
20 letter and before your July 26, 2010, letter,
21 were there any communication between you and
22 your office and anybody from Walgreen?
23    A.    I'm sorry; between when and
24 when?
25    Q.    The May 7, 2009, letter and then

1          LINDA M. SHICK
2 your July 26, 2010, letter.
3     A.    Communications? Yes.
4     Q.    Are they referenced in the
5 Exhibit 2 and the Amicus notes?
6     A.    For the most part, yes.
7     Q.    Okay. Are there any others that
8 aren't mentioned there? You did talk about the
9 conversation you had with Mr. Freeman, but that
10 was in 2009 I believe, correct?
11    A.    I think that there -- there may
12 be e-mail -- well, the e-mails may be
13 referenced, once Brett Stacey got involved that
14 might -- the e-mails might be referenced. I
15 don't know that there is any missing.
16    Q.    Let me ask the question a
17 different way, you can use the Critelli notes,
18 Exhibit 2, or your memory, whatever you can
19 use, when is the next time you had a
20 communication with Walgreen after the 2009
21 events?
22    A.    It looks like -- well, from
23 those notes it looks -- it looks like the next
24 time that it comes up again is -- well, let me
25 check the letter, but it looks like July of

1          LINDA M. SHICK
2 2010 it comes up again.
3           Once it's resolved with Mike
4 Freeman, then the next communication is the
5 July of 2010.
6     Q.    So that's your Shick 3 letter,
7 July 26, 2010?
8     A.    Yes.
9     Q.    That was your next communication
10 with Walgreen after Mike Freeman and you
11 resolved the 2009 events?
12    A.    Yes. And I am -- and I am
13 surmising that I contacted Walgreens via
14 telephone or else I wouldn't have known to
15 address the letter to Brett Stacey.
16    Q.    Okay. But you don't have any
17 note of that conversation with Walgreen or you
18 don't know who you spoke to?
19    A.    No, not that I am -- not that I
20 am running into readily easily.
21    Q.    Okay.
22    A.    My best recollection would be
23 that I would have called the number for Michael
24 Freeman and been told either by him or someone
25 else that I needed to communicate with Brett

1          LINDA M. SHICK
2 Stacey.
3     Q.    So let's look at your July 26,
4 2010, letter, which is Shick 3.
5     A.    Okay.
6     Q.    Do you have that in front of
7 you?
8     A.    I do.
9     Q.    Okay. Let me ask you generally
10 first, you may or may not be able to give me an
11 answer, is everything in this letter that you
12 stated to Walgreen, and specifically Brett
13 Stacey, is it based on something that you -- on
14 what you heard from Dr. Yarus?
15    A.    And things that I did.
16    Q.    Okay. Let's just go through it
17 then.
18          Well, first of all, what do you
19 mean by that? What do you mean, things that
20 you did?
21    A.    Well, I start out telling him I
22 represent Dr. Yarus and that this is the second
23 time within a year that this has been an issue
24 with Walgreens and here is a copy of my letter
25 that I sent back in May of 2009, so that I

LINDA M. SHICK

1 LINDA M. SHICK
2 would make him aware, if he was not privy to
3 that prior event, I was showing him evidence
4 that there had been a prior event.
5 Q. Okay. Just to -- I'm sorry.
6 A. And then not just based on
7 Dr. Yarus, but I actually say: "Based on
8 Michael Freeman's assurances that this matter
9 was being handled, Dr. Yarus declined to file a
10 civil action against Walgreens."
11 Q. And the matter is obviously the
12 alleged defamation of course, correct?
13 A. Yes.
14 Q. Okay. So staying in that second
15 paragraph of your July 26, 2010, letter where
16 you say: "His reputation is again being harmed
17 by Walgreens' employees spreading false
18 information to his patients and the general
19 public," what's your basis for saying that?
20 A. There had again been an event
21 that a patient had gone to a Walgreens and had
22 been declined the filling of their prescription
23 and they were advised that he was being
24 investigated.
25 Q. How do you know that though?

1 LINDA M. SHICK
2 A. From Dr. Yarus.
3 Q. Do you have any other source of
4 knowledge?
5 A. No.
6 Q. So your statement to Walgreen
7 that Dr. Yarus' reputation is again being
8 harmed by Walgreens' employees spreading false
9 information to his patients and general public,
10 that, the basis for that statement is
11 Dr. Yarus' statement to you?
12 A. Yes.
13 Q. And then the next paragraph, the
14 third paragraph in your July 26, 2010, letter:
15 "On July 23, 2010, a patient of Dr. Yarus was
16 advised by the Walgreens' pharmacy" -- I will
17 skip the address -- "that prescriptions written
18 by Dr. Yarus would not be filled as Dr. Yarus
19 is under investigation," what's your basis or
20 your source of that knowledge?
21 A. Dr. Yarus.
22 Q. Any other basis or source?
23 A. No.
24 Q. Do you know the patient's name?
25 A. I do not.

1 LINDA M. SHICK
2 Q. So you don't know from firsthand
3 or direct knowledge if that statement is true
4 or not, you are relying on Dr. Yarus to be
5 honest with you, correct?
6 A. I am relying on him.
7 Q. And then the fourth paragraph in
8 your July 26, 2010, letter, you start off by
9 saying: "Dr. Yarus is not being investigated
10 by any agency." What is your source of
11 knowledge or your basis for that statement?
12 A. Well, when Dr. Yarus told me it
13 was happening again, I had to question him
14 about whether he knew whether or not he was
15 being investigated and also make sure that he
16 had communicated with his resources as to
17 whether or not he was being investigated.
18 Q. So you asked him those
19 questions?
20 A. I did.
21 Q. You said to him in effect, "Are
22 you being investigated," you asked him that
23 question?
24 A. I asked -- I said to him, "Do
25 you have any way to ascertain whether or not

1 LINDA M. SHICK
2 you are being investigated?"
3 Q. And what did he say?
4 A. He said, "I am not being
5 investigated and, yes, I do have a way to
6 ascertain that."
7 Q. Okay. And was this a telephone
8 conversation with Dr. Yarus?
9 A. Yes.
10 Q. Do you remember when it was?
11 A. If I wrote the letter on July
12 26th, it would have been sometime between July
13 23rd and July 26th.
14 Q. Did he come into your office or
15 was the conversation all via telephone?
16 A. Telephone.
17 Q. All right. And do you know what
18 Dr. Yarus did, if anything, to figure out,
19 determine whether or not he was under
20 investigation by the DEA or any other agency in
21 July of 2010?
22 A. I cannot -- I cannot identify
23 who he communicates with regarding the status
24 of his license.
25 Q. Other than Dr. Yarus telling you

43 (Pages 166 - 169)

LINDA M. SHICK

2 that he was under investigation in July of
3 2010, did you do any investigation yourself to
4 figure out if he was or not?
5     A.    No. I didn't feel that I had
6 the tools to do that, again, because I didn't
7 have the HIPAA and, secondly, because I thought
8 it would be illegal for me to send in a ringer.
9     Q.    Okay. So your entire source of
10 the statement that Dr. Yarus is not being
11 investigated by any agency is Dr. Yarus,
12 correct?
13    A.    Yes.
14    Q.    And staying in that same
15 paragraph in your July 26, 2010, letter, your
16 next statement, your next sentence: "The
17 Walgreens Pharmacy personnel admitted that the
18 Walgreens' computer system warned them that
19 Dr. Yarus is under investigation and precluded
20 filling any prescriptions written by him," what
21 time frame are you talking about, to start
22 with?
23    A.    Contemporary with writing of the
24 letter.
25    Q.    Okay. So July of 2010?

LINDA M. SHICK

2     A.    Correct.
3     Q.    So how do you know that
4 Walgreens' pharmacy personnel admitted that,
5 that statement there in your letter?
6     A.    Because that again was part of
7 my request of Dr. -- well, I think he had
8 already done it, as soon as the patient advised
9 him that they were told that their prescription
10 wouldn't be filled, he or a member of his staff
11 contacted Walgreens and said, "Why aren't you
12 filling my prescription?"
13    Q.    Is that what he told you?
14    A.    Yes.
15    Q.    Okay. What did Walgreen say?
16    A.    What I wrote here.
17    Q.    Okay.
18    A.    That the -- that he is under
19 investigation and they are precluded from
20 filling any prescriptions written by him.
21    Q.    So your statement in Paragraph 4
22 of your July 26, 2010, letter that Walgreens --
23 that, okay, that their computer system warns of
24 an investigation of Dr. Yarus and that they are
25 refusing to fill prescriptions written by him,

LINDA M. SHICK

2 your source of that information is Dr. Yarus?
3     A.    Yes.
4     Q.    You have no personal knowledge
5 yourself?
6     A.    No. I had no way to get that.
7     Q.    So you are relying on him to be
8 truthful with you, correct?
9     A.    Yes.
10    Q.    And you can't point to any
11 evidence yourself other than Dr. Yarus'
12 statements to you that he was -- in support of
13 the statement that he -- strike that. I'm
14 sorry; I got myself convoluted there.
15          Can you point to any evidence
16 that Dr. Yarus was -- I'm sorry; can you point
17 to any evidence that Walgreens' computer system
18 did have such a warning or a statement in it,
19 other than Dr. Yarus' comment?
20    A.    No, and I -- and I assume that
21 to be true because why would he make that up?
22 He is in the business of rendering medical
23 treatment to people. Why does he want to have
24 a -- why does he want to make up a lawsuit
25 against Walgreens?

LINDA M. SHICK

2     Q.    Can you point to any evidence
3 that Dr. -- I'm sorry; that Walgreen ever
4 refused to fill Dr. Yarus' prescriptions?
5     A.    Can I point to any evidence?
6     Q.    Yes, other than Dr. Yarus'
7 comments to you.
8     A.    No.
9     Q.    Okay.
10    A.    Well, yes, that Brett Stacey and
11 Michael Freeman entertaining my communications,
12 Brett Stacey and Michael Freeman apologizing
13 and saying that it's been corrected.
14    Q.    You are referring to what now,
15 the statements or the prescriptions?
16    A.    Well, they go hand in hand.
17    Q.    You are aware that pharmacists
18 are under an obligation to only fill
19 prescriptions they feel are appropriate,
20 correct? Or maybe you are not aware of that; I
21 don't know.
22    A.    I don't know what "appropriate"
23 means.
24    Q.    Are you aware that pharmacists
25 are required to use their judgment in filling

44 (Pages 170 - 173)

LINDA M. SHICK

1        LINDA M. SHICK
2 prescriptions and if they feel the prescription
3 is not legitimate for whatever reason, they
4 can't fill it, they shouldn't fill it?
5    A.    The way you are stating it, I
6 would -- I would say that that's an incorrect
7 statement, but I would acknowledge that if a
8 pharmacist thinks that it's a fraudulent
9 prescription or that somebody is drug seeking
10 or drug shopping, that they will probably
11 decline to fill the prescription.
12    Q.    It goes beyond that, doesn't it?
13 In other words, pharmacists as medical
14 professionals are obligated to look at a
15 prescription and to use their professional
16 judgment, if they think it's fraudulent, if
17 they think it's drug-seeking behavior or
18 whatever else, they have the right and the
19 obligation not to fill it, correct?
20    MR. BOLDEN: Objection.
21    MR. INNELLI: Objection.
22 BY MR. SANZO:
23    Q.    Generally speaking.
24    MR. BOLDEN: Objection. Can we
25 go off the record?

1        LINDA M. SHICK
2    MR. INNELLI: Go off the record.
3    VIDEO TECHNICIAN: Off the
4 record at 12:44.
5    - - -
6    (The following took place off
7 the video record:
8    MR. BOLDEN: Just read me the
9 question back.
10    - - -
11    (Whereupon, the pertinent
12 portion of the record was read.)
13    - - -
14    MR. BOLDEN: Not only is that
15 more of an argument than a question,
16 your use of the language goes beyond
17 that and the statement that they can
18 refuse to also fill it for whatever
19 other reason is an open-ended argument,
20 and I just think it's asking her to be
21 both a soothsayer as well as aid you in
22 the argument you want to make.
23    I object to the question on the
24 grounds that it's an improper question.
25    MR. INNELLI: It's not a

1        LINDA M. SHICK
2 question.
3    MR. BOLDEN: It's not a
4 question; it's an argument.
5    MR. SANZO: Are you ready to go
6 back on?
7    MR. BOLDEN: Sure, I am ready.)
8    - - -
9    (Video record resumed.)
10    - - -
11    VIDEO TECHNICIAN: Back on the
12 record, 12:45.
13 BY MR. SANZO:
14    Q.    Ms. Shick, I don't really feel
15 the need to remind you again that, you know,
16 you only answer questions that you understand
17 obviously, you know that.
18    If you understand my question,
19 please answer it. If you don't, tell me and I
20 will rephrase the question.
21    MR. INNELLI: I think our
22 objection is there is no question
23 pending.
24 BY MR. SANZO:
25    Q.    Go ahead.

1        LINDA M. SHICK
2    A.    Okay. I understand that there
3 are reasons that pharmacists can decline to
4 fill a prescription.
5    Q.    Okay. In other words, they are
6 not limited just to fraud and just to
7 drug-seeking behavior, correct?
8    A.    No; it could be drug
9 interaction.
10    Q.    Thank you.
11    Okay. Now, still looking at
12 your letter of July 26, 2010, the fifth
13 paragraph, the bottom paragraph on the first
14 page, where you say: "Walgreens actions have
15 caused Dr. Yarus significant emotionally
16 distress," it looks like that was cut and
17 pasted from your 2009 letter, since the same
18 typo is there, if you see that.
19    A.    It does.
20    Q.    Okay. And I have the same
21 question too, what is your basis for that? Is
22 it -- well, go ahead, that's my question, what
23 is your basis for saying that?
24    A.    Dr. Yarus again was -- I could
25 hear that he was upset and he told me that he

45 (Pages 174 - 177)

LINDA M. SHICK

2 was upset by this happening. I think he was
3 also confused that he didn't know where this
4 was coming from or why it was coming at him.
5 I think by the time it happened
6 the second time he was pretty sure that it
7 wasn't his patient being targeted but that it
8 was him being targeted.
9 Q. Is that what he told you or did
10 you just draw that conclusion from your
11 conversation with him?
12 A. I think that we discussed that.
13 I think we went back and said, you know, we
14 thought before we weren't sure that it wasn't
15 the profiling of your patients but now that
16 it's happened a second time at a second
17 location, that this is -- that it's about --
18 it's about Lance Yarus and not about your --
19 not about any specific patient.
20 Q. Did Dr. Yarus ever suggest to
21 you any basis or reason why Walgreens would
22 want to target him?
23 A. At that point he did not know
24 why they would want to target him.
25 Q. Did he ever tell you that

LINDA M. SHICK

2 Walgreens continually routinely fills his
3 prescriptions then and today? Did he ever tell
4 you that?
5 A. That he -- at that -- ever tell
6 me that they routinely fill his prescriptions?
7 Q. Yes.
8 A. I don't have a specific
9 recollection of that conversation.
10 Q. Okay. So other than hearing in
11 his voice in your telephone conversation in
12 July of 2010, can you point to any other
13 support for your statement that he was under
14 emotional distress due to Walgreens' comments?
15 A. Specifically in July of 2010 --
16 Q. Yes.
17 A. -- or subsequent thereto?
18 Q. Let's start with that, July of
19 2010.
20 A. Our communications told me that
21 he was very upset, the immediacy that he got
22 back to me showed me that he was taking it very
23 seriously and was disturbed by it, and, again,
24 I was wondering whether or not I was going to
25 be able to use him as an expert.

LINDA M. SHICK

2 Q. Okay. And in that conversation
3 when you sensed or you observed the emotion in
4 his voice, how would you describe that emotion?
5 Was it anger or something else?
6 A. I -- I think Lance -- that
7 Dr. Yarus was a bit angry but there was more an
8 immediacy to be a problem solver than to vent.
9 Q. Did he raise his voice in that
10 conversation with you over the phone?
11 A. Not to me he wouldn't.
12 Q. Not directly at you, but was his
13 voice raised?
14 A. No. He doesn't talk like that.
15 Q. Okay. Did he curse?
16 A. I --
17 Q. Again, not at you, just in the
18 conversation.
19 A. He could have, but I -- I don't
20 have a specific recollection of that.
21 Q. Did he say anything derogatory
22 about Walgreen in his conversation with you on
23 the telephone in July of 2010?
24 A. No, other than to tell me that
25 they are doing it without a basis and he didn't

LINDA M. SHICK

2 understand why they were doing it. You know,
3 initially, initially I think we concluded that
4 it was at one location and perhaps one rogue
5 pharmacist but now it looked like it was
6 something more than that.
7 Q. Okay. Why do you say that?
8 A. Because it happened at a
9 different location, and I don't believe that
10 this -- I don't believe that the patient
11 profile was the same as the first event.
12 Q. Meaning what, a different race,
13 different gender?
14 A. Yes.
15 Q. Both?
16 A. I believe that it was, that this
17 did not involve a black man.
18 Q. How do you know that?
19 A. That's just my recollection.
20 Q. Well, what was your basis when
21 you knew that? Did you forget or I don't
22 understand what you were saying, that was your
23 recollection.
24 A. It's --
25 Q. That's a bad question. I'm

46 (Pages 178 - 181)

LINDA M. SHICK

2 sorry.

3 A. It's still my recollection.

4 Q. Okay. That's fine.

5 Where did that information come

6 from, Dr. Yarus?

7 A. It would have come from

8 Dr. Yarus.

9 Q. Okay. Do you recall the name

10 yet for that patient? Maybe not.

11 A. No.

12 Q. You don't remember the name of

13 the patient?

14 A. No.

15 Q. Was it one patient or more than

16 one?

17 A. I think the second time it was

18 only one person.

19 Q. So so far, as of July 26, when

20 you wrote this letter, 2010, you have told us

21 about three patients, you don't remember their

22 names, but you told us about two in 2009 and

23 one in 2010; is that correct?

24 A. That -- that's the way I recall

25 it, yes.

LINDA M. SHICK

2 Q. Okay. Are you aware of any

3 other patients in 2009 or 2010 who claimed to

4 have heard defamatory, negative, derogatory

5 comments from Walgreen pharmacists or

6 employees?

7 A. I do not know of them.

8 Q. And getting back to your

9 observations of Dr. Yarus' emotional state in

10 July of 2010, other than that one telephone

11 conversation where he appeared to be emotional,

12 what else can you point to that he was

13 emotionally disturbed or upset?

14 A. Well, as I continued to deal

15 with the issue, I would hear from -- I would

16 hear from Dr. Yarus on the issue, so that I

17 knew that it was -- I knew that it was a

18 concern of his, that this get resolved.

19 Q. You would hear from him via

20 telephone or in person?

21 A. I would hear from him by

22 telephone. I am trying to think back at 2010,

23 whether or not -- whether or not we texted

24 already in 2010. I might have gotten an e-mail

25 from him just asking me, "Have you heard

LINDA M. SHICK

2 anything?"

3 Q. Okay. Did you ever speak with

4 him in person about the Walgreens incidents?

5 A. Not until after -- not during

6 the time period that I represented him.

7 Q. When did you first speak to him

8 about the Walgreen incidents?

9 A. When did I first talk -- I

10 haven't seen him that often. I am trying to

11 think of when I learned that he had brought an

12 action against Walgreens.

13 I can only say with any

14 certainty that the -- the occasion that we had

15 lunch, we talked about it, we talked about what

16 was going -- I think both lawsuits were still

17 going on when we had lunch and we talked about

18 it, but not in great detail.

19 Q. Both lawsuits, meaning this one

20 and the one against Thomas, Thomas & Hafer?

21 A. Yes.

22 Q. What year was that lunch?

23 A. Geez, time goes by so fast, I am

24 thinking it could have been -- I don't know

25 when he filed -- when he filed, but I am -- my

LINDA M. SHICK

2 best guesstimate would be two to three years

3 ago.

4 Q. Okay. And back in July of 2010

5 did you ever suggest to Dr. Yarus that he seek

6 medical treatment for his emotional state?

7 A. No.

8 Q. Did he ever seek medical

9 treatment in 2010 for his emotional state, as

10 far as you know?

11 A. A psychiatrist or psychologist,

12 I do not know.

13 Q. Or any therapist at all for

14 emotions or mental status.

15 A. I don't know.

16 Q. Okay. And another point, you

17 said that he sounded -- I think you may have

18 used the term "concerned" when he called you

19 back. Did you use that term?

20 A. I did use that concern.

21 Q. There is one thing if you are

22 concerned, there is another thing about being

23 emotionally upset. When he was talking to you

24 about Walgreens, was he simply concerned or was

25 it beyond that? Was he upset?

47 (Pages 182 - 185)

LINDA M. SHICK

2 A. He was upset about it. It's as
3 if -- my analogy would be as if someone had
4 called my license into question.
5 Q. Okay.
6 A. I would be more than concerned.
7 Q. You would be angry?
8 A. I would be livid.
9 Q. Okay. In questions about the
10 last paragraph on July 26, 2010, letter, a
11 couple more, similar to the questions I asked
12 you about the 2009 letter, this appears to be
13 the same language, have they interfered -- you
14 say: "They have," meaning Walgreens,
15 interfered with Dr. Yarus' doctor/patient
16 relationships. Do you have any evidence for
17 that?
18 A. Yes, the patient that had to
19 advise Dr. Yarus that he couldn't get his
20 medication or she couldn't get her medication.
21 Q. Did that patient continue to
22 treat with Dr. Yarus after July of 2010?
23 A. I do not know.
24 Q. Can you point to anything else
25 that suggests that Walgreens has interfered

LINDA M. SHICK

2 with Dr. Yarus' doctor/patient relationships?
3 A. No. Just it would be something
4 I surmised.
5 Q. And the same kind of question
6 about the last sentence on that first page of
7 your July 26, 2010, letter, "They," meaning
8 Walgreens, "have injured his reputation and
9 jeopardized his professional standing," do you
10 have any evidence for that?
11 A. That particular patient, the
12 prior patients and what I would surmise by
13 having this happen.
14 Q. Do you know if any of those
15 three patients we have talked about now, the
16 ones from 2009, the two from 2009 and the one
17 from July of 2010, do you know if any of those
18 three patients believed what Walgreens
19 allegedly said to them?
20 A. I think that they did initially
21 believe it before they were reassured by
22 Dr. Yarus' office that that wasn't true.
23 Q. And do you know if the comments
24 allegedly made by Walgreen to those three
25 patients made those patients think any less of

LINDA M. SHICK

2 Dr. Yarus?
3 MR. BOLDEN: Objection.
4 VIDEO TECHNICIAN: Off the
5 record at 12:56.
6 - - -
7 (The following took place off
8 the video record:
9 MR. BOLDEN: Read the question
10 back to me.
11 - - -
12 (Whereupon, the pertinent
13 portion of the record was read.)
14 - - -
15 MR. BOLDEN: How can she get
16 inside their mind and know what they
17 really believe? I think your question
18 is objectionable.
19 Once again, you are asking her
20 to know what somebody else thought.
21 MR. SANZO: Ready to go back
22 on?)
23 - - -
24 (Video record resumed.)
25 - - -

LINDA M. SHICK

2 VIDEO TECHNICIAN: Back on the
3 record, 12:57.
4 BY MR. SANZO:
5 Q. Ma'am, do you under --
6 A. I understand your question.
7 Q. Good.
8 A. I think that I surmised and that
9 from what they expressed initially in returning
10 to him that they had a problem, I think that
11 unless they believed what the staff said, that
12 they -- that they at least initially thought
13 less of him.
14 Q. And that surmising or that
15 assumption of yours is based on what you were
16 told by Dr. Yarus, correct?
17 A. And putting myself in that
18 position.
19 Q. In other words, you don't know
20 whether or not anyone from Walgreens said
21 anything to those three patients, you heard
22 that from Dr. Yarus, correct?
23 A. I do know that they said
24 something or else Brett Stacey and Michael
25 Freeman would not have entertained me.

48 (Pages 186 - 189)

LINDA M. SHICK

2  Q.  Okay. And you know that those
3  three patients allegedly went back to see
4  Dr. Yarus about the alleged comments from what
5  you were told by Dr. Yarus, correct?
6  A.  They returned to the office or
7  they called him. I can't with any specificity
8  say which.
9  Q.  And do you know if those three
10 patients continued to treat with Dr. Yarus
11 after they allegedly heard those comments from
12 Walgreen?
13 A.  I don't know.
14 Q.  Okay. And do you know if any of
15 those three patients ever passed on or
16 disseminated the alleged comments to anybody
17 else in the world?
18 A.  I don't have firsthand
19 knowledge.
20 Q.  Other than your May 9, 2000 --
21 I'm sorry; your May 7, 2009, letter and your
22 July 26, 2010, letter, did you ever send any
23 other correspondence to Walgreen?
24 A.  E-mails to Brett Stacey.
25 Q.  The ones we have talked about

LINDA M. SHICK

2  today already?
3  A.  Yes.
4  Q.  Okay. But no other
5  correspondence though --
6  A.  No.
7  Q.  -- on your letterhead?
8  A.  No.
9  Q.  And other than that one letter
10 from Brett Stacey to you dated August 13, 2010,
11 have you ever received any other correspondence
12 from Walgreen about Dr. Yarus?
13 A.  Just the e-mails from Brett.
14 Q.  Right, that we talked about
15 already today?
16 A.  Yes.
17 Q.  And the August 13, 2010, letter
18 from Brett Stacey to Dr. Yarus was at your
19 request, correct?
20 A.  Yes.
21 Q.  When I was asking you questions
22 a few minutes ago about evidence that you might
23 be aware of of emotional distress by Dr. Yarus,
24 you said something to the effect that "not at
25 that time." How about to the current day, can

LINDA M. SHICK

2  you point to anything at all, do you know of
3  any evidence that would suggest that Walgreens
4  has caused Dr. Yarus ongoing or continued
5  emotional distress?
6  A.  Yes. I know that Dr. Yarus had
7  a cardiac event. I don't know that the only
8  source of the stress was Walgreens but it
9  certainly was part of what was a contributing
10 factor.
11      I know that at the time -- I
12 believe that at the time of the cardiac event
13 both lawsuits were still pending, and I know
14 that that's been very stressful for him. I did
15 hear about the cardiac event and know that --
16 know that he had to cut back his practice
17 after, after he suffered that.
18 Q.  And how did you hear about the
19 cardiac event?
20 A.  I think initially -- I think
21 initially I had clients who had appointments
22 and received a telephone call that those
23 appointments were going to be cancelled
24 indefinitely.
25 Q.  Your own clients you mean?

LINDA M. SHICK

2  A.  Yes.
3  Q.  Okay. So what did you do to
4  learn that he had suffered a cardiac event?
5  A.  I probably got on the phone
6  with -- at that point in time I -- there is
7  another Michelle. I don't think I talked to --
8  I think I talked to that Michelle and -- I
9  think that the phone call had already -- my
10 staff had already taken the message and I think
11 I called back and said, "What happened," and
12 got an explanation that he was hospitalized and
13 had undergone surgery.
14 Q.  And who told you that?
15 A.  I -- if I had to -- my best
16 guess would be the current Michelle.
17 Q.  Michelle Casdia?
18 A.  Yes.
19 Q.  And what was the time frame of
20 that conversation with Michelle Casdia?
21 A.  The time frame as to the cardiac
22 event?
23 Q.  Yes.
24 A.  Well, the cardiac event was
25 about a year ago, and I probably heard about it

49 (Pages 190 - 193)

LINDA M. SHICK

1 LINDA M. SHICK
2 within a week of it happening.
3    Q.    Okay.
4    A.    I don't know what night of the
5 week -- I don't know what day or night of the
6 week it happened, but whenever they were
7 clearing their schedule -- clearing his
8 schedule for them, I was -- I got a phone call.
9    Q.    And your training is in law and
10 not in medicine, correct?
11    A.    Yes.
12    Q.    You are not a cardiologist
13 obviously.
14    A.    No.
15    Q.    Okay. Do you know the physical,
16 the physiological cause of Dr. Yarus' heart
17 attack?
18    A.    I believe he had bypass surgery.
19    Q.    Okay. Do you know the cause of
20 his clogged blood vessels?
21    A.    I don't.
22         MR. INNELLI: Object. It
23   assumes facts not in evidence.
24 BY MR. SANZO:
25    Q.    And what's your basis for saying

1 LINDA M. SHICK
2 that the alleged comments from Walgreen were
3 the cause or a cause of the cardiac event that
4 occurred in 2014?
5    A.    I think when we had lunch, he
6 told me that the lawsuits were putting him
7 under a lot of stress, that the issues and the
8 necessity of having to proceed into litigation
9 was causing him a lot of stress and duress.
10    Q.    Are you aware that Dr. Yarus
11 testifies as an expert, by his testimony,
12 approximately twice a week? Are you aware of
13 that?
14    A.    That he testifies that often?
15    Q.    Yes.
16    A.    Given workers' comp -- a
17 workers' comp practice, I would have guessed
18 that it was more than that.
19    Q.    He may have said three, he may
20 have said two or three, but it's multiple times
21 per week.
22    A.    Right.
23    Q.    Are you aware of that?
24         MR. INNELLI: Aware of what?
25    A.    It doesn't surprise me.

1 LINDA M. SHICK
2 BY MR. SANZO:
3    Q.    Okay. And is testifying as an
4 expert -- when you testify as an expert, you
5 are cross-examined by the defense, right, by
6 the other side?
7    A.    Right.
8    Q.    Is that stressful?
9    A.    I would say sitting here today,
10 no.
11    Q.    Okay.
12    A.    I'm not acting as an expert but
13 I'm not stress -- I'm not stressed. I have
14 been more stressed taking a deposition than
15 giving a deposition.
16    Q.    You are an independent witness,
17 correct?
18    A.    I am an independent witness, but
19 I have testified as a party litigant, and that
20 was very stressful.
21    Q.    Okay. You are -- you have
22 Dr. -- I'm sorry; Dr. Yarus is your former
23 client, correct?
24    A.    Yes.
25    Q.    And you are assisting him,

1 LINDA M. SHICK
2 correct, in this case?
3    A.    Am I assist -- I am trying to
4 give you honest answers.
5    Q.    I'm not suggesting otherwise.
6 What I'm saying is that at Dr. Yarus' request
7 you are cooperating on his behalf, correct?
8    A.    Yes. I would cooperate with you
9 too if you called me.
10    Q.    Okay. Can you point to any
11 medical evidence that the alleged comments by
12 Walgreen caused Dr. Yarus to have a heart
13 attack sometime in the future?
14    A.    A direct nexus?
15    Q.    Yes. Any medical evidence?
16    A.    I would have to rely on a
17 medical expert for that.
18    Q.    Okay. And can you point to --
19 strike that.
20         Are you aware of -- you read the
21 Amended Complaint in federal court against
22 Walgreens, correct?
23    A.    Yes.
24    Q.    So you are generally aware of
25 the allegations?

1          LINDA M. SHICK
2     A.     Yes.
3     Q.     Okay. Do you have any personal
4  knowledge of any allegation made by Dr. Yarus
5  in this current lawsuit?
6          MR. BODLEN: Objection.
7          MR. INNELLI: Yes, objection.
8          MR. BOLDEN: Objection.
9          VIDEO TECHNICIAN: Off the
10    record at 1306.
11          - - -
12     (The following took place off
13    the video record:
14          MR. BOLDEN: Could you read the
15    question back?
16          - - -
17     (Whereupon, the pertinent
18    portion of the record was read.)
19          - - -
20          MR. BOLDEN: I don't understand
21    what you mean by that question.
22          MR. SANZO: Okay.
23          Ready to go back on?)
24          - - -
25     (Video record resumed.)

1          LINDA M. SHICK
2          - - -
3          VIDEO TECHNICIAN: Back on the
4    record, 1306.
5  BY MR. SANZO:
6     Q.     Ms. Shick, do you have the
7  Amended Complaint in front of you there?
8     A.     Yes, I do.
9     Q.     Okay. Let's start with the
10 Amended Complaint, if you would, just look
11 through that, and my question will be, do you
12 have any personal knowledge of any of those
13 allegations, direct knowledge, personal
14 knowledge?
15     A.     Well, I have personal knowledge
16 as to Paragraph 1.
17     Q.     About -- where it says: "Did
18 Lance Yarus, a citizen of the Commonwealth of
19 Pennsylvania"?
20     A.     And the office location, yes.
21     Q.     You know what I can do, just to
22 streamline this, I am asking if you have any
23 personal or direct knowledge about the
24 allegations against Walgreen. So any
25 biographical information about Dr. Yarus, you

1          LINDA M. SHICK
2  don't have to worry about that.
3          MR. INNELLI: Why don't you go
4    to specific paragraphs?
5     A.     Well, there is allegations in
6  here about the May incident. There is
7  allegations about acts that I took.
8  BY MR. SANZO:
9     Q.     What paragraph are you referring
10 to, ma'am?
11     A.     I am at Paragraph 16.
12     Q.     Okay. So that says: "On May 1,
13 2009, a patient went to the Walgreen pharmacy
14 at 2014 South Broad" -- excuse me -- it talks
15 about an event that allegedly occurred there;
16 is that correct?
17     A.     Yes.
18     Q.     And you have no personal
19 knowledge of that, correct?
20     A.     Only what we have already
21 discussed ad nauseam.
22     Q.     Sure. Yes, sure.
23     A.     And Paragraph 17, we have
24 discussed what I did.
25     Q.     Uh-huh.

1          LINDA M. SHICK
2     A.     18, we discussed what I did.
3     Then 19 is the second event, the
4  July 2010.
5     20 is the second letter.
6     21 is the letter from Brett
7  Stacey.
8     22 is the letter from Brett
9  Stacey.
10     Q.     So 23 begins the year 2013, if
11 you can see that there.
12     A.     Yes. I don't have any personal
13 knowledge about these people.
14     Q.     Okay. So if you look at
15 Paragraphs 23 through 26 of the Amended
16 Complaint, you have no personal knowledge about
17 those allegations, correct?
18     A.     That's correct.
19     Q.     And Paragraphs 27 through 36,
20 the same, you have no personal knowledge of any
21 of that, correct?
22     A.     That's right.
23     Q.     And Paragraph 37 through 42, you
24 have no personal knowledge, correct?
25     A.     Right.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

LINDA M. SHICK

2 Q. Getting away from the Amended
3 Complaint, do you -- strike that, please.
4 One of the allegations Dr. Yarus
5 makes, and it's in the Amended Complaint, is
6 that Walgreens has damaged his patient/doctor
7 relationship. Do you have any personal
8 knowledge of that?
9 MR. BOLDEN: Objection.
10 VIDEO TECHNICIAN: Off the
11 record, 1309.
12 - - -
13 (The following took place off
14 the video record:
15 MR. BOLDEN: I'm not certain
16 whether you are trying to increase the
17 cost of the record, whether you are
18 trying to wear her down. I am not -- I
19 certainly don't have a motive to
20 ascribe to it, but your continual
21 repetition of the same question,
22 slightly altered in the way you express
23 it, is improper, and if you continue to
24 ask her repetitive questions, I am
25 going to bring the matter to the

LINDA M. SHICK

2 attention of the court.
3 MR. SANZO: You are certainly
4 free to do that. I think that, if
5 anything, she is wearing us down. I
6 don't think we are going to wear her
7 down. I am not too worried about that.
8 THE WITNESS: That's what my
9 husband says too.
10 MR. BOLDEN: Well, I can agree
11 with that, but it's wrong.
12 MR. SANZO: Let's go back on.)
13 - - -
14 (Video record resumed.)
15 - - -
16 VIDEO TECHNICIAN: Back on the
17 record, 1310.
18 BY MR. SANZO:
19 Q. Do you remember my question?
20 A. No. I'm sorry.
21 Q. Yes, just Dr. Yarus alleges in
22 the Complaint against Walgreen that Walgreens
23 has damaged his patient/doctor relationships.
24 Do you have any personal knowledge or direct
25 knowledge of that allegation, in support of

LINDA M. SHICK

2 that allegation?
3 A. Not -- not firsthand knowledge,
4 I do not.
5 Q. Okay. Can you point to any
6 evidence of it at all?
7 A. It would only be what I have
8 learned through this lawsuit.
9 Q. From speaking with counsel?
10 A. And --
11 Q. Speaking --
12 A. And discussion -- the discussion
13 that I had with Dr. Yarus.
14 Q. Okay. What did he tell you
15 about that, on that subject?
16 A. He told me that the -- that
17 when -- that they have looked into his computer
18 and found that there is a number of people who
19 only came in one time and have not returned.
20 Q. That's what Dr. Yarus told you?
21 A. That's my understanding.
22 Q. I mean, did he communicate that
23 to you directly or some other person, then you
24 got it from that person?
25 A. No; I got that from Dr. Yarus.

LINDA M. SHICK

2 Q. Okay. And when did that
3 conversation take place?
4 A. I think that we discussed that
5 at lunch.
6 Q. And that was last year you
7 believe?
8 A. I believe so.
9 Q. Okay. Did he tell you anymore
10 about that?
11 A. I think at that -- my
12 recollection at that point in time, the other
13 lawsuit was moving hotter than this one was.
14 Q. Did he give you anymore
15 explanation about his conclusion or his
16 allegation about those patients that you just
17 mentioned didn't come back because of anything
18 that Walgreens did?
19 A. I think that he -- that he and
20 his counsel needed to look at that further.
21 Q. Okay.
22 A. I think he was surprised by the
23 numbers.
24 Q. The other lawsuit that you have
25 mentioned a few times involving Thomas, Thomas

52 (Pages 202 - 205)

LINDA M. SHICK

2 & Hafer also involved a lawyer named James
3 Tinnyo. Does that sound familiar?
4     A.     What's his last name?
5     Q.     James Tinnyo. I believe it's
6 T-I-N-N-Y-O.
7     A.     I know of him because he does
8 workers' comp. I have other cases involving
9 attorneys from Thomas, Thomas & Hafer dating
10 back to actually my defamation case. The case
11 that I won involved a Thomas, Thomas & Hafer
12 attorney.
13     Q.     They were defense counsel you
14 mean?
15     A.     They were not defense -- they
16 were not trial defense attorneys. I think it
17 was one of the Thomases, one of the Thomases,
18 the one that has an airplane, came out to help
19 settle once I got the verdict.
20     Q.     Okay.
21     A.     But -- so I have known -- I have
22 known a number of attorneys from that firm for
23 a long time.
24     Q.     Okay.
25     A.     But I don't know him.

LINDA M. SHICK

2     Q.     Do you know anything about that
3 lawsuit involving Thomas, Thomas & Hafer and
4 James Tinnyo, besides what you have already
5 mentioned today?
6     A.     I know that it's resolved
7 confidentially. I don't know the terms of the
8 resolution. I know the basis of it. I know
9 basically what happened that led to the
10 lawsuit.
11         Beyond that I don't know
12 anything -- I don't know anything more than
13 that.
14     Q.     Do you know what damages
15 Dr. Yarus claimed against Mr. Tinnyo in Thomas,
16 Thomas & Hafer?
17     A.     I -- I believe that he felt that
18 that cost him -- that that cost him patients,
19 that cost him expert work, and that it caused
20 him physical and emotional harm.
21     Q.     Did he tell you those things?
22     A.     The -- he told me -- I am trying
23 to remember how I learned it. I may have
24 learned it when I looked at the lawsuit.
25     Q.     Do you recall discussing the

LINDA M. SHICK

2 Thomas, Thomas & Hafer lawsuit with Dr. Yarus
3 at any point in time?
4     A.     Yeah, I think -- I think we
5 talked about it a little bit at lunch, that
6 lunch.
7     Q.     The same lunch that you were
8 talking about earlier?
9     A.     Right.
10     Q.     From last year?
11     A.     Right.
12     Q.     Can you recall what he said
13 about it?
14     A.     I -- I think that he said that
15 this -- the litigation was eating up a lot of
16 his time and energy and that it's very
17 stressful and that it's very disturbing to have
18 your reputation and your license, comments made
19 like that about it, and then I asked him why,
20 why this particular attorney called him a
21 crackhead.
22     Q.     What did he say?
23     A.     He said that he thought that the
24 guy was frustrated during the deposition, that
25 Lance had held his ground during the deposition

LINDA M. SHICK

2 and that the guy was a -- that the guy lost his
3 cool and made some comments that he shouldn't
4 have made.
5         MR. SANZO: Okay. I am just
6 about done. I might have another
7 question or two, but for the time being
8 I will let other counsel ask questions
9 if they have any.
10         THE WITNESS: Okay.
11         MR. SANZO: Thank you.
12         MR. BOLDEN: Are you okay to go
13 another five minutes with me?
14         THE WITNESS: Do I look frail?
15         MR. BOLDEN: Actually, you
16 don't.
17         THE WITNESS: Thanks.
18 BY MR. BOLDEN:
19     Q.     Okay. I just want to ask you
20 some follow-up questions with respect to some
21 questions that Mr. Sanzo posed to you.
22         I believe you testified that
23 both Mr. Stacey and Mr. Freeman both each
24 stated that remarks had been removed from the
25 computer system; is that correct?

53 (Pages 206 - 209)

LINDA M. SHICK

1
2  A.   That's right.
3  Q.   Based on the sequence of events,
4  the language that was in your letter, the
5  language that each one of them used with you,
6  do you have any doubt in your mind that the
7  remarks they were referring to was the comment
8  that he was under investigation by the DEA?
9       MR. SANZO: Objection to form.
10  A.   No. I concluded that they --
11  that any negative comments about Dr. Yarus had
12  been removed from the Walgreens system.
13  BY MR. BOLDEN:
14  Q.   Okay. You said that Michael
15  Freeman was not being candid with you, is that
16  correct, or not being truthful with you?
17  A.   I -- I thought that he had more
18  information than what he was willing to share
19  with me.
20  Q.   Okay. And is it based on his
21  language, anything you took from the statement
22  that he made, did that contribute to your
23  belief that he was not being candid?
24       MR. SANZO: Objection to form.
25  A.   It didn't make -- it wasn't that

LINDA M. SHICK

1
2  I thought that he was talking to me and being
3  sneaky. I thought that he was -- it just
4  didn't make any sense to me that a company as
5  large as Walgreens, and even a mom-and-pop drug
6  store, if they had a computer with a prescriber
7  profile, that if some notation was made in that
8  computer, that they would know how, when and
9  why it was made, and for him to tell me that
10  they are not able to ascertain anything more
11  from their system than who prescribed -- who
12  fills a given prescription, I thought that that
13  was -- that -- frankly, that that was bull.
14  BY MR. BOLDEN:
15  Q.   And when each one of them said
16  to you that the remarks had been removed from
17  the computer system, in your mind at least did
18  what they say to you convey to you the belief
19  that each one of them looked at the
20  computer system in order to be able to give you
21  that statement?
22       MR. SANZO: Objection to form,
23  misleading.
24  A.   I -- I concluded that there --
25  that them assuring me that there was nothing

LINDA M. SHICK

1
2  negative about Dr. Yarus in their system was
3  true and correct and that if it had resolved at
4  that point, that it did not warrant the filing
5  of a lawsuit.
6  BY MR. BOLDEN:
7  Q.   And when you received from each
8  one of them an apology, did you consider that
9  to be an acknowledgement that the statements
10  were in the computer system and had been
11  made?
12       MR. SANZO: Objection to form,
13  misleading.
14  A.   Yes, I did -- I concluded that
15  Dr. Yarus' position and allegations were
16  correct in the fact that they told me that --
17  well, Brett Stacey apologized and that they
18  said that, that they had removed them from the
19  system.
20  BY MR. BOLDEN:
21  Q.   And when Mr. Freeman said to you
22  that they also counseled all staff and
23  reprimanded them, what did that mean to you?
24       MR. SANZO: Objection to form.
25  A.   I interpreted that to mean that

LINDA M. SHICK

1
2  he had done some kind of investigation and that
3  he had solved the problem and that he had --
4  which was another reason I thought he wasn't
5  being candid, because who are you reprimanding
6  if you don't know who did it?
7  Q.   Okay. The other -- you -- one
8  of the things you had indicated was that -- in
9  responding to Mr. Sanzo, is that in the first
10  incident in 2009 it was two black men who went
11  to a Walgreens and tried to pay for their
12  prescriptions with cash, and you said in the
13  second event that it didn't fit the same
14  profile. Could you just be a little clear on
15  that?
16  A.   That was my --
17       MR. SANZO: Objection to form.
18  A.   (Continued) My recollection was
19  that in the first event that Dr. Yarus and I
20  discussed whether or not the target was the
21  patients and/or Dr. Yarus, that it was an
22  excuse not to fill those particular
23  individuals' prescription, given the nature of
24  the prescription, the nature of the people, and
25  cash.

54 (Pages 210 - 213)

LINDA M. SHICK

2 BY MR. BOLDEN:
3    Q.    Okay.
4    A.    The second time, it's my
5 recollection that it was a different patient
6 type than black individuals with cash.
7    Q.    Okay. And cash was a component
8 of this issue, either paying with cash or
9 paying in some other fashion, correct?
10    A.    That's my recollection.
11    Q.    You responded to a series of
12 questions by Mr. Sanzo about your belief that
13 the patients would have recommunicated or
14 repeated the same information they heard to
15 others, and you said that it was based on
16 your -- based on your common sense and based
17 upon your life experiences, and was it also
18 based upon the knowledge that you derive over
19 the years from being an attorney representing
20 people?
21    MR. SANZO: Objection to form.
22    A.    Yeah, it's -- yes, it's the fund
23 of knowledge that makes me draw conclusions and
24 pass judgments and have opinions.
25    MR. BOLDEN: That's all I have.

LINDA M. SHICK

2 BY MR. SANZO:
3    Q.    Ma'am, are you testifying in
4 this case as an expert in any way, shape or
5 form, as far as you know?
6    A.    No, not as far as I know.
7    Q.    Do you know what Brett Stacey's
8 position was back in 2010 with Walgreen?
9    A.    I know how he signed his letter.
10    Q.    "Senior Counsel" is it?
11    A.    Yes, "Senior Attorney."
12    Q.    Did Brett Stacey have access to
13 Walgreens' computer system that contained --
14 that allegedly contained the information
15 involving Dr. Yarus?
16    A.    I would assume that Brett Stacey
17 either had direct access or had minions to do
18 his bidding.
19    Q.    So when he told you, according
20 to what your testimony was, that he -- just
21 paraphrasing -- that he looked into the issue
22 and the comments were removed, that could have
23 been based on his own personal investigation
24 into the computer, it could have been based on
25 somebody else's investigation relayed to him,

LINDA M. SHICK

2 correct?
3    A.    That's correct, but I concluded
4 that he knew firsthand or else the problem was
5 endemic and much larger than what I was led to
6 believe it was.
7    Q.    Can you point to anything that
8 would refute the position that what Mr. Stacey
9 told you was based on somebody else's, another
10 Walgreen employee's investigation or another
11 Walgreen employee's work?
12    A.    Well, through our communications
13 where he says he looked -- he was looking into
14 it, I knew Brett Stacey wasn't filling
15 prescriptions.
16    Q.    Okay. Looking into the
17 situation in general?
18    A.    Looking in -- yes, looking into
19 the issues about which I complained.
20    Q.    Okay. So do you refute or can
21 you refute Brett Stacey if he says to you that,
22 "I didn't look at it personally, I had a
23 Walgreen pharmacist look at it," can you refute
24 that?
25    A.    I can't. I'd think less of him

LINDA M. SHICK

2 but I wouldn't -- I can't refute it.
3    Q.    The same kind of questions with
4 Michael Freeman, would you have any reason to
5 refute Michael Freeman if he says to you, "I
6 didn't look into it personally but I had a
7 Walgreen pharmacist look into it"?
8    A.    I can't -- I can't refute that.
9 I -- I -- I would be very disappointed but I
10 can't refute that.
11    Q.    Are you aware that the computer
12 in question, it's called the Prescriber Profile
13 System? Have you ever heard that term before?
14    A.    "Prescriber Profile"?
15    Q.    Yes.
16    A.    Yes, I have heard that term.
17    Q.    Are you aware that's a
18 confidential system that the lawyers for
19 Walgreens cannot access? Are you aware of
20 that?
21    A.    No, I don't know who has -- I am
22 surprised that their -- that their -- and I
23 don't believe that their counsel -- not all
24 counsel, but there has to be counsel for
25 Walgreens that would have access to that.

55 (Pages 214 - 217)

LINDA M. SHICK

2  Q.  Okay. That's your belief?

3  A.  Yes.

4      How could -- how could Walgreens

5  deal with the department of -- or the Drug

6  Enforcement Agency without having counsel?

7  Q.  Well, they have counsel. That's

8  not my question.

9      My question is, are you aware

10 whether or not Walgreens' corporate counsel,

11 inhouse counsel, has access to the Prescriber

12 Profile System?

13 A.  Well, are we talking about

14 counsel like -- are we talking about access

15 like their counsel can just go on and log in or

16 are we talking about whether or not their

17 counsel can -- has access through channels?

18 Q.  In other words, through other

19 people.

20 A.  Or with assistance, I would

21 expect that their counsel would be able to get

22 that.

23 Q.  Okay. But, I mean, my question

24 really, I don't want to -- it's just a simple

25 question, do you know either way if Walgreens'

LINDA M. SHICK

2  inhouse counsel, which included back then at

3  least Brett Stacey and Michael Freeman, if they

4  had access to the Prescriber Profile System,

5  direct access?

6  A.  I -- I don't -- I don't know

7  that.

8      MR. SANZO: Okay. That's all I

9  have got. Thanks.

10     THE WITNESS: Okay.

11     MR. BOLDEN: Thank you.

12     THE WITNESS: Thank you.

13     VIDEO TECHNICIAN: No questions?

14     The time now is 1325. This

15 concludes the deposition. End of Tape

16 2 of 2.

17         - - -

18     (Witness excused.)

19         - - -

20     (Deposition concluded at 1:25

21 p.m.)

22         - - -

23

24

25

LINDA M. SHICK

2      CERTIFICATE

3

4      I do hereby certify that I am a

5  Notary Public in good standing, that the

6  aforesaid testimony was taken before me,

7  pursuant to notice, at the time and place

8  indicated; that said deponent was by me duly

9  sworn to tell the truth, the whole truth, and

10 nothing but the truth; that the testimony of

11 said deponent was correctly recorded in machine

12 shorthand by me and thereafter transcribed

13 under my supervision with computer-aided

14 transcription; that the deposition is a true

15 and correct record of the testimony given by

16 the witness; and that I am neither of counsel

17 nor kin to any party in said action, nor

18 interested in the outcome thereof.

19

20     WITNESS my hand and official seal

21 this 1st day of May, 2015.

22

                    Denni A. Gal

23     _____

24         Notary Public

25

LINDA M. SHICK

2      INSTRUCTIONS TO WITNESS

3      Please read your deposition over

4  carefully and make any necessary corrections.

5  You should state the reason in the appropriate

6  space on the errata sheet for any corrections

7  that are made.

8      After doing so, please sign the

9  errata sheet and date it.

10     You are signing same subject to

11 the changes you have noted on the errata sheet,

12 which will be attached to your deposition.

13     It is imperative that you return

14 the original errata sheet to the deposing

15 attorney within thirty (30) days of receipt of

16 the deposition transcript by you. If you fail

17 to do so, the deposition transcript may be

18 deemed to be accurate and may be used in court.

19

20

21

22

23

24

25

```
 1          LINDA M. SHICK
 2          - - - - - - -
 3          E R R A T A
 4          - - - - - - -
 5  PAGE   LINE   CHANGE
 6    ___   ___   _____
 7  Reason for
 8  Change:
 9    ___   ___   _____
10  Reason for
11  Change:
12    ___   ___   _____
13  Reason for
14  Change:
15    ___   ___   _____
16  Reason for
17  Change:
18    ___   ___   _____
19  Reason for
20  Change:
21    ___   ___   _____
22  Reason for
23  Change:
24
25  ASSIGNMENT NO: 2051772
```

```
 1          LINDA M. SHICK
 2      ACKNOWLEDGMENT OF DEPONENT
 3       I, _____, do
 4  hereby certify that I have read the foregoing
 5  pages ___ to ___ and that the same is a
 6  correct transcription of the answers given by
 7  me to the questions therein propounded, except
 8  for the corrections or changes in form or
 9  substance, if any, noted in the attached Errata
10  Sheet.
11
12
13  DATE             SIGNATURE
14
15      Subscribed and sworn to before me
16  this ___ ___ day of _____,
17  2015.
18
19          My commission expires:
20      _ _____
21
22
23      Notary Public
24
25
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

**&**

& 2:3 78:16 80:5
  94:7 102:11,22
  120:23 184:20
  206:2,9,11 207:3,16
  208:2

**0**

00:02:14  20:17
01656  1:7 5:15
09  46:25 71:19
  115:8

**1**

1  3:11 10:9,11 12:6
  13:4 126:24 129:18
  129:19 153:7
  199:16 200:12
10  3:11,24 92:11
  100:13 109:8,11
  110:7 115:8
100  2:4
10:02  26:10,16
10:10  33:8
10:11  33:14
11  41:13
11-11  95:21
11:09  92:5
11:21  92:14
11:25  32:14
11:35  105:19
11:36  107:7
11:55  128:13
11:56  129:16
11th  34:19 35:20
  96:8,8
12  47:8
1220  2:13
12:01  39:12
12:10  144:5
12:11  145:23
12:16  151:4
12:23  152:7
12:25  154:25

12:27  155:24
12:44  175:4
12:45  176:12
12:56  188:5
12:57  189:3
12th  25:5,10 47:6
13  191:10,17
1306  198:10 199:4
1309  202:11
1310  203:17
1325  219:14
13th  25:5
14  3:12 20:18,21,23
  21:6,8 58:18 61:18
1515  2:13
16  3:13 15:5 62:20
  200:11
17  18:3 55:17 57:7
  64:12,17 66:24
  200:23
17th  25:6 65:24
  66:22
18  68:6,15 201:2
1800  1:24
1801  1:24
1818  2:8
18901  1:12
18th  24:23 25:6
  67:13
19  201:3
19102  2:13
19103  1:25 2:8
19110  2:5
1972  6:24
1992  7:9
1st  220:21

**2**

2  3:12 13:22 14:17
  14:19,25 20:18,20
  20:23 21:6,7 23:8
  30:9 39:3,3,11 42:2
  43:9 45:5,15,20
  47:2,7 48:13 55:11
  57:23,23 58:18

62:20 66:3 68:6
  92:15 163:5,18
  219:16,16
20  1:8 5:5 107:18
  201:5
2000  57:2 190:20
2001  7:11 112:10,17
2002  57:3
2007  50:6,14
2008  12:11 126:23
  129:20
2009  7:14,25 12:9
  13:4 16:8,12,16
  18:3 24:23 28:12
  42:11 43:13 47:9
  55:17 57:8 59:7
  62:8 63:12 64:12,17
  66:24 68:6,15 69:9
  72:10 74:3 97:6
  101:22 108:2,18
  126:23 129:19
  130:14 132:6 134:8
  134:12 135:5
  136:12 137:4
  140:21 142:16
  143:22 146:12
  147:11 150:4 153:6
  154:2 158:23
  162:19,25 163:10
  163:20 164:11
  165:25 177:17
  182:22 183:3
  186:12 187:16,16
  190:21 200:13
  213:10
2010  25:20 26:23
  27:11 28:10 30:23
  41:13 42:11 43:14
  47:13 60:11,12,16
  60:19 62:8,13 72:10
  74:4 97:7,20 98:18
  98:19 99:22 101:22
  103:22 108:2,19
  162:20 163:2 164:2
  164:5,7 165:4

166:15 167:14,15
  168:8 169:21 170:3
  170:15,25 171:22
  177:12 179:12,15
  179:19 180:23
  182:20,23 183:3,10
  183:22,24 185:4,9
  186:10,22 187:7,17
  190:22 191:10,17
  201:4 215:8
2011  102:3,15
2012  99:20 141:17
2013  60:23,24 61:15
  61:19 62:3 201:10
2014  3:14 13:5 15:5
  62:20 63:4,4,10
  75:22 134:13 195:4
  200:14
2015  1:8 5:6 75:23
  76:7 99:18 119:13
  140:21 220:21
  223:17
2051772  222:25
209  3:5
21  201:6
215  3:6
215.563.6161  2:5
215.999.5774  2:14
22  201:8
23  27:11 167:15
  201:10,15
2300  2:4
23rd  169:13
25  52:2
26  3:15 28:10
  162:20 163:2 164:7
  165:3 166:15
  167:14 168:8
  170:15 171:22
  177:12 182:19
  186:10 187:7
  190:22 201:15
267.238.9884  2:9
26th  169:12,13

**27** 16:15 201:19
**2:14** 1:7 5:15

**3**

**3** 3:15 25:25 26:4,20
164:6 165:4
**30** 30:23 221:15
**30th** 39:5,12,19
**31** 3:17
**32** 3:18
**34** 3:19
**35** 3:20
**36** 3:21 201:19
**37** 201:23
**3740** 2:8

**4**

**4** 3:17 31:12,13,15
147:11 171:21
**40** 3:6
**42** 201:23
**44** 1:11 5:9

**5**

**5** 3:18 32:17,19
33:17
**5/7/09** 3:11
**5627** 27:15
**5th** 17:18 130:18
132:19 133:2,6,17
133:18,25 150:4

**6**

**6** 3:5,19 34:6,7,8,11
**6/12** 3:24 46:20
**6th** 133:25

**7**

**7** 3:20 12:9 16:12
28:12 35:10,12,17
41:2 69:8 126:23
134:8,12 135:5
136:12 137:4
142:15 143:22
146:12 147:11
150:4 153:6 154:2
158:23 162:19,25

190:21
**7/26/10** 3:15
**7th** 132:23 133:2,22
133:25

**8**

**8** 3:21 36:20,22 37:9
127:6
**8/12** 25:13 67:21
**8/13** 25:14 67:22
**8/13/10** 3:21
**8/17** 25:14,16 67:23
**8/19** 23:9,9
**8/3/2010** 32:14

**9**

**9** 3:22 92:10 94:14
95:5,20 96:13,14
97:2 109:20 113:12
114:20 127:6,9
136:12 154:2
190:20
**92** 3:22,24
**9:41** 10:17
**9:45** 12:2

**a**

**a.m.** 1:13 5:7 32:14
**ability** 9:16 37:21
120:7
**able** 43:6 86:24
139:9,13 165:10
179:25 211:10,20
218:21
**absolutely** 24:3
105:10 107:16
**access** 161:23
215:12,17 217:19
217:25 218:11,14
218:17 219:4,5
**accident** 100:25
101:2
**accurate** 42:6
221:18
**accurately** 20:12

**acknowledge** 174:7
**acknowledgement**
212:9
**acknowledgment**
223:2
**acting** 159:8,12
196:12
**action** 1:4 166:10
184:12 220:17
**actions** 13:15
147:12 158:23
177:14
**acts** 200:7
**actual** 59:6 75:25
126:18
**ad** 200:21
**additional** 102:19
**address** 12:21,25
164:15 167:17
**admissible** 124:4,7
**admission** 142:10
143:12
**admit** 139:7
136:14 137:5,12
142:17 170:17
171:4
**advanced** 16:4
**advice** 52:17
**advise** 9:13 33:21
34:4 39:17 186:19
**advised** 13:4 23:23
134:19 166:23
167:16 171:8
**advising** 27:6 77:17
86:14
**advocate** 159:9,13
**affair** 60:10
**affect** 154:16 156:23
**aforesaid** 220:6
**age** 7:4
**agency** 13:9 21:15
27:8 29:4 131:9
139:16 168:10
169:20 170:11

218:6
**ago** 22:15 41:2 50:5
50:23 51:25 64:6,6
70:12 75:24 76:2
78:6 94:7 185:3
191:22 193:25
**agony** 14:5
**agree** 133:19 203:10
**agreed** 69:21 86:6
**agreement** 141:11
**ahead** 25:18 40:22
176:25 177:22
**aid** 175:21
**aided** 220:13
**airplane** 206:18
**al** 5:12
**allegation** 145:13
198:4 203:25 204:2
205:16
**allegations** 96:13
122:8 197:25
199:13,24 200:5,7
201:17 202:4
212:15
**alleged** 113:16
123:16,18 125:9,10
132:18 142:10
143:12 146:10
156:22 161:6
166:12 190:4,16
195:2 197:11
**allegedly** 82:3 88:15
88:19 89:13 91:9
115:2,2 121:12
122:14 141:24
142:19 187:19,24
190:3,11 200:15
215:14
**alleges** 203:21
**allentown** 53:13
**allowed** 12:17
**altered** 202:22
**alternative** 51:13
**amended** 83:9,10
93:10,11 114:14,22